```
 1              IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 2                            CIVIL DIVISION

 3

 4      ERIN SMITH, ET AL.           )

 5           PLAINTIFFS,             )

 6                                   )

 7      VS.                          )     CASE NO. 1:21-CV-02170 (FYP)

 8                                   )

 9      DAVID WALLS KAUFMAN, ET AL.)

10           DEFENDANTS.             )

11

12      ******************************************************

13              NON-STENOGRAPHIC VIDEOTAPED DEPOSITION

14                          OF ERIN SMITH

15                          VOLUME 1 OF 1

16                          MARCH 6, 2025

17      ******************************************************

18      NON-STENOGRAPHIC DEPOSITION OF ERIN SMITH, HAVING BEEN DULY SWORN

19      BY TRACI FRAZIER, NOTARY PUBLIC IN AND FOR THE STATE OF MARYLAND.

20      THE WITNESS APPEARED REMOTELY FROM MONTGOMERY COUNTY, MARYLAND,

21      FROM 10:01 A.M. TO 2:37 P.M. EST, PURSUANT TO FEDERAL RULES OF

22      CIVIL PROCEDURE AND ANY PROVISIONS STATED ON THE RECORD OR

23      ATTACHED HERETO, AND SKRIBE, INC.'S TERMS & CONDITIONS OF

24      SERVICE.

25
```

| | |
|---|---|
| 1 | **APPEARANCES OF COUNSEL** |
| 2 | |
| 3 | ON BEHALF OF ERIN SMITH, ET AL., PLAINTIFFS: |
| 4 | DAVID P. WEBER |
| 5 | RICHARD J. LINK |
| 6 | GOODWIN WEBER PLLC |
| 7 | 11115 LAKE VIEW LANE |
| 8 | SUITE 1698 |
| 9 | BERLIN, MARYLAND 21811 |
| 10 | 301-850-7600 |
| 11 | DAVID.WEBER@GOODWINWEBERLAW.COM |
| 12 | RICHARD.LINK@GOODWINWEBERLAW.COM |
| 13 | APPEARED VIA VIDEOCONFERENCE |
| 14 | |
| 15 | ON BEHALF OF DAVID WALLS KAUFMAN, DEFENDANT: |
| 16 | HUGHIE D. HUNT |
| 17 | KEMET HUNT LAW GROUP |
| 18 | 7845 BELLE POINT DRIVE |
| 19 | GREENBELT, MARYLAND 20770 |
| 20 | 301-982-0888 |
| 21 | HHUNT@KEMETHUNTLAW.COM |
| 22 | APPEARED VIA VIDEOCONFERENCE |
| 23 | |
| 24 | |
| 25 | |



1                    **APPEARANCES OF COUNSEL (CONT.)**

2

3   ALSO PRESENT:

4         TRACI FRAZIER, NOTARY

5         CAMRON, JORDAN, COURT REPORTER FOR VETERAN REPORTERS

6         DAVID KAUFMAN, DEFENDANT

7         APPEARED VIA VIDEOCONFERENCE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ERIN SMITH V. 06/13/2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1                    INDEX TO EXAMINATION

 2

 3   EXAMINATION                                        PAGE

 4   EXAMINATION BY MR. HUNT                            10

 5   EXAMINATION BY MR. WEBER                           71

 6   EXAMINATION BY MR. HUNT                            72

 7   EXAMINATION BY MR. WEBER                           96

 8   EXAMINATION BY MR. HUNT                            111

 9   EXAMINATION BY MR. WEBER                           124

10

11

12                    INDEX TO EXHIBITS

13

14   PLAINTIFFS'              DESCRIPTION               PAGE

15   EXHIBIT 1                PLAINTIFF'S SECOND AMENDED COMPLAINT  23

16   EXHIBIT 2                PROGRESS NOTES FROM PFC ASSOCIATES   39

17   EXHIBIT 3                MPD INJURY REPORT                    47

18   EXHIBIT 4                CERTIFICATE OF DEATH                 56

19   EXHIBIT 5                DECLARATION OF DR. JONATHAN L. ARDEN  58

20   EXHIBIT 6                STATEMENT OF PATRICK J. SHEEHAN MD   73

21

22   DEFENDANTS'              DESCRIPTION               PAGE

23   EXHIBIT 1                ARDEN FORENSICS DATED 02/28/2025     104

24   EXHIBIT 2                FIFTH AVENUE FORENSICS AUTOPSY       108

25
```

1            MS. DEY:  Good morning, everyone.  We are on the record.

2     Today's date is March 6th, 2025, and the time is 10:01 Eastern Time.

3     And this is an oral non-stenographic deposition of Erin Smith, taken

4     under Erin Smith, et al., v. David Walls-Kaufman, et al., in case number

5     1:21-CV-02170, FYP, and today's deposition is being conducted remotely.

6     I will now introduce Traci Frazier.  She will give the oath.

7            THE NOTARY:  My name is Traci Frazier, certified notary in

8     the state of Maryland.  I'm administering the oath from 21552 Thames

9     Avenue, Suite 203, Lexington Park, Maryland, St. Mary's County, and the

10    witness is located in Montgomery County.  By entering this Skribe event,

11    parties present have agreed to Skribe's terms of service and acknowledge

12    this deposition is occurring non-stenographically and is being recorded

13    by the scheduling attorney through Zoom.

14           Would counsel please state their appearance and locations for

15    the record.

16           MR. WEBER:  Okay.  Before we state our -- our names for the

17    record, you just recited something that is inappropriate and we object.

18    We do not agree to the terms and conditions of Skribe.ai.  We specifically

19    object to the terms and conditions of Skribe.ai.  This is Dr. David

20    Weber.  I am one of the attorneys for the plaintiff.  We were required

21    purportedly to accept a contract of adhesion that stated terms and

22    conditions of Skribe.ai simply to enter into this Zoom room.  That is

23    inappropriate.  It is not required by the Federal Rules of Civil

24    Procedure, Rule 30.  And we object.

25           We do not agree to that and that -- and the witness is not



1  agreeing to that by taking an oath here today.  In fact, we're so

2  concerned about the trustworthiness and reliability of whatever is being

3  conducted here today using Skribe.ai that we have engaged our own court

4  reporter, and our own court reporter is in the Zoom room and will swear

5  the witness later.

6          Ms. Frazier, if you wish to render an oath to the witness

7  that is appropriate, you are welcome to do so, but I will instruct my

8  client to not agree to what you just read because she is not agreeing

9  to the terms and conditions.

10          THE NOTARY:  Okay.

11          MR. WEBER:  If you want to ask her to swear an oath to tell

12  the truth, the whole truth, and nothing but the truth, you can.

13          MR. HUNT:  Okay.  Weber, can you just stop?  I mean, seriously?

14  Seriously?  I mean, it's 9:00 -- 10:00.  Relax.  So what do you want to

15  do?

16          MR. WEBER:  No.  I'm -- I'm -- I'm very bothered by this.

17          MR. HUNT:  I mean -- I mean -- I mean, let's -- let's just

18  cut it out.  I mean, seriously?  It's a deposition.  So do you want --

19  I mean, are you saying you don't want to have a deposition?  You're --

20  you're not agreeing to this when I sent you the --

21          MR. WEBER:  No.  I'm not agreeing to what she just read.

22          MR. HUNT:  What -- what are you doing?

23          MR. WEBER:  I'm not agreeing to what she just read, and I

24  won't have my client accept it.

25          MR. HUNT:  Okay.  So I mean, the point -- that -- that's a -

ERIN SMITH V.                                                MARCH 06, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   | - that's bizarre, David.

2   |          MR. WEBER:  No.  It's not bizarre, Hughie.  If you read the

3   | terms and conditions, it's not bizarre at all.

4   |          MR. HUNT:  It's -- it's -- it's -- it's -- it's bizarre.  So,

5   | I mean, this -- this is the day of the deposition.  You've had this

6   | notice for six days.  What is the problem?

7   |          MR. WEBER:  We didn't find out the terms and conditions until

8   | we clicked accept to enter into the Zoom room, Hughie.

9   |          MR. HUNT:  Okay.

10  |          MR. WEBER:  It literally just popped up on the screen and

11  | would let us in.

12  |          MR. HUNT:  I -- I understand that, but this is just

13  | ridiculous.

14  |          MR. WEBER:  Okay.

15  |          MS. DEY:  Can I -- can I interject for a minute?  Erin is

16  | only going to be agreeing that she's going to be giving her testimony

17  | truthfully.  That's all she's agreeing to.

18  |          MR. WEBER:  That's fine, but, Brenda, that's not what --

19  | that's not what Traci just said.

20  |          MS. DEY:  That -- that's for the --

21  |          MR. WEBER:  If you want -- if you want to -- an oath -- if

22  | Traci wants to read an oath as a deponent officer, that she agrees to

23  | tell the truth, the whole truth, and nothing but the truth, so help her,

24  | Traci can do that, but that's not what Traci just read.

25  |          MS. DEY:  That -- that's what --

1          MR. WEBER:  And if we had a transcript, we could read it back,

2     but we don't have a transcript.

3          MS. DEY:  We -- we have a transcript.  It's there.  And she's

4     going to swear in the witness right now.  The witness is not agreeing -

5     -

6          MR. WEBER:  Right.  But what she -- but what she just read

7     and she just said was not part of the oath.  So --

8          MS. DEY:  Yes.  And you didn't let her -- you didn't let her

9     finish because her next -- the next thing out of her mouth was going to

10    be, I will now swear in the wetness.

11         MR. WEBER:  I understand.  But before that, she read a whole

12    thing and said that everybody here is agreeing to something, and we're

13    not agreeing to it.

14         MS. DEY:  Okay.  So you -- you've been --

15         MR. WEBER:  We're not agreeing to anything.

16         MS. DEY:  Okay.

17         MR. WEBER:  The only thing she's agreeing to is to tell the

18    truth, the whole truth, and nothing but the truth or whatever oath is

19    required in the state of Maryland.  That's it.

20         MS. DEY:  Okay.  That's fine.

21         Go ahead, Traci.  You may swear in the witness now.

22         THE NOTARY:  Thank you.  I will now swear in the witness.

23         Erin Smith, will you please raise your right hand.

24                         ERIN SMITH,

25         having first been duly sworn, testified as follows:

1          THE NOTARY:  For the record, we have provided the last four

2     numbers of your valid government-issued identification from the State

3     of Virginia, Fairfax County as numbers 4955; is that correct?

4          THE WITNESS:  Yes, ma'am.

5          MS. DEY:  Thank you, Traci.  I'll now turn it over to the

6     court reporter.  You may introduce yourself and swear in the witness.

7          MR. JORDAN:  Thank you.  Due to the unusual nature, and I'm

8     -- I'm quite unsure how this is supposed to play out, so I'm just going

9     to do what I normally do.  I have a read-in of my own.  My name is Camron

10    Jordan.  I'm the court reporter, who'll be taking today's testimony with

11    the national firm of Veteran Reporters, Incorporated.

12          Today is the 6th day of March 2025.  The time is approximately

13    10:07 a.m. We're meeting remotely via Zoom video conference to take the

14    deposition of Erin Smith in the matter of Erin Smith, et al. v. David

15    Walls-Kaufman, et al., pending in the Superior Court of the District of

16    Columbia, case number 1:21-CV-02170 (FYP).

17          Will counsel please identify yourselves for the record

18    stating your name, firm address, and whom you represent?

19          MR. WEBER:  Sure.  Before I do that, I just need to correct

20    something you said, Mr. Court Reporter.  I apologize.  This case is not

21    pending in the Superior Court.  It's pending in the United States

22    District Court for the District of Columbia.

23          On behalf of the plaintiffs, this is Dr. David Weber.  I am

24    an attorney at Goodwin Weber, PLLC.  Our mailing address is Goodwin

25    Weber, PLLC, 11115 Lakeview Lane, 1698 Berlin, Maryland, 21811.  And I

1    will let my co-counsel introduce himself.

2            MR. LINK:  Good morning.  I'm Richard Link on behalf of the

3    plaintiffs as well.  I have the same business address as David Weber.

4    And I'm here in person with the deponent, Erin Smith.

5            MR. HUNT:  And good morning.  My name is Hughie Hunt.  I am

6    at 2503 Chesterfield Avenue, Baltimore, Maryland.  I represent defendant

7    David -- Dr. David Walls Kaufman.

8            MR. JORDAN:  Thank you, Counsel.  Are there any observers

9    present?

10           MR. HUNT:  I do expect my client to log in at some point.

11   He's stuck in traffic, but --

12           MR. JORDAN:  At that -- at that time, if your client could

13   introduce themselves and just -- so that we have a record that they're

14   present for the deposition.

15           Will the deponent please state your full -- state your full

16   legal name and address for the record.

17           THE WITNESS:  Erin Smith.  Alexandria, Virginia.

18           MR. JORDAN:  Thank you, Ms. Smith.  Please raise your right

19   hand to be sworn.  Do you solemnly swear or affirm the testimony you

20   give today will be the truth, the whole truth, and nothing but the truth,

21   so help you God?

22           THE WITNESS:  Yes.

23           MR. JORDAN:  Counsel, you may proceed.

24                        EXAMINATION

25   BY MR. HUNT:



ERIN SMITH, ET AL. v. David Walls-Kaufman, et al.    March 4, 2025
Case 1:21-cv-02170-ACR    Document 80-7    Filed 05/09/25    Page 11 of 135
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1    Q    Okay.  Good morning, Ms. Smith.  My name is Hughie Hunt.  We

2    haven't formally met.  I represent Dr. David Walls-Kaufman.

3         Have you ever had your deposition taken before?

4    A    No, sir.

5    Q    Just wanted to explain a few kind of background of what it

6    is.  This is a recorded conversation.  There will be a transcript of

7    this proceeding that will be used in -- in -- in this proceeding.  So

8    the first kind of rule of the game is, it's important to give verbal

9    responses.  A lot of times, nonverbal responses, people shake their head

10   uh-huh, yes, nod.  But it's important to give verbal responses if you

11   could try to do that for me.

12        It just makes it a little bit cleaner for the record; is that

13   fair?

14   A    Yes, sir.

15   Q    Okay.  And I'm going to ask a series of questions related to

16   this lawsuit that you filed.  If you don't understand my question, it's

17   perfectly reasonable to tell me you don't understand, and I'll do my

18   best to ask a better question.

19        If you answer my question as presented, I'm going to under -

20   - I'm going to -- I'm going to assume you understood the question and

21   just answered it the best way you knew how; is that fair?

22   A    Yes, sir.

23   Q    Okay.  And so this is not a marathon.  If you need a break,

24   just let me know.  It's now 10:11.  I -- I try to break every hour.  I

25   don't expect this to, you know, last seven hours or whatever we're

1    allowed.  But if at any time you need a break, just let me know.  We can

2    take a break, okay?

3        A    Yes.

4        Q    Okay.  And so obviously, this is a very sensitive case.

5    You've experienced some loss here.  I'm not trying to offend you.  I am

6    just here to ask you some questions about some very emotional topics.  I

7    understand that.  I'm just going to try to get through it, but again,

8    I'm just trying to do my job.  I'm not here to -- to offend you or to

9    berate you.  I'm just going to ask you a series of questions and just

10   understand, I'm just trying to do my job the best way I know how, okay?

11            All right.  So what's your occupation, ma'am?

12       A    (No audible response).

13       Q    I'm sorry.  I didn't hear you.

14       A    Currently, I am -- currently, I am unemployed.

15       Q    Okay.  What -- what was your occupation before you became

16   unemployed?

17       A    I worked in a nonprofit.

18       Q    And what did -- what kind of work did you do for the nonprofit?

19       A    I was the director of their first responder branch.

20       Q    Okay.  And so what were your duties?  What does that -- what

21   did you do for --

22       A    I worked to provide better mental health for first responders,

23   whether it was fire, law enforcement, dispatch, or EMS.

24       Q    Okay.  And how long did you do that?

25       A    For six months.



```
 1        Q     Okay.  And what was the time period --

 2              MR. WEBER:  Excuse me.  Just -- I'm sorry.  Mr. Hunt, just

 3   one more thing.  I just wanted to clarify for the record that her

 4   testimony, and the same could have been for your client last week, that

 5   this is marked sensitive under the Court's protective order.

 6              MR. HUNT:  I have no problem with that.

 7              MR. WEBER:  Thank you.  I'm sorry to interrupt.

 8   BY MR. HUNT:

 9        Q     And you said for six months, ma'am?  That you worked in this

10   job?

11        A     Correct.

12        Q     Okay.  And so --

13        A     Yes.

14        Q     -- when did that start and when did that end, specifically?

15        A     Approximately July of 2024, and ended in approximately

16   February of 2025.

17        Q     Okay.  And so before that, where did you work?

18        A     I worked for an executive search firm in Washington, D.C.

19        Q     And what did you do for them?

20        A     I was a project manager managing searches for legal counsel.

21        Q     Okay.  All right.  And you mean, like, if somebody wanted to

22   get a lawyer, did you have, like, a website and they would go to your

23   website, or can you explain that?

24        A     Or if you were Google and you were looking for a general

25   counsel, you would approach the company, and we would do research and
```

1  find you options, and go through the entire process from contracting

2  through hiring.

3       Q    Oh, okay.  Okay.  And how long did you work there?

4       A    Approximately four years.

5       Q    Okay.  For -- and -- and can you give me that time period?

6       A    (No audible response).

7       Q    The dates, ma'am.

8       A    Right.  Fall of 20 -- or fall of 2019 until spring of '23.

9       Q    Okay.  And so where did you -- did you -- what's your highest

10  level of education?

11       A    I have two bachelor's degrees.

12       Q    And where are they from?  And what are -- what are -- what is

13  the emphasis or background?

14       A    The first one is from Florida State University.  I have a

15  degree in family/child and consumer sciences with a minor in

16  communications. My second degree is from Bowling Green State University.

17  I have a degree, a Bachelor's of Science in sport management and a minor

18  in business.

19       Q    Okay.  And what year did you obtain those degrees?

20       A    2006 and 2009.

21       Q    Okay.  All right.  And so can you tell me how you met your

22  husband?

23       A    I met him through an app.

24       Q    Okay.  And when and -- when and where did you meet?

25       A    We met in 2015 in Virginia.



1    Q    Okay.  And then after you met, you started dating?

2    A    Correct.

3    Q    Okay.  And then when -- when did you get married?

4    A    We got married February 2nd, 2019.

5    Q    Okay.  And at the -- you -- you were working at the ex -- I

6  think you said the executive search firm; is that correct?  At the time

7  you were --

8    A    The -- no.

9    Q    Okay.  Where were you working at at the time you got married?

10   A    An educational production company in Virginia.

11   Q    Okay.  And what were you doing for them?

12   A    Contracting talent for their product.

13   Q    Okay.  Okay.  And so now, when you were married to -- to your

14  husband, what -- what -- how -- how was he employed?

15   A    He worked for the Metropolitan Police Department.

16   Q    Okay.  And so as long as you've been married to him, he worked

17  in the -- for the Metropolitan Police Department?

18   A    Yes.

19   Q    Okay.  And what -- when you were first married to him, what

20  -- what -- what was his assignment or what -- where was -- what was he

21  doing for the MPD?

22   A    He was a patrol officer.

23   Q    Okay.  And at -- at some point, did that change?

24   A    No, sir.

25   Q    Okay.  So he -- he was always a patrol officer?

1       A     Yes.

2       Q     Okay.  And now, as far as the defendants in this case, do you

3   know Dr. David Walls-Kaufman?

4       A     Can you repeat that?

5       Q     Do you know -- well, it's probably a bad question.  Before

6   you filed this lawsuit, did you have any personal acquaintance with Dr.

7   David Walls-Kaufman?

8       A     No.

9       Q     And before you filed this lawsuit, did you have any personal

10  acquaintance -- acquaintance with Taylor F. Taranto?  I think that's his

11  name.

12      A     No.

13      Q     And to your knowledge, your husband, your late husband,

14  Jeffrey Smith, did he have any acquaintance with David, Dr. David Walls-

15  Kaufman?

16      A     No.

17      Q     And did he have any acquaintance with defendant Taylor

18  Taranto?

19      A     No.

20      Q     Okay.  Now, you filed a -- a -- a lawsuit in this case as the

21  surviving spouse and as a plaintiff against Dr. David Walls-Kaufman and

22  Taylor Taranto; is that correct?

23      A     Yes.

24      Q     And can you tell me what led you to name Dr. David Walls-

25  Kaufman as a defendant?

ERIN SMITH V. DAVID                                          March 7, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1        A    My counsel did an investigation.

2        Q    Okay.  And so your counsel.  And you mean Dr. Weber?

3        A    Yes.

4        Q    Okay.  And -- well, and -- and -- and what did he find?

5        A    Can you repeat the question?

6        Q    You said that your counsel, Dr. Weber, did an investigation,

7   and that led you to name Dr. David Walls-Kaufman as a defendant in this

8   case, correct?

9        A    Yes.

10       Q    And I guess the -- the question is, what evidence did he find

11  to suggest that Dr. David Walls-Kaufman should be named as a defendant,

12  to your knowledge?

13       A    To my knowledge, he found video evidence.

14       Q    Okay.  And --

15       A    Between my --

16       Q    I'm sorry.  You -- you can -- I -- I thought you were done.

17  Did you have anything else to -- to say?

18       A    No, sir.

19       Q    Okay.  He found video evidence.  And -- and -- and what video

20  evidence was that?

21       A    Video evidence of the events in the United States Capitol.

22       Q    Okay.  And -- and based on that video evidence, is that what

23  led you to name Dr. David Walls-Kaufman as a defendant?

24       A    Correct.

25       Q    Okay.  And when you say video evidence, are you referring to

 1  the open source video that you attached to your complaint?

 2       A    Yes.

 3       Q    Okay.  So I'm going to take you back to January 6th of 2021.

 4  Where were you that day?

 5       A    At my house.

 6       Q    Okay.  And that was -- was that located in Virginia at the

 7  time?

 8       A    Yes.

 9       Q    Okay.  And where was your -- was your husband with you that

10  day before he left to go to work?

11       A    Yes.

12       Q    Okay.  And -- and what time did he leave --

13       A    Yes.

14       Q    What time did he leave to go to work that day?

15       A    Approximately 1:00 p.m.

16       Q    Okay.  And then where was he assigned on that day with the

17  Metropolitan Police Department?

18       A    He was assigned to the Second District.

19       Q    Okay.  And so at some point, he was at the United States

20  Capitol building; is that correct?

21       A    Yes.

22       Q    Okay.  And so do you know how he -- did you talk to him about

23  when he was going over there or how did he -- do you know any -- have

24  any knowledge of how he ended up being assigned there to the Capitol

25  that day?

1        A    So he was assigned to a civil disturbance unit to be downtown,

2   and his civil disturbance unit was ordered to be there at the Capitol.

3            MR. JORDAN:  I apologize for interrupting.  It seems like Ms.

4   Smith's signal has -- has broken up.

5            MR. HUNT:  Yeah.  We -- do you have any internet problems,

6   Mr. Link?

7            MR. LINK:  Unstable.  We can hear you.

8            MR. HUNT:  Yeah.  You -- you -- you're under a little bit of

9   a delay, it seems.

10           MS. DEY:  Could you possibly move the monitor a little bit

11  closer to Ms. Smith?  That might help.

12           MR. LINK:  It just said it was -- it was unstable, but we can

13  hear you.

14           MR. HUNT:  Yeah, you're freezing up and it's -- sometimes

15  it's a little bit difficult to hear.  Ms. Smith.

16           MR. JORDAN:  If I may suggest, the blurred background can

17  sometimes limit your bandwidth.  If you remove the blurred background,

18  it may help your signal.

19           MR. WEBER:  I -- unfortunately, I -- I know where they are.

20  They're in our Gaithersburg office.  And are you guys able to get closer

21  to the door?  Like, I don't know where you are in the room.

22           MR. LINK:  Well, it's a fishbowl.

23           MR. WEBER:  Okay.

24           MR. LINK:  What's near the door?

25           MR. WEBER:  Well, then, yeah, the signal should be good then.

```
 1              MR. HUNT:  Well, we can go off the record for a second if --
 2  you know, I don't think we need this --
 3              MR. WEBER:  Well, it's looking like it's better now.  You see
 4  the signal next to her name turn white from where it was yellow and red
 5  before.
 6              MR. LINK:  Oh, wow.  Yeah.  Is that better?
 7              MR. WEBER:  I mean, again, it looks like it's better to me
 8  that the signal has turned white to the left of her name.  I don't know
 9  if that means it's better bandwidth.  So the court reporter might have
10  been right by changing the blur.
11              MR. JORDAN:  We can proceed and see how it goes.  If I can't
12  here, I'll just ask for -- for you to repeat.  And if you could, please
13  repeat your last question and answer.
14  BY MR. HUNT:
15      Q    Okay.  I actually forgot my last question, but let me see
16  here.  So I think we were talking about -- we last we're -- we're talking
17  about the unit that your late husband was assigned to.
18              And that was the civil disturbance unit, correct?
19      A    Yes.
20      Q    And -- and that's how he ended up at the Capitol on January
21  6th of 2021?  I think you told me that.
22      A    Correct.  Correct.
23      Q    Okay.  Now, were you in communication with him at that time?
24      A    No.  So he -- the first communication I had from him was, he
25  sent a text message that said, London had fallen.
```

1      Q      Okay.  Yeah.  I thought I -- I think I saw that.  And then

2   that was while he was in the Capitol?

3      A      Correct.

4      Q      Okay.  Now, and -- and you were -- you had a -- a -- an

5   exchange with him by text.  Did he ever mention being assaulted at the

6   Capitol in that exchange?

7      A      No.

8      Q      And so and -- and we can agree you weren't at the Capitol.

9   We -- we can agree on that, on January 6th, 2021.  We can agree that you

10  weren't there, correct?

11     A      Yes, I was -- yes, I was not there.

12     Q      And we can agree that you didn't see Dr. David Walls-Kaufman

13  or any of his actions on that day.  You didn't see anything.  We can

14  agree on that?

15     A      No.  Correct.  Yes, we can agree.

16     Q      And now part of your complaint, and I'm going to pull it up

17  here, is that Mr. Taranto and mister -- or Dr. David Walls-Kaufman were

18  involved in a conspiracy, correct?

19     A      Yes.

20     Q      Okay.  And as you sit here today, do you have any evidence or

21  knowledge of anything that Taranto or Dr. David Walls-Kaufman as far as

22  any communication before January 6th of 2021?

23            MR. WEBER:  Objection.  It calls for a legal -- it -- it --

24  it calls for her to provide legal -- the -- the Second Amended Complaint

25  speaks for itself.  Notwithstanding my objection, you can respond.

BY MR. HUNT:

Q    How about I just ask a better question.  Now, you've already told me that Dr. David Walls-Kaufman, you didn't know him before January 6th of 2021, correct?

A    Yes.

Q    And you didn't know the other defendant, Mr. Taranto either, correct?

A    Yes.

Q    And -- and so the -- the -- the -- the question is, do you have any evidence to suggest that they had met before January 6, 2021, defendant Dr. David Walls-Kaufman and Mr. Taranto?

A    Not to my knowledge.

Q    Okay.  And as far as any communication, do you have any evidence that Dr. David Walls-Kaufman and -- and -- and defendant Taranto actually talked to each other before January 6, 2021?

A    Not to my knowledge.

Q    And now, I know we kind of talked about the open source video that you've attached to your complaint, and we'll go through that.

But is it your claim that Dr. David Walls-Kaufman and defendant Taranto were working together during the January 6, 2021, incident?

MR. WEBER:  Objection.

THE WITNESS:  Can you repeat your question?

MR. WEBER:  Well, hold on.  Hold on.  Hold on.  I want to state my objection.  I object.  This is calling for a legal con --

 1  conclusion.  The Second Amended Complaint speaks for itself.  It's very

 2  clear.  I mean, we're all in agreement she wasn't there that day.  So

 3  she's making allegations, and we all agree it's her obligation to prove

 4  them.

 5  BY MR. HUNT:

 6      Q    Okay.  And maybe -- maybe I'll just -- this makes it a little

 7  easier.  I am now sharing my screen.  And I'll just go up here.

 8          MR. HUNT:  This is the Second Amended Complaint.

 9          (Defendants' Exhibit 1 was marked for identification.)

10  BY MR. HUNT:

11      Q    Can you see that, ma'am?

12          MR. WEBER:  Actually, to -- to clarify, I -- I just -- you

13  know, I just want to place on the record, I'm looking at a Word document,

14  or what appears to be a Word document that you have shared on the screen,

15  and the name of the document is Plaintiff's Second Motion for Leave to

16  Amend the Complaint.

17          MR. HUNT:  Yes.

18          MR. WEBER:  So I just want to clarify that at least based on

19  what it's called, I don't know whether this is the Second Amended

20  Complaint.  All we see on your screen at the very top is Plaintiff's

21  Second Motion for Leave to Amend the Complaint.

22          MR. HUNT:  Okay.  And we'll go through it.

23  BY MR. HUNT:

24      Q    But -- so your lawyer filed a motion to -- to -- to amend

25  your complaint.  And what I'm showing you is a part of that motion.  And



```
 1   this is if -- you could see that top, it says, "United States District

 2   Court for District of Columbia."

 3            Do you see that?

 4       A    Yes.

 5       Q    Okay.  And then it has Erin Smith and Erin Smith, personal

 6   representative?

 7       A    Yes.

 8       Q    And Dr. David Kaufman and Taylor F. Taranto.  This is your

 9   Second Amended Complaint.  Do you -- do you recognize this document?

10       A    Yes.

11       Q    Okay.  And so I'm just going to take you to the part that I

12   want to ask you a few questions about.

13            Now in this Paragraph 9, you claim that co-defendant Taranto

14   assisted Dr. Kaufman during a physical altercation with MPD officers,

15   correct?

16            MR. WEBER:  Objection.  I'm, again, stating what I've stated

17   before, this appears to be the Second Amended Complaint.  The Second

18   Amended Complaint is not signed by Ms. Smith.  The Second Amended

19   Complaint is signed by counsel.  This is a legal pleading.  We object

20   to the extent that you are asking her to -- she didn't write this.  It's

21   clear that this was written by counsel.

22            MR. HUNT:  I'm not -- I'm not -- I'm not asking her legal

23   questions.  I'm just asking her what evidence she has to support these

24   allegations.  What -- I mean --

25            MR. WEBER:  So ask her that.
```



ERIN SMITH, ET AL. v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
1              MR. HUNT:  I have to go through the -- the -- the statement,
2    I mean --
3    BY MR. HUNT:
4         Q    Okay.  So in Paragraph 9, it says, "Co-defendant Taranto
5    locked arms or otherwise assisted Kaufman during a physical altercation
6    with MPD officers."
7              What evidence do you have to support that allegation in this
8    case?
9         A    The officer's body cam.
10        Q    Okay.  And other than the officer's body cam, is there any
11   other evidence you have to support that allegation?
12        A    I'm sorry.  Can you repeat the question?
13        Q    You -- you said that the body cam -- the officer's body cam,
14   and I assume you mean your -- your husband's body cam and any other
15   officer present's body cam.
16             Is that what -- is that -- my understanding of your response,
17   is that a correct understanding?
18        A    My husband's body cam.
19        Q    So that's -- you are only relying on your husband's body cam
20   evidence, correct?
21        A    His in addition to the other people that were there that day.
22        Q    Your husband's body cam and any other officer's body cam,
23   correct?  Is that -- is that fair?
24        A    Yes.
25        Q    Okay.
```

1      A      Yes.

2      Q      What other evidence do you have to support that allegation?

3      A      The open source videos.

4      Q      Okay.   And so the open source videos and the body cam.

5 Anything else?

6      A      Not to my knowledge.

7      Q      Okay.  And so now we've already talked about this, after this

8 incident -- after January -- after the incident, when is the first time

9 you got to speak with your husband after the January 6th, 2021, incident

10 at the Capitol?

11     A      I'm sorry, can you repeat that one more time?

12     Q      So when it -- so you said -- you told me earlier that he left

13 home around -- I believe you said around 1:00 p.m. that day?

14     A      Yes.

15     Q      What time did you come back in contact with him?

16     A      We exchanged text messages a few times.

17     Q      Okay.  And then after that, when did you see him in person?

18     A      When he returned home at approximately 3:00 in the morning on

19 January 7th.

20     Q      Okay.  And so at 3:00 in the morning, I know other than the

21 text messages that you've produced, did -- did you have a phone call

22 before three -- 3:00 in the morning?  Did he call you?

23     A      Yes, he let me know he was going to the clinic.

24     Q      Okay.  And so he went to the clinic right after the incident?

25     A      No, sir.

 1       Q      Okay.  What time did he go to the clinic?

 2       A      My best guess would be I remember maybe around 8:00 p.m.

 3       Q      Okay.  And so he called you -- about what time did he call

 4   you that day?

 5       A      Around that time.

 6       Q      Okay.  And what was the nature of the conversation?  What did

 7   he say?

 8       A      He said he was going to the clinic, but not to worry.  And

 9   that was the extent of it.

10       Q      Did he say why he was going to the clinic?

11       A      No.

12       Q      Okay.  Did he mention being in an altercation with Dr. David

13   Walls-Kaufman or defendant Taranto?

14       A      Not when I spoke to him on the 6th.

15       Q      Okay.  And so he goes to the clinic and then you say, after

16   he goes to the clinic, he comes home at 3:00 a.m.?

17       A      Yes.

18       Q      Okay.  And when he comes home at 3:00 a.m. do you talk to

19   him?

20       A      Yes.

21       Q      Okay.  And what's your conversation?  What do you talk about?

22       A      I asked him if he was okay.

23       Q      And what did he say?

24       A      He said that he had been hit in the head and he was fine and

25   I could go to sleep so I could go to work the next day.

 1        Q    Okay.  And at that time, did he tell you about a physical

 2   altercation that he'd been in with Dr. David Walls-Kaufman or defendant

 3   Taranto?

 4        A    Not that I remember.

 5        Q    Not that you remember, or he didn't tell you?

 6        A    I don't remember him saying anything like that.

 7        Q    Okay.  Did he say he had been hit by anything?

 8        A    Yes.  He said he had been hit in the head.

 9        Q    And what was he hit in the head with?

10        A    As far as my recollection, that's all I can remember him

11   saying.

12        Q    Okay.  Did he say he -- where he had been hit in the head?

13        A    At that moment when he returned home, no.

14        Q    Okay.  And did he say it was inside the Capitol when this

15   happened or outside the Capitol?

16        A    I don't remember.

17        Q    Okay.  Did -- now, did you have any -- do you have any

18   recollection or at some point did you -- do you have any information

19   about when and where that happened?

20        A    Can you repeat that?

21        Q    So you told me that he told you he'd been hit in the head,

22   correct?

23        A    Yes.

24        Q    Okay.  And did he say what he was hit in the head with?

25        A    No.

ERIN SMITH, ET AL., vs.                                              March 07, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1          Q    Okay.  At some point, did you get any further information

2    from him about him being hit in the head?

3          A    Yes.

4          Q    And when did you -- what further information did you get?

5          A    That he had been hit in the head and his neck area and he was

6    in pain.

7          Q    Okay.  And any other information?

8          A    Not that I can remember.

9          Q    Okay.  And so he goes -- he comes home at 3:00 a.m. from the

10   clinic and then what happens the next day?

11         A    Then he came home.  I went to sleep.  I went to work the next

12   day.  When I got up from work, I went and checked on him to see how he

13   was doing.

14         Q    Were you concerned?

15         A    Yes.

16         Q    Okay.  And how was he doing that day?

17         A    He said that his head and his neck were hurting.  He was

18   sensitive to light.

19         Q    Okay.  And -- and -- and -- and was this directly related to

20   him being hit in the head with that object?

21         A    To the best of my knowledge, yes.

22         Q    Okay.  So what happened -- did he go to work that day?  What

23   happened next?

24         A    No.  So after he left the clinic and came home, they ordered

25   him back to the clinic on the 14th.  So he was home from the 7th through

1    the 14th.

2        Q    Okay.  And so from the 7th through the 14th, what was going

3    on with him?  Was he -- was his condition improving?

4        A    No.

5        Q    And -- and can you tell me what -- what happened through the

6    7th and the 14th?  Was -- did he go -- did he get more medical treatment

7    or --

8        A    No.

9        Q    Okay.

10        A    He continued to complain that his head hurt, his neck hurt,

11    that he was in pain.  He was not sleeping.  He was sensitive to light.

12        Q    Okay.  And what did he attribute that pain and -- to at that

13    point?

14        A    He had said that he had been hit.  He was involved in hand-

15    to-hand combat.

16        Q    Okay.  And so you're saying he had -- well, you -- you already

17    told me he had been hit -- and hit with that object.  But he told you

18    he was in hand-to-hand combat as well?

19        A    Yes.

20        Q    Okay.  Did he mention Dr. David Walls-Kaufman or defendant

21    Taranto?

22        A    No.

23        Q    Okay.  And did he go seek further medical treatment?

24        A    No.

25        Q    And were you concerned?

ERIN SMITH, ET AL. v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1      A      Yes.

 2      Q      And did you advise him to go seek further medical treatment?

 3      A      No.

 4      Q      Why not?

 5      A      I was not aware of the level of his injuries at the time.

 6      Q      Okay.  And so when you say you were not aware of the level of

 7  his injuries, did you think it -- at the time, it was just minor injuries?

 8      A      I did not know exactly what caused him to have these feelings

 9  and, you know, what was going on.  I didn't -- or pain and stuff.  I

10  didn't know what had actually caused it.

11      Q      Okay.  Now, when you say feelings, what -- what feelings were

12  you -- or are you referring to?

13      A      As far as pain and suffering.

14      Q      Okay.  So it -- was it more physical pain or was it more

15  emotional pain?

16      A      Physical.

17      Q      So he was having physical pain, but not enough to concern you

18  enough to advise him to seek further medical treatment; is that fair?

19      A      At that time, yes.

20      Q      Okay.  And so was he -- you know, in those seven days you

21  just talked about, was he just off duty?

22      A      Correct.  He was ordered to return on the 14th, so he was

23  home for the week.

24      Q      Okay.  And so did he go back on the 14th?

25      A      He returned to the clinic on the 14th with the expectation to
```

 1  return to work.

 2       Q    Okay.  And what happened -- what happened that -- when he

 3  went to back to work?

 4       A    He went to the clinic on the 14th and they ordered him to

 5  return to work on the 15th.

 6       Q    Okay.  And so did you talk to him about that?

 7       A    About the clinic?

 8       Q    About going back to work on the 15th?

 9       A    Can you repeat that?

10       Q    You said that he went on the 14th for, I believe, a follow-

11  up examination by MPD, correct?

12       A    Yes.

13       Q    And after they did whatever they did as far as examining him,

14  they deemed him fit for duty?

15       A    Correct.

16       Q    And ordered him to return on the 15th?

17       A    Yes.

18       Q    What I'm asking you simply is that did you talk to him about

19  having to go back to work?

20       A    No, not specifically.

21       Q    Okay.  Was he concerned at all?  Did he express any concerns

22  about going back to work?

23       A    No, not that I remember.

24       Q    Did -- was he -- did -- was he looking forward to going back

25  to work?



1      A    I don't remember.  I don't know.

2      Q    Okay.  Were you concerned with him going back to work?

3           MR. WEBER:  Excuse me for just one second.  Hughie, I am very

4   sorry, and it's my fault.  It has nothing to do with the client.  I'm

5   not even in the client's room.  I have to pee really badly.

6           MR. HUNT:  No, no --

7           MR. WEBER:  Can we take -- can we take -- and it's -- and

8   it's not from your depo --

9           MR. HUNT:  You don't -- you don't have to put that on the

10  record.  Just -- we'll take --

11          MR. WEBER:  Well, it's on.  But I had a lot of tea.  I'm

12  really sorry.

13          MR. HUNT:  No, no --

14          MR. WEBER:  Just give me --

15          MR. HUNT:  There's no explanation.

16          MR. WEBER:  I literally only need a minute.

17          MS. DEY:  It is 10:49 a.m. Eastern Time.  We're off the

18  record.

19          (A recess was taken.)

20          MS. DEY:  It is 10:58 a.m. Eastern Time.  We are on the

21  record.  You may proceed.

22          MR. HUNT:  Okay.  Thank you.

23  BY MR. HUNT:

24      Q    Just to touch on where we were before, we were talking about

25  your late husband going back to work on the 15th.

ERIN SMITH v. DAVID WALLS KAUFMAN, ET AL.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1          And so as I understand it, he had been seen by the MPD doctors

2   on the 14th and -- and been cleared to return to work on the 15th,

3   correct?

4          A     Yes.

5          Q     Okay.  And so at the time of him going back to work, were you

6   concerned about him going back to work?  No --

7          A     I knew he was still in pain.  Other than -- you know --

8          Q     I'm sorry, I'm going to stop you because it -- you -- you

9   broke up.

10         A     Yes.

11         Q     So I don't know, we can't really -- I'm going to have to ask

12  you that question again.  You -- I don't know if it's your -- the internet

13  link, but you were cut off when I asked you the question.  So I'm going

14  to -- I'm going to try to answer -- ask you again just to be fair to

15  you, okay?

16         So when he goes back to -- he's ordered to go back to work on

17  the 15th by the MPD doctors, were you concerned with his health at that

18  time to be able to go back to work?

19         A     I was concerned because I knew that he was still in pain and

20  was not 100 percent.

21         Q     Okay.  And did you express that to him?

22         A     I told him -- I mean, I worried about him every day just with

23  the job.  But, you know, I told him if he is not 100 percent, you know,

24  should he go back to the clinic?  And he said he would just go back to

25  work.

1      Q      Okay.  Was he concerned at all or to your knowledge?

2      A      Not that I can remember.

3      Q      Now, when he was going back to work, what was his -- I know

4  you told me before he was a patrol officer and then he was in, I think,

5  the Second District.

6             At that time, when he went back on the 15th, what -- what was

7  his duty assignment?

8      A      Patrol officer.

9      Q      Okay.  And again, in the Second District?

10     A      Correct.

11     Q      Okay.  So that first day back, what -- what -- what was that

12 like at your house?  What was the -- can you take me to that day on the

13 15th?  Did you talk to him that morning before he left or afternoon?

14     A      Yeah.  So it was a standard work day for both of us.  He got

15 up, he did his normal routine.  I got him lunch, made his meal to take

16 to work, and it was just, you know, pretty -- pretty standard day of

17 just getting ready for work as it would be any other day.

18     Q      That's impressive you made them lunch.  My wife doesn't make

19 me lunch ever.  So you made him lunch.  It was just a normal day.

20             Wasn't anything out of the ordinary; is that fair?

21     A      Yes.

22     Q      Now at one -- so what was -- is that his normal shift?  Like,

23 what was it, like, 1:00 to 10:00 or what was his normal shift?

24     A      Right.  So he worked second shift.  However, with the events

25 that transpired and the holiday coming up, the hours shift.  And I'm not

1  really sure exactly what the shift was, but they do change due to events

2  and holidays.

3      Q    Okay.  So on the 15th, he -- he still was going in at 1:00?

4      A    It was sometime in the afternoon.  I'm not sure of the exact

5  time.

6      Q    Do you know what time he got off that day?

7      A    On --

8      Q    The 15th.  What time was he supposed to get off?

9      A    He would've gotten off sometime between 10:30 and 12:30 a.m.

10     Q    Okay.  So did -- did he talk to you that day?  I mean, tell

11 me about after he left the house, what communication you had with him?

12     A    He left.  I said goodbye and that I loved him and he left for

13 work.  And that was the last correspondence.

14     Q    Okay.  And -- and what happened on that day?

15     A    Can you clarify?

16     Q    So you said that was the last correspondence that you had

17 with your late husband, correct?

18     A    Yes.

19     Q    And so he drove or he left the house at 1:00.  At some point,

20 your husband took his own life; is that correct?

21     A    Yes.

22     Q    And how did you be -- how did you first find out that he had

23 -- he had taken his life?

24     A    An MPD -- a family liaison officer showed up at my house.

25     Q    Okay.  And what time did that happen?

1       A    I don't remember --

2       Q    Okay.

3       A    -- the exact time.

4       Q    So they tell you he -- he had taken his own life and then

5  what was your reaction to that?

6       A    Shock.

7       Q    I mean, there was no --

8       A    Honestly, I don't really remember after they said anything.

9  It was a -- you know --

10      Q    The day -- from the time he left at 1:00, would it be fair to

11 say you didn't -- you didn't have any indication that he was going to

12 take his own life that day?

13      A    No.  None.

14      Q    Okay.  Would it be fair to say that it -- you know, I know

15 you had talked about him having I think you said headaches and blurred

16 vision.

17           I think you said blurred vision as well; is that correct?

18      A    He -- sensitive to light.

19      Q    Sensitive.  Okay.  Sensitive -- light sensitive.  Was he still

20 experiencing that?

21      A    As far as I can remember, yes.

22      Q    Okay.  But it -- was it less -- did he experience less of

23 those symptoms than, I guess from the -- the 6th or the 7th when he came

24 home, by the 14th, had the symptoms kind of like subsided to some degree?

25      A    I don't remember.

```
 1        Q      Okay.  But it would be fair to say they subsided enough for

 2   MPD -- MPD to clear him to go to work.  You -- you would agree with

 3   that?

 4        A      I can't answer that.

 5        Q      Okay.

 6        A      I don't know.

 7        Q      Okay.  And so -- well -- well -- well, let me ask you this.

 8   Did he ever tell you that when he got hit in the head, I believe you

 9   told me he got hit in the head, was that with a metal object?

10        A      I don't remember the specifics.

11        Q      Did someone throw something at him and hit him in the head,

12   to your recollection?

13        A      I know now that something was thrown, but I did not know then.

14        Q      Okay.  So what do you know now?

15        A      Now, there was a physical altercation that occurred in the

16   U.S.  Capitol, and there was also a metal pole that was thrown in his

17   direction that hit him in the head.

18        Q      I'm sorry, what?  I'm -- you -- you broke up.  A metal -- I

19   couldn't hear that.

20        A      There was also a pole that was thrown that also hit him.

21        Q      A pole was thrown and hit him in the head?

22        A      Yes.  In addition to the physical altercation that occurred

23   in the U.S.  Capitol.

24        Q      Now you -- you -- you keep mentioning this physical

25   altercation that occurred in the Capitol.  Is there -- what are you --
```

1  what are you referring to?

2      A      To the defendant attacking my husband.

3      Q      You mean Dr. David Walls-Kaufman?

4      A      Correct.

5      Q      Okay.  And -- and -- and you're saying your husband made those

6  allegations to you?

7      A      No.  You asked what I know now versus what I knew that day.

8      Q      Okay.  So this is what you're saying happened?

9      A      Correct.

10     Q      Would you agree that your husband claimed that his injuries

11 were from that metal pole that was hit in his face?  Would you agree

12 with that?

13     A      No.  I would not say all of his injuries were from that.

14     Q      Oh, I didn't --

15     A      He said he experienced hand to hand combat.

16     Q      Okay.  I'm -- I understand that.  I'm -- and we're going to

17 get to that.  I'm saying, as far as what he told the Metropolitan Police

18 Department medical team, would you agree that he attributed his injuries

19 to that metal pole you talked about?  Would you agree with that?

20     A      I was not there when he explained what happened that day.

21            MR. HUNT:  Okay.  All right.  Let me go there.  Hang on for

22 one second here.  Let me see.  Now I'm showing you what has been marked.

23            (Defendants' Exhibit 2 was marked for identification.)

24 BY MR. HUNT:

25     Q      And this is part of what you provided in discovery.  And I'll

1    go back up here so we can kind of see it here.  This is progress notes.

2    And you can see Police and Fire Clinic.  You -- you talked a little bit

3    about that earlier.

4            This is -- this is where he was going to get his treatments,

5    correct?

6        A    Yes.

7        Q    Have you seen this document before?

8        A    Not the follow-up, no.

9        Q    Okay.  So I'll just represent to you, there's some discovery.

10   We  asked  you  for  some  documents.    Do  you  remember  doing  your

11   interrogatories, signing those for --

12       A    Yes.  Yes.

13       Q    This is part of -- this is part of the documents your counsel

14   has provided.  And I want you to take a minute and just, you know, look

15   through it.  Okay.

16           Do you see where it says, "History of present illness"?

17       A    Yes.

18       Q    And it says, "35-year-old MPD male here for follow up after

19   an injury to his neck on the day of the protest in the Capitol.  Member

20   states he had twisted his neck when an object hit his face shield.  He

21   states  feeling  well  today.    Denies  any  headache  or  neck  pain.    No

22   dizziness, fever, chills, changes in vision, N/V or unsteady gait."

23           And then it shows his blood pressure at the time and you can

24   see his discharge instructions.  Do you see that?

25       A    Yes.

1      Q     Now, you would agree these are -- this is the medical record

2  from your husband's visit on that 14th, the follow-up?

3             MR. WEBER:  Objection.  If she knows.

4             MR. HUNT:  Okay.

5             MR. WEBER:  I don't -- I'm sorry if I missed it.

6             MR. HUNT:  Okay.  If -- if you know.

7             MR. WEBER:  Right.  I -- I'm sorry if I missed it, but I'm

8  not even sure she's ever seen this before Hughie, so I just want to make

9  sure -- you know, we've been -- again, I'm saying this, I know it's not

10  her, but we've been very cautious to -- to protect her from seeing things

11  that might upset her.  So you might want to just start by asking her if

12  she's ever seen this before because I think this is the first time she's

13  ever seen it.

14             MR. HUNT:  Well, I appreciate you not testifying at her

15  deposition, but I get it.

16  BY MR. HUNT:

17      Q     You see that name there, Jeffrey L. Smith?

18      A     Yes.

19      Q     And that's your late husband's name, correct?

20      A     Yes.

21      Q     And he was born on April 15th, 1985?

22      A     Yes.

23      Q     Okay.  And so I'm going through the rest of the document.  It

24  says, "Neck, no redness, no swelling, no tenderness on palpation, full

25  range of motion."

1      You see that?

2      A    Yes.

3      Q    All right.  Down here.  And you can see the -- the doctor is

4  a Malomo, M.D., and I don't know if it's a doctor, but Oriaifo, a medical

5  provider.

6           And right here, on January 6th, 2021, you see that, the date?

7      A    No, I do not see the date.

8      Q    Right here, it says January 6th, 2021?

9      A    Oh, yes.

10     Q    "Office visit.  New injury.  Neck pain."  And again, that's

11  -- that's your husband's name, Jeffrey L. Smith?

12     A    Yes.

13     Q    Date of birth 4-15-1985, correct?

14     A    Yes.  Yes.

15     Q    And you -- you -- you've already talked about this, but he

16  told you that day he was going to the clinic.

17          You've already talked about he went to the clinic before he

18  came home, correct?

19     A    Yes.

20     Q    This is the visit he had?

21     A    Yes.

22     Q    And it -- it says, "History of present illness: On-duty injury

23  as he was controlling the protestors today.  He jarred his neck when an

24  object hit his face shield.  Pain is localized in his right side of neck

25  and is aggravated by neck flexion -- neck flexion.  No radiating pain

 1  or parasthesia to the right arm.  No headache, no vision changes, or

 2  dizziness.  No fevers or chills.  No nausea or unsteady gait," correct?

 3          MR. WEBER:  Are -- are you asking correct, does she see it or

 4  is she agreeing with it?  Objection.

 5          MR. HUNT:  I mean --

 6          MR. WEBER:  Sorry.

 7          MR. HUNT:  Just make your objection.

 8          MR. WEBER:  Just -- just if you can, restate --

 9  BY MR. HUNT:

10      Q    This is your husband's medical record.  You agree with that,

11  correct?

12      A    Yes.

13      Q    And -- and after seeing it, you -- you agree that the only

14  injury he complained of is that object you talk about -- talked about

15  being hit in his face?

16          MR. WEBER:  Objection as to form.  She can say that it's the

17  only thing on the document, but she can't agree that that's the only

18  thing he said.  She doesn't know.

19  BY MR. HUNT:

20      Q    Based on what the document presents and his medical chart,

21  the only evidence we have of any injury that your husband complained

22  about right after the incident and at that follow up visit is that pole

23  you said that he was hit in the face with.

24          Do you agree with that?

25      A    Can you scroll up, down --

1        Q     Down?

2        A     -- so I can see the whole thing?  Or the other way.

3        Q     You want to go -- you want to go -- how far do you -- well,

4   you just tell me to stop, and I'll stop.

5        A     Okay.  Stop.  Do you mind asking your question again?

6        Q     Yes.  Now, we've already been through the -- the -- the first

7   -- the second visit, the 14th, the follow-up where he was cleared.  And

8   now this is the first visit.  This is when your husband, you've already

9   testified about going to the clinic.  And based on the medical

10  documentation, the only injury complained of was the injury that you

11  told me when an object hit his face shield.  I think you said a pole.

12             That's the only thing your husband complained about.  You can

13  agree on that?

14       A     No, because it's not specifically -- it's not that specific

15  in this statement.

16       Q     Okay.  Well, what other injury did he complain about to the

17  medical folks?

18             MR. WEBER:  I'm sorry.  I was muted.  I think she's asking

19  your --

20             THE WITNESS:  Is it what is listed here?

21  BY MR. HUNT:

22       Q     Okay.  I'm asking you --

23             MR. WEBER:  Hang on.  Hang on.  Mr. Hunt --

24             MR. HUNT:  I'm just asking you --

25             MR. WEBER:  I'm sorry.  She's just moving slower than you.  I

 1  think she's answering the question you asked her one question ago.

 2          MR. HUNT:  Dr. Weber said --

 3          MR. WEBER:  If you can rephrase --

 4          MR. HUNT:  You either make objections and place them on the

 5  record, but what are we doing here?  This is a deposition.  She has to

 6  answer the questions.  I'm -- I'm -- make your objections and let me ask

 7  my questions.  That's all I ask for.

 8          MR. WEBER:  Okay.  I -- I object to form.  I think that the

 9  witness --

10          MR. HUNT:  That's fine.  That's fine.  You -- you objected to

11  form.  There's no speaking objections.  You objected to form.  I get it.

12  I'll ask a better question.

13  BY MR. HUNT:

14      Q    Now, Mrs. Smith, I understand this may be difficult for you.

15  I understand that.  But all I'm asking you is, based on this -- these

16  medical records, the only thing he talked to his doctors about was being

17  hit -- hit -- hit -- jarred in his neck when an object hit his face

18  field.  That's the only thing he talked about.

19          Do you agree with that or not?

20      A    Yes.

21      Q    Okay.  So -- now this is a -- a questionnaire.  Okay.  And -

22  - and -- and do you recognize your husband's signature?

23      A    Yes.

24      Q    It says Jeffrey L. Smith.  So you agree that he filled out

25  this new injury questionnaire?

1    A    Yes.

2    Q    And that was 1-6-2021?

3         MR. LINK:  What's the question?

4    BY MR. HUNT:

5    Q    It was on one -- January 6th, 2021.  It says, "Last day --

6    last day worked on full duty," correct?

7    A    Yes.

8    Q    All right.

9    A    Yes.

10   Q    Go back up here.  Let's take a look at that.  "What areas of

11   your body did you injure?"  And that says neck; is that correct?

12   A    Based upon the form, yes.

13   Q    Now, these are some -- some other notes from other medical

14   visits.  Again, this is for your husband.  This is, I guess his bi --

15   biennial physical.  And he didn't smoke, he was a moderate drinker, and

16   he was in good health in 2019, correct?

17   A    Yes.

18   Q    And so before the January 6th, 2021, incident, he -- you agree

19   your husband with his -- was in good physical condition, he didn't have

20   any neck pain or any of those problems?

21   A    Yes.

22        MR. LINK:  Yes, I agree.

23        THE WITNESS:  Yes, I agree.

24   BY MR. HUNT:

25   Q    And again, these are just other medical records and just for

```
 1   completeness, we can kind of just go through them.  This just goes on

 2   for a period of time.

 3             MR. HUNT:  Have you -- I'm showing you -- it is an on-duty

 4   injury report.

 5             (Defendants' Exhibit 3 was marked for identification.)

 6   BY MR. HUNT:

 7       Q    Is that your husband's signature -- I mean, I'm sorry,

 8   handwriting?

 9       A    Yes.

10       Q    Okay.  And right here it says, "Jeffrey Smith, officer, badge

11   number 4626, and element 2D."

12             I think you already talked about that's where he was assigned,

13   the Second District?

14       A    Yes.

15       Q    Okay.  And then we got again, that's 1-6-2021.  And then it

16   says, "Nature of injury/illness: pain to neck," correct?

17       A    Yes.  That's what it says.

18       Q    And this was filled out by your husband, Officer Smith?

19       A    Yes.  Yes.

20       Q    And then it says, "Cause: List the known or suspected cause

21   of your injury or illness."  And in your husband's writing, it says,

22   "Hit with flying object in face shield of helmet," correct?

23       A    Yes.

24       Q    And these are the facts that your husband submitted on this

25   application.  The -- the question was, "Describe the nature and
```

1  circumstances of your injury/illness.  Describe the areas of the body

2  affected.  Specify when and how the injury occurred and include names

3  and contact information of any witnesses to the injury/illness."  Do you

4  see that question, ma'am?

5      A    Yes.

6      Q    Can you read your husband's response into the record?

7      A    "I was outside of the U.S.  Capitol and people started

8  throwing things, metal objects around 5:35 p.m.  Some kind of object hit

9  me in the face shield.  Began feeling pain in my neck and face."

10     Q    Okay.  And that was your husband's response, correct?

11     A    Yes.

12     Q    And we can agree that, as far as how your husband saw his

13 injury, he attributed the injury to that pole you talked about hitting

14 him in the face.  We can agree on that?

15         MR. WEBER:  Objection as to form.  Are you asking about this

16 document or what he said to her?

17         MR. HUNT:  I'm not -- again, I -- she can -- are you saying

18 she can't answer the question I just asked?

19         MR. WEBER:  No.  Of course she can answer the question.

20         MR. HUNT:  Okay.

21         MR. WEBER:  I'm objecting as to form.  You're asking her to

22 agree with something, but it's not clear if you're asking about the

23 document --

24         MR. HUNT:  I'm going to ask her -- I'm -- you can have a

25 continuing objection to form.  I'm going to ask you again.



1  BY MR. HUNT:

2      Q    Now, you've already told me that this is your husband's

3  document that he submitted to MPD, correct?

4      A    Yes.

5      Q    This is his handwriting, correct?

6      A    Yes.

7      Q    We talked about his response.  You read that into the record,

8  correct?

9      A    Yes.

10     Q    And all I'm asking you, as far as your husband's injuries

11 from the medical documentation and from this document that he filled

12 out, you would agree that your husband attributed his injuries -- the

13 cause of his injuries to that object that hit him in the face?

14         MR. WEBER:  Objection as to form.

15         You can answer.

16         THE WITNESS:  I -- I don't know.  I -- he filled it out.

17 BY MR. HUNT:

18     Q    Okay.  I understand that.  And I know this must be difficult

19 for you.  And I know you -- you -- you've testified to, you know, Dr.

20 Walls-Kaufman and the video and the assault, but what I'm asking you,

21 ma'am, is from your husband's perspective, from the medical records that

22 you can see, and from what he said right here in his own handwriting,

23 when they ask him about his illness or injury and how it -- how and when

24 it occurred and any contact of any witnesses, the nature and

25 circumstances, his response was that his injuries were caused by that

1    metal object that hit him in the face.

2              We can agree on that?

3              MR. WEBER:  Objection as to form.  Objection as to multiple

4    compound question.

5              You can answer it if you understand.

6              THE WITNESS:  I agree that that is what he wrote.

7    BY MR. HUNT:

8        Q    You agree that he wrote that his injuries were caused by the

9    metal object?  You agree with that?

10       A    Yes.

11       Q    Okay.  And as far as Dr. Walls-Kaufman goes, we can agree

12   that he wasn't outside the Capitol and he didn't throw that?  We can

13   agree with that?

14             MR. WEBER:  Objection as to form.

15             You can answer the question if you [inaudible 01:19:35].

16             THE WITNESS:  No, I don't know.

17   BY MR. HUNT:

18       Q    Okay.  Well, let -- let's ask it a different way.  This open

19   source video you talked about, does it show Dr. Kaufman throwing an

20   object and hitting your husband in the face?

21       A    Can you clarify that more?

22       Q    You talked to me on the record earlier about -- I asked you

23   a specific question.  What evidence do you have about this conspiracy

24   that defendant Taranto and David -- Dr. Walls-Kaufman conspired to

25   assault and attack your husband?  And what you told me was that there

1   was body cam video, correct?  You told me that; is that right?  Do I

2   have that right?

3        A    Yes.

4        Q    And you told me that that body cam video consisted of your

5   husband's body cam video and other body cam videos, correct?

6        A    Yes.

7        Q    And you also had an open source video?

8        A    Yes.

9        Q    That, I guess someone somehow posted on the internet, correct?

10       A    Yes.

11       Q    In any of those videos, does it show Dr. David Walls-Kaufman

12   throwing a metal object and hitting your husband in the face?

13       A    Not to my knowledge.

14       Q    Okay.  So as you sit here today, you would agree with me you

15   do not have any evidence that Dr. David Walls-Kaufman threw any metal

16   object and hit your husband in the face.

17            MR. WEBER:  Objection.

18   BY MR. HUNT:

19       Q    You would agree with that statement?

20            MR. WEBER:  Objection.  Asked and answered.

21            You can answer the question if you know.

22            MR. LINK:  Remember the question?

23            THE WITNESS:  No.  I'm sorry.

24   BY MR. HUNT:

25       Q    Okay.  Do it -- do it again.  All right.  Well, you've already

 1  been through the -- the evidence in the body cam video and the open

 2  source video, and you've already agreed that none of those videos show

 3  -- depict Dr. Kaufman throwing a metal object and hitting your husband

 4  in the face.

 5          You agree with that statement, correct?

 6      A   Yes.

 7      Q   Now, it's a very simple question.  Based on that response,

 8  you don't have any evidence depicting Dr. Kaufman throwing any metal

 9  object and hitting your husband in the face.

10          Do you agree with that statement?

11      A   I don't know.

12      Q   Okay.  You don't know.  Okay.  Let's live in that for a

13  second.  What other evidence other than those -- what we already talked

14  about, the body cams and the open source videos, is -- do you have any

15  witnesses that can testify to Dr. David Walls-Kaufman hitting your

16  husband with a metal object in the face, throwing that metal object?

17      A   Can you clarify that a little bit more?

18      Q   And a metal object --

19      A   Or -- I'm sorry.  Every -- everybody froze.  I'm sorry.  I

20  didn't -- I didn't hear part of that.

21      Q   Okay.  Well, so I'm -- I'm going to start over.  You've

22  already told me there's no video showing Dr. Kaufman throwing a metal

23  object and hitting your husband in the face on January 6th, 2021.

24          We've already been through that, correct?

25      A   Yes.



Created by Skribe | support@skribe.ai

1      Q    I'm asking you, is there a witness that you -- that has

2  personal knowledge of Dr. David Walls-Kaufman throwing a -- a metal

3  object and hitting your husband in the face?

4      A    No, not to my knowledge.

5      Q    So you don't know of any witness that would be able to testify

6  that Dr. David Walls-Kaufman threw a metal object and hit your husband

7  in the face?

8      A    Not with a thrown metal pole.

9      Q    Okay.  And so we don't have -- you don't have any witnesses,

10  you don't have any video to suggest that Dr. Kaufman caused this

11  particular injury to your husband.  We -- we can agree on that.  And

12  when I say this particular injury -- in the face.

13          You can agree with that statement?

14      A    You cut out halfway through.

15      Q    All right.  Let's see.

16          MR. LINK:  Do we need to have this video on -- this thing on

17  the screen?  I don't know.  It's still up there.  That's one -- that's

18  just a thought.  So ask the question.

19          MR. HUNT:  Maybe that's better.

20          MR. LINK:  Okay.  Okay.  Thank you.

21  BY MR. HUNT:

22      Q    So am just trying to -- to pin down exactly what we can agree

23  on.  And as I understand it, we agree on this -- this is what we -- we

24  agree on right here, right now.  There's no video showing, whether it's

25  bodycam or open source, there's no video in your possession or to your



1    knowledge that shows Dr. David Walls-Kaufman throwing a metal object and

2    hitting your husband in the face.

3              You agree with that statement?

4         A    Yes.  Based on it being thrown.

5         Q    Okay.  And you also agree that you don't have any witness, to

6    your knowledge, that can testify that they saw Dr. David Walls-Kaufman

7    throw a metal object and hit your late husband in the face, correct?

8         A    Specifically to the thrown object, yes.

9         Q    Okay.  And we've also been down this, based on your husband's

10   assertions, the evidence we have, he attributed to -- his injuries to

11   being hit by a metal object in the face.

12             Do you agree with that as well?

13        A    Yes.  As far as what he wrote on the form, that's correct.

14        Q    Okay.  Now -- so after your husband took his own life, did

15   you apply for benefits through the Metropolitan Police Department?

16        A    We had to, yes.

17        Q    And -- and tell me about that.  What -- what -- what did you

18   apply for?

19             MR. LINK:  Can I just -- my objection will be a collateral

20   source rule objection.  If we can have a continuing objection to that

21   part of it.

22             MR. HUNT:  Absolutely.  You can have that objection.

23             MR. LINK:  Thank you.

24   BY MR. HUNT:

25        Q    What did you apply for ma'am?

1     A     Death benefits.

2     Q     Okay.  And what happened with your application?

3     A     We had to prove that his death was a line of duty death.

4     Q     Okay.

5     A     Which fell under the --

6     Q     Go ahead.  It fell under the what?

7     A     Which falls under their stipulations, the city.

8     Q     Okay.  When you say the city, you mean the city of the District

9  of Columbia?

10    A     Yes.

11    Q     Okay.

12    A     The District of Columbia.

13    Q     Was -- was your initial application denied?

14    A     To the best of my knowledge, we applied and it went back and

15  forth.

16    Q     Okay.  And why did it go back and forth?

17    A     Because the burden of proof is on me to prove that his death

18  was the line of duty death.

19    Q     So initially, did they term -- determine it wasn't a line of

20  duty death?

21    A     That's correct.

22    Q     And why did they determine it was not a line of duty death?

23    A     Because typically, a suicide is not deemed a line of duty

24  death.  But under certain circumstances, they are.

25    Q     Okay.  And so initially, because your husband took his own

1    life, it was not deemed a line of duty death; is that correct?

2        A    Yes.

3        Q    And so what actions, if any, did you take to get your

4    application approved?

5        A    We had to prove that his death was caused by the job.

6        Q    Okay.  And -- and how did you do that?  How did you prove

7    that?

8        A    We provided them with the documentation needed to show that

9    what occurred led to his death.

10       Q    Okay.  Let me just share this here.  Let's see here.

11            MR. WEBER:  And just for the record, I'm a little late in

12   making the objection, but I'm making it anyway.  With regards to

13   questions about the District of Columbia Police and Firefighters Relief

14   Board, those are conclusions of law that, you know, she can talk about

15   what she understands.  But at the end of the day, it's -- she's not the

16   right witness for this.

17            MR. HUNT:  Okay.  I mean, I'm -- I -- I -- I think I'm entitled

18   to ask her about it.

19            Now, I'm -- this is the death certificate for your husband,

20   correct?

21            (Defendants' Exhibit 4 was marked for identification.)

22            THE WITNESS:  Yes.

23   BY MR. HUNT:

24       Q    Okay.  And his date of death was January 15th, 2021?

25       A    Yes.



 1       Q    And -- and then it says, basically the immediate cause of

 2  death was a gunshot wound to the head, correct?

 3       A    Yes.

 4       Q    And it said that his time of death was 3:28 p.m.?

 5       A    Yes.  That's what it says.

 6       Q    Okay.  And you -- you already told me that on the day in

 7  question, he left your house about, I think you said 1:00 -- 1:00 p.m.

 8  or so, correct?

 9       A    No.  On that day, I was unsure of exactly what time he left

10  due to the holiday schedule.

11       Q    Okay.  But he -- he -- he never made it to work?

12       A    Correct.

13       Q    Give me one second here.  Now, we -- we talked a little bit

14  about this.  Can you see that okay?

15       A    Yes.

16       Q    And you -- you talked about -- you -- you -- the burden was

17  on you to prove that the death was a line-of-duty death, correct?

18       A    Yes.

19       Q    And that was for, you know, benefits under the Police and

20  Firefighters Retirement and Relief Board?

21       A    Yes.

22       Q    And Dr. Jonathan Arden, did you retain him to work on your

23  case?

24       A    Yes.

25       Q    Okay.  And how -- how did you find Dr. Arden?

1      A      Through counsel.

2      Q      Okay.  So you -- you -- you retained a lawyer to help you

3  navigate the police board and -- and to -- to obtain the benefits?

4      A      Yes.

5             MR. HUNT:  Okay.  And so you retained Dr. Arden, and he was

6  retained to render an expert opinion on the manner and cause of death

7  of Jeffrey Smith.

8             (Defendants' Exhibit 5 was marked for identification.)

9  BY MR. HUNT:

10     Q      That's Paragraph 3; is that correct?

11     A      Yes.

12     Q      Okay.

13     A      Yes.

14     Q      And so part of his report is that the direct cause of Jeffrey

15  Smith's death was a single-type contact gunshot wound to the head that

16  resulted in a mortal brain injury, correct?

17     A      Yes.

18     Q      And then he -- he says he agrees with Dr. Sheehan's opinion

19  that the trauma of January 6th, 2021, led to depression, which in -- in

20  turn, caused Jeffrey Smith's death.

21             There is a direct cause-and-effect relationship between a

22  line-of-duty work trauma and Jeffrey Smith's death on January 15th,

23  correct?

24     A      Yes.  That's what it states.

25     Q      Okay.  And in his report, in -- in Paragraph D, it says, "The

Case 1:21-cv-02170-ACR     Document 80-7     Filed 05/09/25     Page 59 of 135
ERIN SMITH, ET AL., v. xxxxx                                         MARCH 07, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   video of the event demonstrates that Officer Smith was struck in the

2   face and head while his face shield was up.  In the injury or illness

3   report that he filed, Officer Smith reported pain in his neck and face,

4   corroborating he was struck in the face.  As a direct result of being

5   struck in the face and head, Smith was stunned and fell.  The loss of

6   consciousness resulting from the blow indicates he suffered a concussion.

7   These symptoms that he manifested after being injured in the riot and

8   leading up to the suicide, including anxiety and depression, represented

9   post-concussion syndrome.  Therefore, his mood changes were the direct

10  result of head trauma he suffered in the riot on January 6th, 2021,"

11  correct?

12       A    Yes.

13       Q    And we can agree that Dr. Walls-Kaufman is not mentioned in

14  this report?

15       A    Yes.  His name is not in that section you read.

16       Q    Okay.   And there's no reference to Dr. Walls-Kaufman

17  specifically?

18            MR. WEBER:  Objection as to form.  Objection as to whether

19  this is the appropriate document.  There is an updated report.

20  BY MR. HUNT:

21       Q    You can answer.

22       A    At the time this was given, there was no known people by name.

23       Q    Okay.  But the -- there's no mention of an assault?

24            MR. WEBER:  Objection as to form.  If you put that paragraph

25  back up there -- you're -- you're going the wrong direction, Mr. Hunt.



1   Okay.  If you could go -- I -- I'm sorry, Mr. Hunt.  If you could go

2   down in the other direction -- yep.  No.  Keep going.  Yep.  It's

3   Paragraph D, just a little more.  Just -- just let her look at that if

4   you would.  I think that's the paragraph you're asking about.  You got

5   to scroll up one line.  I'm -- I'm sorry, Mr. Hunt.  Just one more line,

6   right -- there you go.  Thank you.

7           THE WITNESS:  Do you mind repeating it again?

8   BY MR. HUNT:

9       Q    Yeah.  I don't mind.  I -- I forgot my question as well.

10      A    Okay.

11      Q    Lots of objections.  I know that part of your claim here is

12  that -- and -- and -- and -- and just so I'm clear, is it your contention

13  that the allegations you raised in the complaint, that the so-called

14  assault on your husband by Dr. Kaufman caused your husband's death?

15      A    Can you just repeat that again one more time?

16      Q    Well, you're a plaintiff.  You're suing for wrongful death.

17  Do you understand that?

18      A    Yes.

19      Q    And you understand that you are saying that part of your

20  complaint, and you can correct me if I'm wrong, is that Dr. Kaufman's

21  actions caused your husband's death.

22           Is that your allegation?

23      A    Yes.

24      Q    And you think that without -- or you assert or believe that

25  if this assault -- so-called assault that you mentioned in your complaint

1  didn't happen, then your husband would be alive today.

2        Is that your contention?

3    A    Yes.

4    Q    Okay.  So even though the -- all your medical report, your

5  expert, and your husband ascribe the injuries to the pole being hit in

6  his face, is it your contention the -- the sole cause of your husband's

7  death is the actions of Dr. David Walls-Kaufman?   Is that your

8  contention?

9        MR. WEBER:  Objection as to form.  Objection as to misleading.

10  Objection as to compound question.  The misleading objection is based

11  on the paragraph in front of us, which does not indicate the pole.

12        MR. LINK:  I would just object as far as this might call for

13  expert testimony.  That would be my objection, but subject to that --

14        MR. WEBER:  All right.  So now we got four objections.

15        But you can answer if you understand the question, Ms. Smith.

16        THE WITNESS:  I don't.

17  BY MR. HUNT:

18    Q    I don't either.  All I'm getting at, ma'am, is very simple.

19  Is it your contention that Dr. Kaufman's actions caused your husband's

20  death?

21    A    Yes.

22    Q    Okay.  Is it your contention that the -- the pole hit him --

23  that hit your husband in the face caused your husband's death?

24    A    Repeat that one more time.

25    Q    Is it your contention that the pole that hit your husband in

1   the face caused your husband's death?

2       A    Yes.  It's contributing.

3       Q    Is it your contention that the suicide caused your husband's

4   death?

5       A    No.  There would be no suicide if this didn't occur.

6       Q    And when you say this, what do you say is this?

7       A    The concussions and the loss of consciousness that occurred

8   that day.

9       Q    Okay.  So there would be no suicide -- your contention is

10  there would be no suicide if the concussions and loss of consciousness

11  didn't occur that day?

12      A    Correct.

13      Q    Okay.  And then part of that, or to build on that, is it your

14  assertion that the pole that hit your husband in the face caused the

15  concussion and loss of consciousness?

16          MR. LINK:  I think that -- that would definitely call for --

17  my objection is expert testimony was required, but to get to your --

18  right objection.

19          MR. WEBER:  And objection is also asked and answered.

20          That question was answered and she responded, no.  She said

21  it was contributing.

22  BY MR. HUNT:

23      Q    Is it your contention that the pole that hit your husband in

24  the face caused him loss of consciousness and -- and a concussion?

25          MR. LINK:  Could we have the same objection, so we don't have

1  to keep saying this, Mr. Hunt?

2          MR. HUNT:  I mean, you can have any objection you want.  I

3  mean, I know you guys want to testify for your witness, I get it, but

4  no speaking objections are allowed.  Make your objections.

5          MR. WEBER:  We actually don't want to testify for our client.

6          MR. HUNT:  Okay.  Well, then stop --

7          MR. WEBER:  We're just trying to make objections.

8          MR. HUNT:  Yes, sir.  Just make --

9          MR. WEBER:  Richard, I think we should just make objections

10  to his questions.

11          MR. HUNT:  Let's just make objections and move on.  It's --

12  it'll be very simple.  These are very simple question.

13          MR. WEBER:  Objection as to calls for expert testimony.

14  BY MR. HUNT:

15      Q    Is it your contention that the pole that hit your husband in

16  the face caused him a concussion and loss of consciousness?

17          MR. WEBER:  Objection.  Calls for expert testimony.

18          But you can answer the question if you know.

19          THE WITNESS:  I don't know.

20  BY MR. HUNT:

21      Q    You don't know?

22      A    I -- I don't.  I'm not a doctor.

23      Q    Okay.  So would it be fair to say, then, that you are just

24  leaning on whatever the medical report says, Dr. Arden, who you hired,

25  correct?

```
1          A     Yes.  They understand the medical field much more than I do.

2          Q     Okay.  So then we agree you -- you can't give any firsthand

3   testimony about how your husband died.  We agree with that, correct?

4          A     Okay.  Yes.

5          Q     Okay.  And you --

6          A     I -- I -- I don't --

7          Q     You -- you don't have any personal knowledge of how --

8                MR. WEBER:  Objection.  She was in the middle of making --

9   she wanted to -- please let her finish.

10               THE WITNESS:  Oh.  I can't give firsthand knowledge when I

11  wasn't present when he died.

12  BY MR. HUNT:

13         Q     And as far as what caused his death, you can't give any

14  testimony on that?

15               MR. WEBER:  Objection.  It calls for expert testimony.

16               But she can answer if she understands.

17               THE WITNESS:  Sorry.  Can you repeat just one more time?

18  BY MR. HUNT:

19         Q     Well, we've been through this, and -- and it's pretty simple.

20  You're not a doctor.  You've already told me that, correct?

21         A     Correct.

22         Q     You can't give any testimony on how or why or the cause of

23  your husband's death?  We agree on that?

24               MR. WEBER:  Objection.

25               THE WITNESS:  Yes.  An expert can.
```

```
 1              MR. WEBER:  Hold on.  I'm making an objection.  Then you can

 2   answer if you want, but you already said it.

 3              I'm objecting as to form.  I'm objecting as to expert witness.

 4   The expert witnesses did interview her so she does have information to

 5   provide, but she is not the expert.  And she has already answered, so -

 6   -

 7   BY MR. HUNT:

 8      Q    Now, you were interviewed in connection with this --

 9              MR. LINK:  Can -- my client says she would like to take a

10   break for a second.  Is that --

11              MR. HUNT:  Yeah.  You know what?  It's -- it's 12:00.  So

12   let's just take 15 minutes.

13              MS. DEY:  It is 11:59 Eastern Time, and we're off the record.

14              (A recess was taken.)

15              MS. DEY:  It is 11:00 -- it is 12:15 -- 12:15 p.m. Eastern

16   Time, and we are on the record.

17              You may now proceed.

18              MR. HUNT:  Okay.  So it's 12:15.  We'll see where we at, but

19   I wanted to take a -- a -- a 30-minute break at 1:00.  We can take a

20   little longer.  I -- I -- I have a status conference that I have to

21   attend to, and for those of you eating lunch -- so if you wanted to have

22   a longer break, we can talk about that as it gets toward -- we'll see

23   where we're at.  We'll see what happens.

24              And I'm assuming -- doctor -- Dr. Weber, are you going to

25   question the witness as well?  Well, you don't -- you don't have to
```

```
1   declare now.

2              MR. WEBER:  No.  I mean, we'll see --

3              MR. HUNT:  Yeah.

4              MR. WEBER:  But probably very minimally if --

5              MR. HUNT:  Yeah.  Just for purposes of timing.  Okay.  All

6   right.

7   BY MR. HUNT:

8        Q    So we're -- we're -- we're back on the record.  We're going

9   to shift gears a little bit.

10             You -- you -- you told me earlier that, you know, after the

11  incident, you weren't aware of Dr. Walls-Kaufman or defendant Tarantanto

12  (phonetic) until -- until you got that open source video; is that

13  correct?

14       A    Yes, after they were identified from the open source video.

15       Q    Now, how did -- now, did someone send you that video or did

16  -- tell me about that.

17       A    As far as the videos that were available online for public?

18       Q    Yes.  Did you did you find it?  Were you searching for it?

19  Did someone send it to you?  How did you become aware of that open source

20  video?

21       A    Through counsel.

22       Q    Okay.  And Dr. Weber?

23       A    Correct.

24       Q    Okay.  And so -- and I'm assuming Dr. Weber represented you

25  through the Metropolitan Police Board situation?
```

1      A     Yes.

2            MR. HUNT:  Okay.  Well, you've done a fine job.  You got the

3     benefits.

4     BY MR. HUNT:

5      Q     And through that investigation, he became aware of the open

6     source video, and then that's when you became aware of Dr. David Walls-

7     Kaufman as a defendant.  Is that a fair assessment?

8      A     Yes, that's fair.

9      Q     Now, this might be a tough question.  Do you remember the

10    timing of that when you -- when you first became aware of the open source

11    video?

12     A     If I remember correctly, it would've been in the summer of

13    '21.

14     Q     Okay.  And once you -- well, let me ask you this.  Did --

15    were you planning to make a wrongful death claim before you saw that

16    video?

17     A     We did not know what transpired that day until we saw the

18    video.

19     Q     Okay.  So -- and when you say we, you -- you mean you and

20    your lawyers?

21     A     Correct.

22     Q     Okay.  Yeah.  So I'm not -- when I ask you questions, don't

23    tell me what you discussed with your lawyers or anything like that.

24            I'm only asking from your perspective, okay?

25     A     Understood.

1      Q    And I guess I'm getting at before -- you know, obviously it's

2  an emotional situation.  Did you want to sue before you saw that video?

3  Did you have that inclination?

4      A    I didn't know what to do.  I was thrown into a situation I

5  never thought would occur, and I was just trying to figure things out

6  as information came along.

7      Q    And so when you became aware in 2021 of Dr. Kaufman from that

8  open source video, you wanted to pursue something against him.  Is that

9  a fair assessment?

10      A    Yes.

11      Q    Okay.  Because you feel he's responsible for your husband's

12  death, for lack of a better term?

13      A    Yes.  Yes.

14      Q    And it -- it -- it -- it made you angry, I'm -- I -- I would

15  imagine; is -- is that right?  Were you angry at Dr. Kaufman?

16      A    I was angry at everything that was, you know, going on.

17      Q    Okay.  And so once you got that information, did you attempt

18  to have criminal charges brought against him?

19      A    Can you clarify that a little bit more?

20      Q    Did you -- did you attempt or talk to the U.S. attorney about

21  bringing criminal charges for assault, battery, attempted murder?  Did

22  you -- did you talk to them about bringing charges against mister -- Dr.

23  Kaufman?

24      A    No.  No.

25      Q    You never approached him for that?



ERIN SMITH, ET AL. v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1      A     No.

2      Q     Okay.  You never met with him?

3      A     No.

4      Q     Neither you or your counsel?

5      A     I -- I don't know that answer, but I did not.

6      Q     Okay.  Did you want criminal charges to be brought against

7  Dr. Kaufman?

8      A     I -- I have no control of what the U.S. government does, so

9  that was their choice, not mine.

10      Q     Okay.  Were you upset that they didn't bring criminal charges

11  as far as assault or battery or any type of attempted murder against Dr.

12  Kaufman?

13      A     The charges they brought are the charges they brought.  I

14  have no control over that.

15      Q     I -- I -- I understand you don't have any control.  I'm just

16  asking your mindset.

17      A     Can you ask again?

18      Q     Yes, ma'am.  Once you got the open source video, did you

19  expect that Dr. Kaufman would be charged with battery, assault, or some

20  type of violent crime against your husband?  Did you expect that to

21  happen?

22      A     Yes.

23      Q     And to your knowledge, why didn't it happen?

24      A     I don't know.

25      Q     Okay.  And why did you expect that to happen, as far as you

1   expected, you know, an assault or some type of violent crime to be

2   brought against Dr. Kaufman?

3       A    Any assault against a police officer should be charged at the

4   highest level.

5       Q    Okay.  Well -- and when it wasn't, did you express concern

6   with anyone other than your counsel?

7       A    Not that I remember.

8       Q    Okay.  All right.  So --

9           MR. WEBER:  Just hold on a second.  I -- I just -- Hughie,

10  I'm not trying to --

11          MR. HUNT:  I'm moving on, so you can -- you don't have to put

12  on --

13          MR. WEBER:  But -- but I want to correct something that she

14  said.  Can I ask a redirect?

15          MR. HUNT:  You can't -- you can't -- you can't -- you can't

16  correct.  You can -- you can ask her questions after she has finished

17  testifying.  You can't correct something she said.  That's not how it

18  works.

19          MR. WEBER:  Yeah.  I understand, Hughie.  I'm just trying for

20  -- for time's sake to -- you want to get at something.  I think I know

21  what you want to get at.  We can do it on redirect, but --

22          MR. HUNT:  Go ahead and ask your question, Dr. Weber.  Go

23  ahead.

24          MR. WEBER:  I --

25          MR. HUNT:  Just get it over with.



 1              MR. WEBER:  Okay.  Thank you.

 2                          EXAMINATION

 3   BY MR. WEBER:

 4        Q    Ms. Smith, I -- you -- I believe you have met with Department

 5   of Justice officials.  Can you just tell Mr. Hunt who you met with and

 6   when it was and what you said?

 7        A    The -- the meeting that I remember was post the sentencing of

 8   Kaufman.  We all met at the federal courthouse.  And I -- I can't really

 9   remember what -- exactly what was said, but that's when I met the U.S.

10   attorneys.

11        Q    But there was another meeting, just responding to what Mr.

12   Hunt said, where you met with the very highest levels of the Department

13   of Justice.

14              Can you please just say when that was, who was there, and

15   what, if anything, you said about what Mr. Hunt just asked, which was

16   express your annoyance or anger or whatever, as to whether there should

17   be a case or not a case, just -- just so you -- we correct your testimony,

18   please?

19        A    Understood.  I can't remember the exact date, but I met with

20   Merrick Garland and his people in regards to the Public Safety Officer

21   Support Act of 2022 to provide benefits to survivors of suicide for any

22   first responder.  And in that meeting, I had expressed my feelings of

23   anger and frustration towards them that no charges at that time had been

24   brought to the two people that attacked my husband.

25              MR. WEBER:  Thank you, Mr. Hunt.  I just wanted to make sure

```
 1   --

 2              MR. HUNT:  All right.  That's fair -- fair enough.

 3                        EXAMINATION

 4   BY MR. HUNT:

 5      Q    All right.  So in 2021 -- the summer of 2021, you had

 6   identified Dr. David Walls-Kaufman as a potential defendant in your

 7   lawsuit for wrongful death and other claims, correct?

 8      A    And just to clarify, you said summer, yes?

 9      Q    Yeah.  Well --

10      A    I couldn't --

11      Q    Yeah.  I'm sorry.

12      A    Okay.

13      Q    That was -- I thought that was what you told me earlier, that

14   that's when you first became aware of the open source video?

15      A    That's correct.  It just glitched and I just want to make

16   sure I heard you correctly.

17      Q    All right.  Yeah.  Just let me know when that happens because

18   it's -- sometimes it seems like it's going along, and then and Mr. Link

19   is all frozen.  Just -- just let me know, because we want to -- we want

20   to -- we -- you know, we -- we -- we want to keep it as clean as possible

21   and we're trying -- I'm trying to finish this up.  Obviously, your

22   counsel will have opportunity to question you.

23              So you became aware of Dr. Walls-Kaufman as a defendant in

24   the summer of 2021.  Now, and Dr. Arden, let me see when his -- you had

25   retained Dr. Arden -- let me get this date right -- right around that
```

ERIN SMITH, ET AL. v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   time, in the summer of 2021, correct?

2       A    Yes.

3       Q    It seems like that report is -- is dated August 13th of 2021.

4   So I'm assuming you had to -- you had to retain him before then?

5       A    Yes.  If I remember correctly, I spoke to him in the early -

6   - earlier part of the summer.

7       Q    Okay.  And then -- then there was a Dr. Sheehan.  And -- and

8   -- and -- and he -- he interviewed you in 2022, correct?

9       A    No.  I'm sorry.  I thought you were referring to Dr. Sheehan.

10  I spoke to Dr. Sheehan in the summer of '21.  I did not speak to Dr.

11  Arden.

12      Q    Okay.  Yeah.  But it says here -- and -- and you can correct

13  me.

14           MR. HUNT:  I'm going to Sheehan's report, and we can clear

15  that up.

16           (Defendants' Exhibit 6 was marked for identification.)

17  BY MR. HUNT:

18      Q    My question was with Dr. Arden, you had retained him in the

19  summer of 2021 because his report was dated August 13th of 2021?  That

20  was my question.

21      A    Yes, that's correct.  Yes.

22      Q    You know, just -- at some point before that, not that you had

23  talked to him.

24      A    Yes.

25      Q    Is that -- we can agree on that?

1    A    Yes.

2    Q    Okay.  And so with Dr. Sheehan, and -- and what -- what I

3  have here, and this was -- is -- this is dated March 8th, 2022, and it

4  says that he interviewed you on February 18th of 2022, Erin Smith; is

5  that correct?  I can --

6    A    Yes.

7    Q    I can move it up if you can't see it.  I'm sorry.

8    A    I don't remember the exact date, but if that's what's listed,

9  yes.

10    Q    Okay.  Yeah.  You wouldn't have any reason to question it.

11  This was attached to your complaint.  So in 2022, when you were

12  interviewed, you -- you'd already identified Dr. Walls-Kaufman as a

13  defendant.

14         You'd already, you know, served your complaint -- or filed

15  your complaint, correct?

16    A    I believe so.

17    Q    Okay.  Let -- let's go -- I'll represent -- I'll go -- we'll

18  go back up to the top here.  This is May 10th of 2022, and -- and you -

19  - you filed a second Motion for Leave to Amend Complaint?

20    A    Yes.

21    Q    Okay.  So you -- you had already -- you had already sued Dr.

22  Walls-Kaufman at the time of your interview with Sheehan, correct?

23    A    Yes.

24    Q    Okay.  And I just want to talk a little bit about that, and

25  we'll -- we'll move -- move on here.

1               Now, do you see that paragraph?

2          A    Yes.

3          Q    Can you read that?  Just take a moment.  I'm going to read

4     through it again.  If you could read through it again, and then I'm

5     going to have -- I have a few questions for you.

6               MR. WEBER:  And just a -- an objection.  She can only see the

7     one paragraph unless you move it around.

8               MR. HUNT:  Yeah.  I'm --

9               MR. WEBER:  That's all she --

10    BY MR. HUNT:

11         Q    Yeah.  I'm going to -- I'm going to make you -- I'm going to

12    give you time to read that and just -- then I'll move it so you can read

13    the -- the rest and -- rest of that paragraph.

14              Are you done?

15         A    Yes, sir.

16         Q    Okay.  Let me try to get you the other -- let's go over here

17    to -- okay.  Did you have a chance to read through everything?

18         A    Yes.

19         Q    Okay.  And Dr. Sheehan, is he a neurologist?  I don't know if

20    you remember that.

21         A    I believe he is a forensic psychiatrist.

22         Q    Okay.  Psychiatrist.  Sorry.  And about how long was the

23    interview on the 18th of 2022 -- February 18th, between you and him?

24         A    Approximately an hour.

25         Q    Okay.

Case 1:21-cv-02170-ACR    Document 88-7    Filed 05/09/25    Page 76 of 135

ERIN SMITH, ET AL., vs.                                      March 07, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1       A       Two hours -- somewhere between one and two hours.

2       Q       And was it over the phone?  Was it in person?

3       A       In person.

4       Q       Okay.  And did you -- what did you review or -- did you review

5    any notes or anything before you had the interview with him?

6       A       No.

7       Q       Okay.  So you just -- you just went there.  You went to his

8    office?

9       A       Correct.

10      Q       And did you fill out anything, like a questionnaire or

11   anything like that?

12      A       No, not that I can remember.

13      Q       Okay.  And so what was the format of the -- I mean, I'm just

14   trying to understand.  He says he interviewed you, but what was the

15   format?  Did he -- did he sit you down and say -- just ask you questions?

16      A       Yes.  So I went to his office -- I believe it's in Columbia,

17   Maryland, sat in his office and he asked me questions about that day --

18      Q       Okay.

19      A       -- about January 6th.

20      Q       January 6th.  He asked you questions about your husband's --

21   your interactions with your husband?

22      A       Correct, so he asked me about that day, what he was like

23   prior, and what was going on in the week after.

24      Q       Okay.  And so did he ask you about what caused his injuries?

25      A       I believe he -- yes.

ERIN SMITH, ET AL. v.                                                    MARCH 07, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1    Q    Okay.  And I'm assuming, obviously, you retained him.  You

2    were -- you were honest with him.

3         You didn't -- you were truthful?

4    A    Yes.

5    Q    And you -- you know, you told him everything you knew?

6    A    Correct.

7    Q    Okay.  And so now, he -- he uses quotation marks in his

8    report.  And right here, he says, "She gave history that her husband

9    returned from work following the riots around 2:00 a.m. on the 7th,

10   2021."  And we talked about that early on the record.

11        But in quotes, he said -- and -- and I -- I'm assuming he's

12   quoting you, is that correct when he has those quotes?

13   A    Yes.

14   Q    And in quotes, it said, "He said he lost consciousness, that

15   he was hit by a metal pipe, and he didn't know where he was."  That was

16   your quote, correct?

17   A    Yes.

18   Q    And that was in response to a question from Dr. Sheehan?

19   A    Correct.

20   Q    And do you remember what question he asked you?

21   A    I do not.

22   Q    Okay.  And you also -- I mean, he doesn't quote you, but he

23   -- he says, "He complained to her of vision problems."  That's your

24   husband complaining to you of vision problems.

25        And then in quotes, he said, "He said his vision was fuzzy,"

ERIN SMITH, ET AL. v.                                                    MARCH 07, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   correct?

2        A    Yes.  Yes, that's what it -- yeah.

3        Q    And that -- and you said that to him?

4        A    Correct.

5        Q    Okay.  And then you didn't remember at that time of any

6   balance problems?

7        A    No.

8        Q    And that your husband had a bad headache?

9        A    Correct.

10       Q    And he had complained about those headaches throughout the

11  nine days before committing suicide, correct?

12       A    Yes.

13       Q    Then you go on to say, "It was like he was listening, but he

14  -- but wasn't recognizing what was being said," correct?

15       A    Yes.

16       Q    And you're talking about when you were having conversations

17  with your husband, that's -- that's what it felt like to you?

18       A    Correct.

19       Q    And then you -- we talked earlier.  You know, he was sensitive

20  light.  He had angry outbursts.  These are all things you've already

21  kind of talked about a little bit, but that was part of what you told

22  him in the interview as well?

23       A    Yes.

24       Q    Now, and you can correct me if I'm wrong, but I don't see any

25  mention of Dr. Walls-Kaufman or anything that Dr. Walls-Kaufman did in

1    this interview, correct?

2              MR. WEBER:  I -- I'm just objecting as to what she has in

3    front of her, because she can only see one paragraph at a time.

4              MR. HUNT:  All right.

5              MR. WEBER:  But --

6              MR. HUNT:  I mean, I'll go back to the top.  We'll start --

7              MR. WEBER:  But I -- I -- I -- I'm not debating what you're

8    saying.

9              MR. HUNT:  All right.

10   BY MR. HUNT:

11        Q    That's the first page.  There's no mention of Dr. Walls-

12   Kaufman in this report, correct?

13        A    Yes.  His name is not in the report.

14        Q    And there's no mention of the alleged assault by Dr. Kaufman

15   on your husband in this report, correct?

16        A    Correct.  There's no one mentioned by name.

17        Q    Okay.  Well, I mean, beyond that, you don't mention it by

18   name, but what I'm asking you is that -- or, you know, from what I can

19   see, the -- the alleged assault in the complaint that Dr. Kaufman, you

20   alleged, committed against your husband with defendant Taranto is not

21   mentioned in this report.

22              You agree with that?

23        A    Yes.

24        Q    Now, as you sit here today, is it your -- would it be your

25   testimony that you mentioned the alleged assault and Dr. Sheehan didn't

```
 1   write it down?  Is that your testimony?

 2        A    No.

 3        Q    Okay.

 4        A    When this was given, it was not asked.

 5        Q    Okay.  So he never asked you about what caused the -- the

 6   concussion-like symptoms, Dr. Sheehan?

 7        A    Can you scroll back up?  Sorry.

 8        Q    Yes.  All right.  I mean, let's just go back to the top.

 9   Where do you want me to go, down a little bit more?

10        A    Yeah.  Could you go down a little more?  And do you mind

11   repeating your question again?

12        Q    I can hardly -- hardly remember my middle name.  I'm going to

13   try -- so people think it's easy to -- sometimes you need a good court

14   reporter to read your questions back.

15             But I guess, really, what I'm getting at here is we spent a

16   lot of time talking about Dr. Kaufman and the alleged assault.  And, you

17   know, you've already told me that you became aware of it in 2021 -- I

18   believe in the summer of 2021, correct?

19        A    Yes.

20        Q    And your counsel was kind enough to question you about a

21   meeting you had with Merrick Garland about bringing charges or your

22   frustration with the lack of criminal charges against Dr. Kaufman,

23   correct?

24        A    Correct.

25        Q    And that -- and I -- and -- and that meeting happened before
```

1  your meeting with Dr. Sheehan?

2      A    No, I don't believe so.  I believe the meeting with Merrick

3  Garland happened after --

4      Q    Okay.

5      A    -- the interview with Sheehan.

6      Q    All right.  That's fine.  But really, my question was, you go

7  through an interview with Dr. Sheehan about -- and you -- you talk about

8  the history.  "She gave history that her husband returned from work

9  following the riots at the U.S.  Capitol around 2:00 a.m. On January

10  7th, 2021."  But what I'm saying is, you don't mention the incident at

11  all regarding the assault that you alleged that was committed by Dr.

12  Walls-Kaufman and defendant Taranto.

13          Why don't you mention it?

14          MR. WEBER:  Objection as to form.  You've got the document in

15  front of her.  She can answer if she knows, but this isn't her document.

16          THE WITNESS:  I don't remember all the questions that were

17  asked.

18  BY MR. HUNT:

19      Q    Okay.  I -- I -- I get it, but -- I get you don't remember

20  all the questions that were -- it's a long -- it's a long time ago.  I

21  get that.

22          But what I'm saying to you is, if you believed that Dr.

23  Kaufman assaulted your husband severely enough to cause his death, why

24  don't you mention it to Dr. Sheehan in the interview?

25          MR. WEBER:  I'm object -- I'm objecting as to form again.

1    It's a -- you can answer the question, Ms. Smith, if you know

2 the answer, but he -- based on this report, you're not the author.

3    THE WITNESS:  I don't know.  I believe I just answered the

4 questions that were asked.

5 BY MR. HUNT:

6    Q    Okay.  So -- well, let's live in that.  He didn't -- you're

7 saying he didn't ask you -- Dr. Sheehan, if I called him as a witness,

8 are you suggesting that he didn't ask you what caused your husband to

9 lose consciousness?

10   A    As far as I can remember.

11   Q    I'm sorry, ma'am.  I didn't understand your response.  Are

12 you saying he -- that Dr. Sheehan didn't ask you the cause of your

13 husband losing consciousness?

14   A    I -- I don't know, because I can't remember exactly what

15 questions were asked.

16   Q    Okay.  Well, it -- it says here that he asked you about your

17 husband's history after he returned from work, correct?

18   A    Yes.

19   Q    And he asked you questions about your husband?

20   A    Yes.

21   Q    You don't remember what questions?

22   A    Correct.

23   Q    But whatever questions he asked, you don't mention the assault

24 that you allege between Dr. Kaufman and -- and defendant Taranto on your

25 husband.

ERIN SMITH, ET AL. v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1              You don't mention that?

2              MR. WEBER:  I -- I -- I object as to form.

3              You can answer the question, but again, you didn't write this.

4              MR. LINK:  I'll object to --

5  BY MR. HUNT:

6      Q    Well, I -- I -- I'll ask another question.  I get it.  You

7  didn't write the report.  We understand.  I understand that.

8              But as you sit here today, do you have a recollection of

9  whether you mentioned the assault of Dr. Kaufman and defendant Taranto

10  on your husband as a cause of his loss of consciousness?  Do you -- do

11  you remember saying that to Dr. Sheehan?

12     A    I don't remember.

13     Q    Okay.  And -- but we can agree it -- it -- it -- it's not in

14  the report, correct?  We agree with it.  You -- you agree with that?

15     A    Based on what's on the screen, it's not in the report.

16     Q    Okay.  Now, you also told me that you're not a doctor.  You

17  are -- we've already been through that, and that the -- the medical folks

18  would make a determination about what the cause of your husband's

19  injuries were, correct?

20     A    Yes.

21     Q    And based on his report, Dr. Sheehan says his head injuries

22  caused the post -- concussion with symptoms consistent with post-

23  concussion syndrome and post-traumatic headaches, correct?

24     A    Yes.

25     Q    And he mentions in his report that you gave him the history

1   that he was hit by a metal pipe and didn't know where he was, correct?

2       A    Yes.

3       Q    And it was consistent with what -- that statement is

4   consistent with the medical records that we've already gone through.

5   You would agree with that, correct?

6       A    It does not state that this was the flying metal pipe, or the

7   one thrown.

8       Q    I -- I understand that. I'm -- I didn't ask you that. I'm

9   -- I'm saying we've already gone through his medical records when he

10  went to the police clinic.

11          And the statement you made is consistent with the medical

12  records that his -- his injuries were caused by a metal pipe?

13      A    Yes.

14      Q    And it's also consistent with the report he filed about that

15  new injury, correct?

16      A    Yes.

17      Q    And you've already told me you became aware of this assault

18  in 2021 that you allege -- it's the summer of 2021, by Dr. David Walls-

19  Kaufman against your husband, correct?

20          MR. LINK:  That will be asked and answered, as you indicated,

21  but --

22  BY MR. HUNT:

23      Q    Right.  You've already told me that.  So my question is, you

24  had --

25          MR. WEBER:  I think he's supposed to say objection, too.  I'm

1   just trying to help my co-counsel.

2           MR. HUNT:  You want to say -- you -- you can say objection if

3   you want, Mr. Link, and I can move on.

4           MR. LINK:  Thank you.

5           MR. HUNT:  Okay.

6   BY MR. HUNT:

7       Q    So my question is, you had that knowledge at the time that

8   you had this interview, but none of that appears in the report.  We

9   agree with that, right?  You agree with that statement?  You had the

10  knowledge that you thought Dr. Kaufman had assaulted your husband on

11  that day, and -- and -- or you had -- you assaulted -- that he assaulted

12  your husband on January 6th, 2021.  You got that knowledge in the summer

13  of 2021.  And when you met with Dr. Sheehan in -- on February 18th,

14  2022, you had already made that assertion that Dr. Kaufman was in --

15  responsible, in part, for the concussion symptoms?  I mean, at least

16  that's my understanding.

17          You -- you're -- you're saying that Dr. Kaufman's assault --

18  so-called assault caused these concussion symptoms, correct?  You are

19  alleging that --

20          MR. WEBER:  Objection.  Objection.  My objection is crazy

21  compound question.

22          MR. HUNT:  That's true.

23          MR. WEBER:  But she can answer if she understands.

24          MR. HUNT:  I'll strike -- I'll strike the question.  Let's

25  answer the -- let's ask it again.

ERIN SMITH, ET AL. v.                                        March 07, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1    BY MR. HUNT:

2        Q    As you sit here today, is it your contention that the alleged

3    assault by Dr. Kaufman caused these concussion symptoms and that loss

4    of consciousness from -- of your husband?  Is that your allegation?

5        A    Yes.

6        Q    Okay.  And you were making that allegation on February 18th,

7    2022, as well, that Dr. Kaufman, his actions in assaulting your husband,

8    caused the loss of consciousness of your husband.  You were making that

9    allegation on February 18th, 2022, when you met with Dr. Sheehan,

10   correct?

11            MR. WEBER:  Object as to form.

12            THE WITNESS:  Can you clarify that?

13            MR. WEBER:  You can answer the -- hold on.  You can answer

14   the question.

15            But I'm objecting as to form.

16            If you know the answer, if you remember what you did, you can

17   answer the question.

18   BY MR. HUNT:

19       Q    And -- and we're going to wrap up here just -- just shortly.

20   All I'm getting at, ma'am, is you -- you -- you're saying that Dr.

21   Kaufman's actions caused your husband's death.  That's the allegation

22   you are making in this case in this, correct?

23       A    Yes.

24       Q    And that allegation is that he assaulted your husband on

25   January 6th, 2021, correct?

1     A     Yes.

2     Q     And that assault caused him to lose consciousness?

3     A     Yes.

4     Q     Okay.  And you -- you knew about that, and you -- you made

5   that assertion in the summer of 2021, correct?

6     A     Yes.

7     Q     And when you filed your initial complaint, you made that

8   assertion?

9     A     Yes.

10    Q     And you continue to make this assertion?

11    A     Yes.

12    Q     Okay.  And -- but on February 18th, 2022, that assertion that

13  Dr. Kaufman caused -- the assault by Dr. Kaufman and defendant Taranto,

14  the assertion that that assault caused him to lose -- your husband to

15  lose consciousness -- consciousness, it doesn't appear in this report,

16  does it?

17    A     His name is not stated in the report.

18    Q     That's not my question, ma'am.  That's not my question.  It's

19  a very simple --

20          MR. WEBER:  All right.  Ask a -- ask a question.  I'm

21  objecting.  Asked and answered.

22  BY MR. HUNT:

23    Q     Now, the question is, that assertion that Dr. Kaufman caused

24  your husband to lose consciousness does not appear in this report?

25    A     I don't know.  Based on what -- this paragraph, his name is

1    not in it.

2        Q    Okay.  We can look at the whole thing again.  It doesn't

3    appear in the report, ma'am.  That assertion does not appear in the

4    report, that Dr. Kaufman caused your husband to lose consciousness.  It

5    doesn't appear in the report because it's -- you didn't tell Dr. Sheehan

6    that.

7             Come on.  We can agree to this.

8             MR. WEBER:  Objection as to form.  Now, this, Counsel, is

9    testifying.

10            You can answer the question if you understand what he is

11   asking, Ms. Smith.

12   BY MR. HUNT:

13       Q    Do you understand the question, ma'am?

14       A    Can you repeat it?

15       Q    You didn't tell Dr. Sheehan that Dr. Kaufman had caused your

16   husband to lose consciousness on January 6th, 2021.

17            You could agree with that.  You didn't tell him that?

18       A    I answered the questions that were asked during that period.

19       Q    But that's not my question, ma'am.  It's a very specific

20   question.  Just answer the question.

21            MR. WEBER:  Objection.  Asked and answered.

22   BY MR. HUNT:

23       Q    You didn't tell him that Dr. Kaufman caused your husband to

24   lose consciousness, did you?

25            MR. WEBER:  Objection.  Asked and answered.

ERIN SMITH, ET AL., v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1              You can answer the question if you understand what he's
 2   asking.
 3              THE WITNESS:  Based on the report, no.
 4   BY MR. HUNT:
 5      Q    Thank you.  All right.  So we're going to reconvene 1:30,
 6   unless you -- you need any additional time.
 7              MR. HUNT:  Does that work for you, Dr. Weber?
 8              MR. WEBER:  It's fine for me.  Do you have more or is this
 9   for us to do redirect, or what's going to happen at 1:30?
10              MR. HUNT:  Let me just look at it.  I don't know if I have
11   much more.  Not a lot more, but I -- I don't think so.  But let -- let
12   --
13              MR. WEBER:  Okay.  Well, it's -- it's your -- you have until
14   -- you have seven hours.
15              MR. HUNT:  I'm trying do --
16              MR. WEBER:  Ours is super brief --
17              MR. HUNT:  Okay.
18              MR. WEBER:  -- but we will just briefly have a redirect, but
19   it'll be really short.
20              MR. HUNT:  Okay.
21              MS. DEY:  Okay.  It is 12:58 Eastern Time, and we are --
22              (A recess was taken.)
23              MS. DEY:  It is -- it is 1:34 p.m. Eastern Time, and we are
24   on the record.
25              You may proceed.
```

ERIN SMITH, ET AL. v.    MARCH 07, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1              MR. HUNT:  Yes, ma'am.

2     BY MR. HUNT:

3         Q    I -- I only have a few more questions.  I just wanted to touch

4     on a few things that you've talked about a little bit.  The open source

5     video, you said that you got it from your counsel.

6              And my question is, who -- who produced the video?  Do you

7     know who produced the video?

8         A    No.

9         Q    And so -- well, you don't know who produced it.  What site

10    did it come from?

11        A    I don't know.

12        Q    Okay.  And as far as it being a -- where did the footage could

13    -- do -- do you know how the footage was obtained?

14        A    No.

15        Q    Well, I mean, so -- and -- and again, this was just -- and

16    you said who investigated?  You said your counsel found the video?

17        A    Yes.

18        Q    Okay.  So -- and when you say your counsel, Dr. Weber?

19        A    Correct.

20        Q    Okay.  So did someone give him the video or did he find the

21    video?

22        A    I do not know.

23        Q    Okay.  So based on what you know, he just told you there's a

24    video or something like that.  Well don't get into what he told you.

25    Strike that.

```
 1              So I guess what I'm getting at is, we don't know who produced
 2   the video.  And when I say we, you -- you don't know who produced the
 3   video.  You've already testified to that, right?
 4        A    Correct.
 5        Q    And then as far as the footage, do you know the -- how they
 6   got the footage?
 7        A    If it was open source, it would've been available to the
 8   public.
 9        Q    Yeah.   Well, I'm just saying, from your own personal
10   knowledge, was that, like, cameras in the Capitol or how -- how did how
11   did they -- how did they obtain the footage if you know?
12              MR. WEBER:  Objection as to form.  Compound question.
13              You can answer the question.
14              THE WITNESS:  I believe the footage was from somebody there
15   that day.
16   BY MR. HUNT:
17        Q    Okay.  But you're not sure?
18        A    As to who took the video, no.
19        Q    You -- you're not sure as to who took the video and really
20   who -- who took the video, who posted the video, and really anything
21   along with that video?
22              MR. WEBER:  Objection.  Form.  Compound question.  But you
23   can answer the question if you --
24              THE WITNESS:  I do not know the exact place where the video
25   was found.
```

ERIN SMITH v.                                                           August 21, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   BY MR. HUNT:

2        Q    Okay.  And then that -- were there documents with the video?

3        A    I do not know.

4        Q    Okay.  And so did it -- it -- well, you don't know there --

5   whether there were documents with the video.  But let's say there were

6   documents with the video.  You don't know who authored any of the

7   documents?

8        A    Can you clarify the question?

9        Q    Well, I asked you whether there were documents or commentary.

10  I said documents, but what I'm getting at is that -- it -- was there

11  documents or commentary with the video?

12       A    I do not know.

13       Q    Okay.  And so from the video, how did you identify Dr. David

14  Walls-Kaufman?  How did -- how --

15       A    They were identified through anonymous sources.

16       Q    Okay.  And -- and when you mean anonymous sources, how -- how

17  -- how -- how did that come about?

18       A    Is -- can you clarify that?

19       Q    Yeah.  Well, you said, anonymous sources.  Did somebody email

20  you, or somebody call you?  Or how -- you say -- how -- he was identified

21  by an anonymous source.  How did you get that identification?

22       A    The identification went through counsel.

23       Q    Okay.  So I -- I guess I'm trying to get at -- how -- you --

24  you say that you got the video in 2021, the summer, through an

25  investigation by your counsel, correct?

ERIN SMITH, ET AL. v. DAVID WALLS-KAUFMAN           April 9, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1       A     Yes.

2       Q     But you don't have any evidence regarding how you got it.

3   And when I say how, like, whether it was emailed or -- or who produced

4   it?

5       A     Correct.

6       Q     Okay.  And so as far as the identification of Dr. David Walls-

7   Kaufman, as you sit here today, you don't know who identified him as the

8   defendant in this case, from that open source video?

9       A     The exact, specific person, no.

10      Q     Okay.  But based on what someone else said as far as him being

11  the person in the video, that's how you came to identify him in this

12  case, correct?

13      A     Can you repeat that one more time?

14      Q     Well, we've already talked about -- you don't know Dr. David

15  Walls-Kaufman.  You'd never met him before January 6th, correct?

16      A     Yes.

17      Q     And your husband, to your knowledge, didn't know him on

18  January 6th or before 2021, correct?

19      A     Yes.

20      Q     And what I'm saying is you -- you've now named him as a

21  defendant in a wrongful death lawsuit.  But your identification of him

22  came from the open source video that you've already testified to,

23  correct?

24      A     Yes.

25      Q     But you don't know who produced the open source video,

ERIN SMITH, ET AL. v.                                           AUGUST 9, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1  correct?

2      A    Correct.

3      Q    And any commentary or any documents identifying Dr. David

4  Walls-Kaufman, you don't know who produced that either?

5      A    Who identified him?  I do not know.

6      Q    You -- yeah.  So my question is simply the way you came to

7  identify him as a defendant in this lawsuit was based on the open source

8  video and based on the -- someone else identifying him as the defendant,

9  correct?

10     A    Yes.

11     Q    And so as we sit here today, you, you know -- on January 6th,

12 2021, and up until the summer of 20 -- 2021, you couldn't identify Dr.

13 David Walls-Kaufman as a defendant in this case; is that fair?

14          MR. WEBER:  Objection as to form.  Can you be more specific

15 about the time period?

16 BY MR. HUNT:

17     Q    Up in -- from January 6th, 2021, up until the summer of 2021,

18 that you testified you got the open source video, you couldn't identify

19 Dr. David Walls-Kaufman as a defendant in this case?

20     A    Correct.

21     Q    And -- and even now, your identification of him is based on

22 the video and commentary from someone you don't know?

23     A    At that point, correct.

24     Q    Right.  Now, as far as now, at this point, what has changed?

25 Like, are you -- are you saying now you have personal knowledge that he

```
 1   was -- he should be identified as a defendant in this case?  Something

 2   has changed?

 3        A    From then we were able to subpoena for the body cam.

 4        Q    Okay.  So the body cams now -- well -- well, let me -- let me

 5   -- let me -- let me ask you this.  The experts you retained in this

 6   case, you gave them the open source video as a part of them developing

 7   their opinions; is that correct?

 8             MR. WEBER:  Objection as to form.  You can answer the

 9   question.  You -- you are using the word them.

10   BY MR. HUNT:

11        Q    The experts.  You -- you got a couple of experts in this case.

12   Do you -- do you -- do you remember retaining an expert?

13        A    Yes.

14        Q    Okay.  And so you -- you've had a number of them.  And all

15   I'm asking you is, did you give them the open source video as a basis

16   to identify Dr. David Walls-Kaufman?

17             MR. WEBER:  Objection as to form.  You can answer the question

18   if --

19             THE WITNESS:  I don't believe that they were given to Dr.

20   Sheehan to identify people.

21   BY MR. HUNT:

22        Q    Okay.

23        A    They were given to understand what happened.

24        Q    Okay.  Well -- well, let me ask you this.  Who did you give

25   the open source video to, as far as the experts in your case, to your
```



1    knowledge?

2            MR. WEBER:  Objection as to form.  If you know.

3            THE WITNESS:  I don't know.

4            MR. HUNT:  Okay.  Okay.  With that, I don't have any further

5    questions.

6                            EXAMINATION

7    BY MR. WEBER:

8        Q    All right.  I'm going to do very brief redirect, Ms. Smith.

9    I'm going to start with the most recent thing that was just asked of

10   you.  Mr. Hunt just asked you something along the lines of, did something

11   change other than the open source video.  And you answered, the body

12   cam; is -- is that right?

13       A    Yes.

14       Q    What is your understanding of how you got the body cam?

15       A    We were not able to get the -- my husband's body cam footage

16   until we filed a lawsuit.  And from there, we were able to subpoena MPD

17   to provide, through the FOIA Act, his body cam footage.

18       Q    And does that body cam footage depict Dr. Kaufman, to your

19   knowledge?

20       A    Yes.

21       Q    And to your knowledge, was Dr. Kaufman dressed in a particular

22   way that day on January 6th?

23       A    Yes.

24       Q    Could you elaborate?  I'm trying not to lead you.  Can you

25   testify as to what the particular state of dress was that makes him so

ERIN SMITH, ET AL. v.                                                    MARCH 06, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   identifiable?

2        A     He was wearing a very specific motorcycle jacket.

3        Q     By any chance, do you remember the colors of the motorcycle

4   jacket?

5        A     Believe it was red and white.

6        Q     Thank you.  In addition to obtaining the body cam images, are

7   you aware of any other video that's out there that assisted in

8   identifying Dr. Kaufman wearing that motorcycle jacket?

9        A     Can you repeat that?

10       Q     Sure.  In addition to the body cam, are you aware of whether

11  there's any other video that depicted him wearing that motorcycle jacket

12  at a different time?

13       A     There's the open source videos from that day of people in and

14  out of the Capitol that were taking video.  I believe he's also on the

15  internal cameras in the Capitol.

16       Q     Are you aware of whether Dr. Kaufman had his own YouTube

17  channel?

18       A     Yes.

19       Q     Do you remember whether there was a video of him in the same

20  motorcycle jacket?

21       A     Yes.

22       Q     Have you become aware of what's happened to that video since

23  you filed your lawsuit?

24       A     Yes.

25       Q     What happened to it?

```
 1        A     It was deleted and removed.

 2        Q     How did you become aware of that?

 3        A     Through, I believe, the United States attorney or the federal

 4   case.

 5        Q     Is there any other testimony that you might have heard where

 6   somebody said that recently?

 7        A     The -- can you repeat that?  Sorry.

 8        Q     Sure.  Have you become aware of any other testimony in this

 9   case where someone has said that very recently, that it was deleted?

10        A     In the deposition?

11        Q     I'm trying not to lead you.  Are you aware of any other

12   depositions in this case?

13              MR. HUNT:  Objection.

14              THE WITNESS:  One.

15   BY MR. WEBER:

16        Q     What other deposition is there in this case?

17        A     The defendant's.

18        Q     Are you aware of any testimony where the defendant said he

19   deleted his own YouTube video that had him wearing his -- this

20   distinctive jacket --

21        A     Yes.

22        Q     -- that identifies him?

23        A     Yes.

24        Q     When was that?

25        A     Last February 27th, I believe.
```

1    Q    It was exactly a week ago, yes?

2    A    Yes.

3    Q    All right.  Now I'm going to the -- the very first thing I

4    want to clear up.  So this is the furthest in time from this morning.

5         Do you remember Mr. Hunt asking you how you have factual

6    awareness that Dr. Kaufman assaulted your husband and you stated, open

7    source video?  Do you remember that?

8    A    Yes.

9    Q    And then you stated, body cam video?

10   A    Yes.

11   Q    And then you stated, other officer body cam video?

12   A    Correct.

13   Q    In addition to those three items: open source, your husband's

14   body cam, other officer's body cam, have you become aware of any other

15   video that has recently been given to -- to your counsel in this case?

16   A    Yes.

17   Q    What is that?

18   A    I believe it's video from the -- the U.S.  Capitol, from their

19   cameras if I can remember correctly.

20   Q    And from your recollection, do you remember who gave that to

21   -- to you, to your legal counsel?

22   A    I believe the federal government.

23   Q    Right.  And by federal government, are you referring to the

24   Department of Justice?

25   A    Yes.



ERIN SMITH V. 12/11/2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1        Q     Okay.  Next, Mr. Hunt spent a bit of time with you showing

2    you two reports from 2022: one of Dr. Arden, one of Dr. Sheehan.

3              Do you remember that from this morning?

4        A     Yes.

5        Q     Are you aware of any more recent reports in this case?

6        A     Yes.

7        Q     What are those more recent reports?

8        A     There is another report from Dr. Bardey, another forensic

9    analysis.  In addition to an updated report from Dr. Arden.

10       Q     Are you aware of why Dr. Bardey was retained in this case?

11       A     Yes.

12       Q     Could you -- you go ahead and testify as to your understanding

13   of why -- without saying anything that your lawyer said to you.

14             But what -- why are you aware of Dr. Bardey being hired in

15   this case?

16       A     The original report at the time was for benefits.  And since

17   then, additional evidence and stuff has come to fruition, and we needed

18   an additional report to expand upon --

19       Q     Oh, but -- but I --

20       A     -- the original.

21       Q     I'm sorry.  I didn't mean to interrupt you.  Let me know when

22   you're done.

23       A     Just to expand upon the original and provide more information.

24       Q     But just to step back for a minute, I mean, why wasn't that

25   done by Dr. Sheehan?  Are you aware of why it wasn't done by Dr. Sheehan?

ERIN SMITH V.                                                      JEROW 09 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1     A     I believe Dr. Sheehan has had a medical diagnosis keeping him

2  from being able to testify.

3     Q     Okay.  So to your knowledge, there's no problem with Dr.

4  Sheehan or his opinions or anything like that?

5     A     No.

6     Q     Okay.  So just staying on Dr. Sheehan for a second.  Mr. Hunt

7  asked you repeatedly questions about his report, and the report that he

8  showed you as an exhibit was dated February 2022; is that right?

9     A     Yes.

10     Q     And you -- I don't want to put words in your mouth.  But you

11  seem to me to be a little confused when he was asking you questions.

12           Can you explain why you were confused?

13     A     The date on the report that was shown was February of 2022.

14  And I believe, based on what I can remember, I first spoke to Dr. Sheehan

15  in July of '21.

16     Q     And there was a prior report that deals with that.  Do you

17  remember that?

18     A     Yes.

19     Q     Other than the -- and you spoke to Dr. Sheehan for both of

20  those reports?

21     A     Correct.

22     Q     Other than that, have you ever spoken to Dr. Sheehan

23  otherwise?

24     A     He may have called one other time.  So approximately a total

25  of three times I've spoken to him.

1    Q    Okay.  So when Mr. Hunt was asking you specifically about

2    that February report and he was being very specific that he wanted you

3    to talk about whether you remembered talking about Dr. Kaufman or the

4    metal pole, do you -- as you sit here today, do you have any memory as

5    to what you talked about in -- in these three different times, at least,

6    that you've spoken to Dr. Sheehan?

7    A    From what I can remember, it was about my husband and him

8    prior, during, and after up until his death.  I do not remember mentioning

9    any specifics about a specific person.

10    Q    And to your memory, what -- what was Dr. Sheehan most focused

11   on when he would speak to you in these three times?  What was it that

12   he was trying to understand from you?

13            MR. HUNT:  Objection to the form of the question.

14            MR. WEBER:  I -- I will rephrase.  I'm sorry.  I --

15   BY MR. WEBER:

16    Q    Was there a particular subject that Dr. Sheehan was focused

17   on in these interviews?

18    A    He was focused on my husband.

19    Q    Okay.  What about your husband?

20    A    And understanding him and who he was before on that -- on

21   January 6th and the week after.

22    Q    And to clarify, that report in February and the earlier

23   report, back then, what was your primary focus in the death of your

24   husband?

25    A    The primary focus was understanding why he died the way he

ERIN SMITH VS                                                                    03-05-2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

 1  died and also in order to get benefits from the city and show that what

 2  he died from was a line of duty death.

 3      Q    So at -- back then, had the city made a decision on whether

 4  it was a line of duty death yet?

 5      A    No.

 6      Q    So just so I make sure I understand it, you're saying that

 7  you were focused on -- on that, on whether it was a line of duty death

 8  or not a line of duty death as a whole at that time?

 9      A    That's correct.  We were trying to get line of duty benefits

10  through the department.

11      Q    Did the city -- did there come a time where the city made a

12  decision?

13      A    Yes.  But their decision was not until approximately March of

14  2022.

15      Q    Which was after these two reports that Mr. Hunt has talked

16  about?

17      A    Correct.

18      Q    Okay.  So what was the decision that the city made?

19      A    That the sole cause of his death was the events of January

20  6th.

21      Q    Okay.  So once you received the line -- and that was a line

22  of duty death designation?

23      A    Correct.

24      Q    So once you received that designation, did the focus -- did

25  your focus change or the focus of your --



ERIN SMITH v. ET AL.                                              05/07/2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1     A    Yes.  Then after that, it was trying to find out exactly who

2  and what was the source of him dying by suicide.

3     Q    Okay.  So you mentioned that there's been two more recent

4  reports.  Do you remember roughly what month or when they were?  These

5  two recent reports?

6     A    I believe they were both finalized within the last month,

7  couple weeks.

8          MR. WEBER:  Okay.  So I'm going to show you what has been --

9  I mean, it's not marked, but we'll -- we'll call it Plaintiffs' Exhibit

10  1.

11          (Plaintiffs' Exhibit 1 was marked for identification.)

12  BY MR. WEBER:

13     Q    Are you able to see my screen?

14     A    Yes.  Is there any way you can make it a little bigger?

15     Q    I could try.  But as --

16     A    If not, I'll --

17     Q    Mr. Hunt -- as Mr. Hunt has already noted, I am technology

18  deficient.  Is this better?

19     A    Much better.

20     Q    Okay.  Can you -- are you able to identify this, what -- I'm

21  calling it Plaintiffs' Exhibit 1?

22     A    Yes.

23     Q    What is it?

24     A    It is the report from Dr. Arden, a supplemental report based

25  on his original report.

ERIN SMITH v. WILLIAM                                        JERRY 02, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1       Q     Do you see a date on it anywhere?

2       A     February 28.

3       Q     Do you have -- do you see a year?

4       A     2025.

5       Q     So that would be last week?

6       A     Yes.

7       Q     Just so we can move quickly and get through it, I'm not

8  representing that this is in the original report.  But I have highlighted

9  a couple of provisions.

10            Can you read the first paragraph that is highlighted out loud

11  for the record, please?

12      A     "The psychological autopsy established that both the

13  psychological trauma and the physical injuries that Jeffrey Smith

14  incurred on January 6, 2021, caused his behavioral changes that

15  culminated in his death by suicide."

16      Q     Now, this is Dr. Arden's report; is that right?

17      A     Yes.

18      Q     So what psychological autopsy is he referring to?

19      A     The update -- the new report from Dr. Bardey.

20      Q     Okay.  Could you please read the second paragraph of Dr.

21  Arden's report?

22      A     "The video analysis demonstrated that defendant Kaufman

23  struck Jeffrey Smith with his own baton inside the face shield of his

24  helmet, causing his helmet to move rapidly and to raise the face shield

25  of the helmet, and then struck Jeffrey Smith a second time with the

1  baton, moving Jeffrey Smith backward from the impact."

2      Q    And then can you read this final paragraph?  It kind of spans

3  the two pages.

4      A    "As previously stated in my declaration, it is my opinion, to

5  a reasonable medical certainty, that the trauma incurred in the event

6  of January 6, 2021, was the direct cause of the depression and the

7  behavioral changes that resulted in the death by suicide of Jeffrey

8  Smith.  That trauma includes both the psychological and physical trauma

9  caused by defendant Kaufman when he attacked Jeffrey Smith with his own

10  baton.  The first impact of the baton was demonstrated to have shifted

11  the helmet and raised the face shield of the helmet, showing application

12  of the blunt force to the head of Jeffrey Smith.

13          "It is more likely than not that the two strikes of Jeffrey

14  Smith with the baton by defendant Kaufman impacted and/or applied forces

15  to the face/head of Jeffrey Smith.  In addition, as we noted by the

16  psychological autopsy, Jeffrey Smith sustained psychological trauma in

17  the chaotic battle during the storming of the Capitol Building, which

18  included psychological trauma inflicted by defendant Kaufman when he

19  attacked Jeffrey Smith.  In summary, the trauma, both physical and

20  psychological, inflicted on Jeffrey Smith by defendant Kaufman was a

21  substantial causal factor to the death of Jeffrey Smith."

22      Q    Is that your understanding of what happened to your husband?

23      A    Yes.

24      Q    And I'm going to move off this document in a minute, but are

25  you aware of what Dr. Arden's former position was with the District of



 1   Columbia?

 2        A    Yes.

 3        Q    What -- what was his former position?

 4        A    That the injuries he sustained that day caused him to die by

 5   suicide.

 6        Q    I'm sorry.  I meant do you -- do you know what he formally

 7   did for work before he was a --

 8        A    Oh.

 9        Q    -- private expert?

10        A    He was a medical examiner of Washington, D.C.

11        Q    In fact, he was the chief medical examiner of the District of

12   Columbia, was he not?

13        A    Yes.

14        Q    Okay.  I'm going to now -- are you now able to see a second

15   document?

16        A    Yes.

17        Q    Yeah.  This one is a little longer.  So I'm just going up to

18   the top.  Okay.  Can you tell me what this document is?

19        A    This is the forensic psychiatry -- psychiatrist autopsy of

20   Jeffrey.

21        Q    By?

22        A    Dr. Arden.  I mean, sorry.  Dr. Bardey.

23        Q    And do you know what the date of this report is?

24        A    February 21, 2025.

25        Q    So that's about two or three weeks ago?

ERIN SMITH v. DAVID WALLS-KAUFMAN      07/09/2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1      A      Yes.

2      Q      Okay.  Have you seen this report before?

3      A      Yes.

4             MR. WEBER:  Again, I'm -- I am -- I am marking this as defense

5      -- as Plaintiffs' Exhibit 2.  I've already uploaded them for Skribe.

6             (Plaintiffs' Exhibit 2 was marked for identification.)

7      BY MR. WEBER:

8      Q      Simply for -- for speed so we can get out of here.  I

9      highlighted a couple things.  I represent that the highlight is not

10     original, meaning I did it to make it quick for you to look at.

11            Can you please read what it says under summary out loud?

12     A      "After reviewing the available discovery, it is evident that

13     Dr. Walls-Kaufman gained control of Officer Smith's baton.  Taking into

14     consideration the professional opinion of Mr. Fredericks, a certified

15     forensic video analysis, as well as the image of Officer Smith's face

16     timestamped after his altercation with Dr. Walls-Kaufman where there is

17     dark discoloration under his eyes, the possibility exists that Dr. Walls-

18     Kaufman used Officer Smith's baton to hit him in the face, causing

19     bilateral periorbital ecchymosis (black eyes) resulting in a possible

20     concussion."

21     Q      Could you read the highlight next that I -- that I've just

22     noted on Page 10 of the report?

23     A      "In addition to suffering from at least one physical injury,

24     Officer Smith suffered from a significant psychological injury as a

25     direct result of his experiences on January 6, 2021.  Specifically the

ERIN SMITH, ET AL. v.                                          March 9, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   action -- "

2       Q    And I -- I -- I recognize that -- that there are now three

3   lines of text in between.  But if you could read the next highlighted

4   portion?

5       A    "Specifically the actions of the defendant, Dr. David Walls-

6   Kaufman."

7       Q    And now I've moved to the next page, which is Page 11 of the

8   report.  Could you read the highlighted portion?

9       A    "With that already tense and overwhelming framework in the

10  background, Officer Smith was then directly exposed to significant

11  psychological trauma on January 6, 2021, as a result of his assault by

12  Dr. Walls-Kaufman and resulting possible physical trauma.  Video footage

13  of the altercation showed a clearly chaotic scene wherein protestors

14  engaged in physical violence with the officers, including Officer Smith.

15       During his altercation with Dr. Walls-Kaufman, Officer Smith

16  can be seen extending out his baton in an effort to create distance

17  between him and the rioters.  However, Dr. Walls-Kaufman gained control

18  of Officer Smith's baton and proceeded to use it against him."

19      Q    Now, you mentioned a few minutes ago that you were present

20  for Dr. Kaufman's deposition last week, right?

21      A    Yes.

22      Q    You saw this -- you saw this -- you saw the video of your

23  husband extending the baton out and Dr. Walls-Kaufman gaining control

24  over it yourself, personally, right?

25      A    Yes.

ERIN SMITH V.  WH 11-04-2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1      Q      What was he wearing?

2      A      A red and white motorcycle jacket.

3      Q      Okay.  Now, can you read the highlight on the bottom of Page

4  11?

5      A      "On January 6th, 2021, while responding to the riot in the

6  U.S.  Capitol, Officer Smith was exposed to significant threats to his

7  life, including his assault by Dr. Walls-Kaufman."

8      Q      All right.  And then I'm moving you to Page 12 of the report.

9  Can you read the first highlighted and then the second highlighted

10  portion of Page 12?

11      A      "At the moment, Dr. Walls-Kaufman took hold of Officer Smith's

12  baton and attempted to use it against him.  He experienced significant

13  fear for his safety while in the line of duty.  In summary, it is our

14  opinion, within a reasonable degree of psychiatric and psychological

15  certainty, that Officer Smith suffered significant physical and

16  psychological injuries as a direct result of his experiences on January

17  6th, 2021.  Specifically the first physical assault at the hands of Dr.

18  Walls-Kaufman, which gave way to acute suicidality leading to his

19  untimely demise."

20      Q      And this report, who was it signed by at the bottom?

21      A      Ally Epstein and Alexander Sasha Bardey.

22      Q      And you hired these people or -- or directed that they be

23  retained?

24      A      Yes.

25      Q      And based on their report, do you have a view as to who caused

ERIN SMITH V. DAVID WALLS-KAUFMAN                            MARCH 9, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1   the death of your husband?

 2        A    Yes.

 3        Q    Who?

 4        A    Dr. Walls-Kaufman.

 5             MR. WEBER:  All right.  I'm sorry to ask these difficult

 6   questions.

 7             All right.  I have no further questions for this witness.  Do

 8   you have any further redirect, Mr. Hunt?

 9             MR. HUNT:  Yes, briefly.

10                          EXAMINATION

11   BY MR. HUNT:

12        Q    So just so I understand it, your husband had black eyes on

13   January 7th, 2021, when he -- when he came home?

14        A    Yes.

15        Q    Okay.

16        A    According to the --

17        Q    According to you?

18        A    No, no, no, no.

19        Q    I'm sorry.  It -- it broke up.  I couldn't hear.  I just --

20   I'm sorry.  I -- I'll rephrase the question.

21             Just so I understand, when your husband came home, you talked

22   -- we talked about it.  You didn't mention no black eyes.  Are you saying

23   now from your testimony that when he came home on January 7th, 2021, at

24   3:00 a.m., he had black eyes?

25        A    I do not remember.
```

```
 1          MR. WEBER:  I'm objecting as to form because it's a -- hold

 2   on.  I'm objecting as to form because it's a compound question.  But if

 3   you understand what he is asking, you're -- you can answer.

 4          THE WITNESS:  I do not remember.

 5   BY MR. HUNT:

 6      Q    You don't remember?

 7      A    No, I do not remember.

 8      Q    Okay.  Did you take a picture of him on January 7th, 2021?

 9      A    No.

10      Q    Did you ever tell anyone he had black eyes?

11      A    No.

12      Q    Did you tell Dr. Arden on that first meeting he had black

13   eyes in February of 2022?

14      A    No, not that I remember.

15          MR. WEBER:  I -- I'm objecting as to form.  I'm not even sure

16   she spoke to Dr. Arden.  Do -- do -- I'll -- I'll just read --

17          MR. HUNT:  I mean, Dr. Weber, you had your turn to question

18   her.  I mean, come on, man, seriously.

19   BY MR. HUNT:

20      Q    Now we went through this at length.  You met with Dr. Arden

21   in February 18th of 2022, correct?

22          MR. WEBER:  I object and I object to form.  She did not meet

23   Dr. Arden.  What we went through is you okay showing --

24          MR. HUNT:  Dr. Weber, you don't get speaking objections.  You

25   made your objections.  I'm moving on -- geez.
```

ERIN SMITH v. MICHAEL WALLS, ET AL.                                    MARCH 5, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1          MR. WEBER:  I'm sorry.  I need to -- to make this objection.

2    You are referencing Dr. Arden.  You are referring to her prior testimony

3    with Dr. Sheehan.

4          MR. HUNT:  Okay.  I am I'm -- I'm I -- I realize that.  I'm

5    pulling up the documents, sir.

6    BY MR. HUNT:

7          Q    On February 18th, 2022, you met with Dr. Sheehan; is that

8    correct?

9          A    Yes.

10         Q    And you ain't telling him nothing about no black eyes at that

11   time; is that correct?

12         MR. WEBER:  I object to the form of this question.  This is

13   his report.  He's the witness.

14   BY MR. HUNT:

15         Q    Did you tell Dr. Sheehan that --

16         MR. WEBER:  I'm sorry.  My objection --

17   BY MR. HUNT:

18         Q    -- your husband had black eyes at the time of January 6th or

19   January 7th, 2021, when he came home?

20         MR. WEBER:  I'm sorry.

21         THE WITNESS:  Not that I remember, no.

22   BY MR. HUNT:

23         Q    Okay.

24         MR. WEBER:  I'm sorry, Ms. Smith.  My objection was

25   interrupted the last time, and I'm making an objection again as to form,

 1  okay?  You can answer the question if you understand the question, but

 2  I'm objecting as to form.

 3  BY MR. HUNT:

 4      Q    So just so we're clear, are you now claiming that your

 5  husband, Jeffrey Smith, had black eyes after the incident on January

 6  6th, 2021, at the Capitol Building?

 7      A    I do not remember.

 8      Q    Okay.  Now, you don't remember.  You just said that.  I get

 9  it.

10           Did your husband ever tell you he had black eyes?

11      A    I do not remember.

12      Q    Okay.  We've already gone through the documentation.  Do you

13  have any document in your possession where your husband made the

14  allegation that he had -- had black eyes from an assault by Dr. David

15  Walls-Kaufman?

16           MR. WEBER:  I object as to the form.  You can answer if you

17  know the question if you understand what he is asking.

18           THE WITNESS:  Can you clarify?

19  BY MR. HUNT:

20      Q    As I understand it, right now, part of your claim, and you

21  can correct me if I'm wrong, is that your husband suffered black eyes

22  because of the assault that Dr. Walls-Kaufman subjected him to on January

23  6th, 2021?  Is that your claim, ma'am?

24      A    I'm not sure I fully understand what you're trying to ask.

25      Q    Okay.  I -- I'll back it up.  The report your counsel just

ERIN SMITH V. DAVID WALLS-KAUFMAN                        MARCH 19, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1   went through, said that your husband would have black eyes; is that

 2   correct?

 3        A    Yes.

 4        Q    And from the assault of Dr. David Walls-Kaufman, correct?

 5        A    Yes.

 6        Q    Is it your claim or contention that the assault that Dr.

 7   Walls-Kaufman, that you allege, caused your husband to have black eyes?

 8        A    Yes.

 9        Q    Okay.  But as you sit here today, you don't remember seeing

10   your husband have any black eyes?

11        A    Correct.

12        Q    The only basis for you to claim that Dr. David Walls-Kaufman

13   caused your husband to have black eyes is the report from your expert

14   witness; is that correct?

15        A    There's a photo.

16        Q    Okay.  There's a photo?

17        A    Yes.

18        Q    From when?

19        A    From January 6th, 2021.

20        Q    And that photo -- okay.  And when is the last time you saw

21   this photo?

22        A    I -- I don't remember.  A couple weeks ago, a month ago.

23        Q    Okay.  Did you have that photo at the time you drafted -- or

24   your responses to your interrogatories?

25        A    Yes.
```

1    Q    Okay.  All right.  And question 12 was, "Identify each person

2  other than an expert witness at trial having discoverable information

3  that supports a position you have taken, including any claim for debt,

4  damages.  State the subject matter or jurisdiction possessed by said

5  persons."

6         Do you remember that question?

7    A    Yes.

8    Q    Okay.  And is this your response?

9    A    Yes.

10   Q    Right there you said -- can you -- can you read from where it

11  says, "I recall the events of January 6th, 2021"?

12   A    Yes.

13   Q    Okay.  Can you start reading there for me, please?

14   A    "I recall the events of January 6th, 2021.  Jeff texted me

15  from the Capitol with a message, London falling.  Jeff arrived home from

16  work January 7th, 2021, at 2:00 a.m., said he had been hit in the head

17  with a metal pipe and did not know where he was.  He mentioned other

18  things that happened that day but did -- but I did not press for him for

19  more information."

20   Q    Continue.

21   A    "After January 6th, 2021, I observed various issues with my

22  husband.  He complained of vision problems, headaches, balance problems,

23  lack of focus, concentration, memory problems, sleep problems, and

24  problems with lights and sound.  He did not want to have the lights on,

25  he said it bothered him.  As far as sleep problems, I noticed him up in

ERIN SMITH V. DAVID WALLS-KAUFMAN, ET AL.    MARCH 7, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1   the middle of the night.  He was emotionally irritable.  I noticed memory
 2   problems.  For example, he did not remember to do the things that he
 3   usually did each day."
 4        Q    Please continue.
 5        A    "When I spoke to Jeff, he seemed mentally and emotionally
 6   distant.  I observed that he was physically clumsy and it appeared he
 7   lost his balance while walking.   He repeatedly said that he had
 8   headaches."
 9        Q    I'm just going to go down -- going down to the end here.  And
10   that's your signature, correct?
11        A    Yes.
12        Q    Now you signed that under oath?
13        A    Yes.
14        Q    And you don't mention any black eyes, correct?
15        A    Yes.
16        Q    Okay.  Do you want to change that answer now?
17        A    No.
18        Q    Okay.  Because he didn't have any black eyes when he came
19   home, we can agree?
20             MR. WEBER:  Objection.  Are you testifying after lecturing
21   us, this woman is a victim of a crime?
22             MR. HUNT:  We can agree on that.
23             MR. WEBER:  No.  We object to this.  If you're going to hector
24   my witness.  If you're going to hector somebody who's the victim of a
25   murder, ask a question.  Otherwise, we're done.
```



ERIN SMITH V. WM. DAVID WALLS-KAUFMAN, ET AL. MARCH 17, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1   BY MR. HUNT:

2        Q    Isn't it true that your husband didn't have black eyes when

3   he came home on January 7th, 2021?

4        A    No, it is not true.

5        Q    Okay.  But you don't remember whether he had black eyes or

6   not?

7        A    No, it was four years ago.

8        Q    Okay.  And -- and -- so are you saying your memory -- well,

9   let's just live in that for a second.  So you testified on -- on your

10  counsel's redirect that you changed -- or you changed your focus from

11  when you were applying for benefits than when you were pursuing a

12  wrongful death case, correct?

13       A    Yes.  It's two separate reports.

14       Q    Two separate reports, but they -- they -- one was a line of

15  duty death and that was for MPD, correct?

16       A    At the time of his death, that's what our focus was.

17       Q    Okay.  And so now the focus is on proving that Dr. Walls-

18  Kaufman caused your husband to -- to lose his life, correct?

19       A    Yes.

20       Q    Okay.  So your experts changed their reports to suit that --

21  to suit whatever your need was in this case.  Is that what -- is that

22  what I'm hearing?

23       A    No.

24            MR. LINK:  Object.  I think that would be argumentative and

25  beyond scope of Plaintiff's knowledge.

```
1               MR. HUNT:  Okay.  Well --

2               MR. WEBER:  He -- he's forgetting to use the word objection.

3    He's making an objection, argumentative beyond the scope of knowledge.

4    BY MR. HUNT:

5        Q    I -- I understand that.  But you -- you -- you -- you just

6    testified that your was different in -- in this in -- in different

7    environments.  The one environment was getting the survivor benefits,

8    which you obtained, correct?

9        A    Yes.

10       Q    And how much did you obtain?

11              MR. WEBER:  Objection.

12              THE WITNESS:  I don't know.

13              MR. WEBER:  This is the same -- hold on, please.  Mr. Link

14   previously made an objection to this.  I'm making an objection, too.

15   This is the collateral source document -- doctrine.  There is D.C. law

16   on this.

17              Subject to that objection, you can answer if you know.

18   BY MR. HUNT:

19       Q    How much money did you get?

20       A    I don't -- I don't know the actual numbers.

21       Q    You don't remember?

22       A    I don't remember the actual numbers.

23       Q    Okay.  You got that money.  And then after you got that money,

24   you turned your focus on filing a wrongful death lawsuit, correct?

25       A    Yes, to determine what happened that day.
```



1    Q    Okay.  And based on that -- and -- and -- and I guess -- I

2  guess I'm just unclear now, based on your -- is your claim now that Dr.

3  Kaufman's action was one of many causes in your husband's demise, or are

4  you claiming that Dr. Kaufman was the only cause of your husband's

5  demise?

6         MR. WEBER:  Objection.  This causes for -- this calls for a

7  legal conclusion, but you can answer the question to the best of your

8  knowledge.

9         THE WITNESS:  Can you repeat the question again?

10  BY MR. HUNT:

11    Q    Well, we've -- we've been through the expert reports.  We've

12  been through your testimony and I just want to be -- I just want to be

13  clear what you're claiming in your case.

14         Are you claiming the only reason your husband died is because

15  of the actions of Dr. Walls-Kaufman?  Is that your assertion here?

16         MR. LINK:  I just -- I would object just because it's asked

17  and answered and also it's beyond the scope of the redirect.  But subject

18  to that, go ahead and answer.

19         THE WITNESS:  Yes, he caused my husband to suffer injuries

20  that led him to die by suicide.

21  BY MR. HUNT:

22    Q    Okay.  Was -- and -- and what I'm getting at is, were there

23  any other injuries your husband sustained that caused that suicide as

24  well, or was that the only cause?  Is that your assertion?

25         MR. WEBER:  Again, I'm objecting as to form.  I'm objecting

 1   because it's calling for a legal conclusion, but subject to that, she

 2   can answer.  And it's asked and answered, as my colleague said.

 3            But you can answer the question if you understand it, Ms.

 4   Smith.

 5            THE WITNESS:  You repeat it?

 6   BY MR. HUNT:

 7       Q    Ma'am, this is very simple.  You -- you already talked about

 8   the two different actions you filed and two different standards or

 9   focuses you had.

10            I'm just only asking you, are you saying -- is your assertion

11   that Dr. Walls-Kaufman's actions of the assault you allege is the only

12   cause of your husband's death, the sole cause?  Is that your assertion?

13            MR. WEBER:  Again, I object based on form.  I object based on

14   asked and answered.  I object based on calling for a legal conclusion.

15   You can answer the question if you know it.

16            THE WITNESS:  I don't know.

17   BY MR. HUNT:

18       Q    Okay.  You don't know?  Well, what other causes -- what other

19   causes do you -- are you aware of that caused your husband's death?

20       A    Can you clarify?

21       Q    Your husband died, ma'am, on January 15th of 2021, what caused

22   this death?

23       A    The assault that he experienced in the U.S.  Capitol.

24       Q    The assault by whom?

25       A    The defendant.



ERIN SMITH v. WEBER, ET AL.                                      March 4, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1        Q    Which defendant, ma'am.

2        A    Kaufman.

3        Q    Okay.  And that's the only cause of his death; is that your

4   assertion?

5             MR. WEBER:  I again object because it calls for a legal

6   conclusion.  I object based on form.  I object based on asked and

7   answered, but you can answer the question if you know.  It.  Is it just

8   Dr. Kaufman or is -- is there other things that contributed to it?

9             THE WITNESS:  There could be other contributing, but he was

10  assaulted and suffered --

11  BY MR. HUNT:

12       Q    What is your --

13       A    -- concussion.

14            MR. WEBER:  I'm sorry.  I object.  You interrupted the witness

15  while she was speaking.

16            Do you want to finish what you're saying, Ms. Smith?

17            THE WITNESS:  No, sir.  Please continue.

18  BY MR. HUNT:

19       Q    What are -- what is your assertion were the other causes of

20  your husband's death?

21            MR. WEBER:  Again, I object based on form.  I object based on

22  compound question.  I object based on asked and answered.  I object based

23  on calling for a legal conclusion.  .

24            Subject to that, I'm rephrasing what he said.  He is saying,

25  are there any other causes to the death of your husband?  So if you

ERIN SMITH V.                                                    09/05/2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

 1 | know, you can answer it.

 2 |        MR. HUNT:  Dr. Weber, I can ask my own question, sir.

 3 | BY MR. HUNT:

 4 |    Q    Ma'am, it's very simple.  What other causes of your husband's

 5 | death are there, if any?

 6 |        MR. WEBER:  I object based on form.  I object based on asked

 7 | and answered.  I object based on calls for a legal conclusion.  You can

 8 | answer the question if you understand it.

 9 |        THE WITNESS:  The events of January 6th.

10 | BY MR. HUNT:

11 |    Q    Okay.  The other events that don't involve Dr. Walls-Kaufman?

12 |    A    I don't know.  It would be based on the medical report.

13 |    Q    Okay.  So would you agree that there are other causes for

14 | your husband's death then, other than your allegation that Dr. Walls-

15 | Kaufman assaulted your husband?  Would you agree that there are other

16 | causes for your husband -- husband's death?  Would you agree with that

17 | statement?

18 |        MR. WEBER:  I again object.  I now object based on compound

19 | questions.  I continue to object based on asked and answered.  I continue

20 | to object based on form.  I continue to object based on calling for a

21 | legal conclusion.  Ms. Smith, you may answer the question.

22 |        THE WITNESS:  I don't know, there could be based on the

23 | reports that were provided.

24 | BY MR. HUNT:

25 |    Q    And the reports of your experts?



ERIN SMITH V. WM. DAVID WALLS KAUFMAN, ET AL.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1    A    Correct.

2         MR. HUNT:  Okay.  I have no further questions.

3         MR. WEBER:  All right.  I apologize.  I need to do one further

4    re-redirect.

5                        EXAMINATION

6    BY MR. WEBER:

7    Q    Ms. Smith, Mr. Hunt asked a lot of questions a few minutes

8    ago about this -- this photograph.  Can you just testify where this

9    photograph came from?  Who took it?  I'm trying to do it in a non-leading

10   way.  So just go ahead and testify as to this photo and what it is.

11   A    Sure.  So it was a selfie that Jeff had taken of himself and

12   texted after the assault.

13   Q    So he texted it to you when?

14   A    That -- on January 6th.  I'm not -- I can't remember the exact

15   time.

16   Q    And you turned that photo over in discovery to Mr. Hunt, did

17   you not?

18   A    Yes.

19   Q    And a few moments ago when Mr. Hunt was talking to you -- you

20   testified that you had seen it just a couple weeks ago.  Why had you

21   seen it recently a couple weeks ago, or whenever it was you said in your

22   testimony?  Why had you seen it?

23   A    To provide it for the expert report.

24   Q    And before that, had you seen it recently as well?

25   A    I can't recall.

ERIN SMITH V.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1    Q    Do you recall whether you turned it over in discovery?

2    A    Yes.

3    Q    So you would've seen it then?

4    A    Yes.

5    Q    Is this photo something that you've been aware of since --

6    since all of the -- since this lawsuit was filed?

7    A    Yes.

8    Q    Is your testimony today the first time you've talked about

9    the black eyes in the photo?

10    A    I don't remember.

11    Q    Okay. Do you remember a long time ago getting the autopsy

12    from the Virginia medical examiner?

13    A    Yes.

14    Q    Do you remember reference in the report to injuries to his

15    suborbital cavities?

16    A    Yes.

17    Q    I'm just going to ask the question again because I think it

18    probably refreshed your recollection.

19        Is this the first time that the issue of the black eyes has

20    come up based on the -- the -- the autopsy from the beginning?

21    A    No, it was brought up during the medical exam and after --

22    when the autopsy was received, based on the photos that I had received

23    from him.

24    Q    So your -- your understanding is -- is that the reference to

25    suborbital fractures is -- is -- has something to do with the black eyes?

ERIN SMITH V.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1  Could you explain what your understanding is?

 2             MR. HUNT:  Objection to the form.

 3             THE WITNESS:  Yes.

 4  BY MR. WEBER:

 5       Q    I -- I'm trying to do it open-ended because you're my witness.

 6  So you -- you have to be the testimony.

 7             What is your understanding?

 8       A    Yes, so based on the autopsy report and where the fractures

 9  were around his eye and face, it correlated to the black eye in the

10  photo.

11       Q    And so I'm just going to ask the same question again.  I'm

12  sorry.  He can object for asked and answered.

13             But now that you're reminded of the autopsy, is this the --

14  is today's testimony the first time that this issue of the black eyes

15  has come up?

16       A    No.

17       Q    And in fact, now do you remember -- has this come up with the

18  other experts even at the beginning of the line of duty death

19  designation?

20       A    I believe so, yes.

21             MR. WEBER:  I have no further questions.

22             MS. DEY:  Okay.  If nobody has anything else, I will take us

23  off the record.  Thank you everyone.  I placed the link in the chat box

24  for the exhibits.  Please upload any exhibits that were introduced to

25  the link.  Counsel for the witness, you will receive an email from Skribe
```

**Skribe**

1  that enables you to review the video record and submit a statement of

2  changes, if any.  Someone from Skribe will also be reaching out regarding

3  ordering a copy of the deposition materials.

4          Now, Mr. Court Reporter, do you have anything?

5          MR. JORDAN:  Yes, still on the record.  Mr. Weber, would you

6  like to advise your client of her right to read and sign the transcript?

7          MR. WEBER:  Yeah.  Ms. Smith, you have a right, I'm sure --

8  I -- I know you heard this last week, too.  You have a right to read and

9  review your transcript and submit any changes if there's been a mistake

10 or you can waive that.  I would suggest that we read the transcript, but

11 it's up to you.

12         THE WITNESS:  Just so I heard you correctly, you're advising

13 me to read it?

14         MR. WEBER:  If you are willing to take the time, yes.

15         THE WITNESS:  Okay.  That's fine.

16         MR. LINK:  We'll make arrangements off the record.

17         MS. DEY:  Is that all?

18         MR. WEBER:  No.  Hang on.  One more thing.  And, Mr. Court

19 Reporter, I submitted the exhibits just now to Brenda, to Skribe, because

20 they gave me a link.

21         MR. JORDAN:  Yes, sir.

22         MR. WEBER:  How do you want me to give them to you?

23         MR.    JORDAN:    You    can    send    them    to    me    at

24 exhibits@veteranreporters.com, or you can simply reply to the email that

25 I sent you earlier.

S▶ribe

ERIN SMITH v. WILLIAM DAVID WALLS KAUFMAN, ET AL.

DAVID WALLS KAUFMAN, ET AL.

DEPOSITION OF ERIN SMITH

```
 1              MR. WEBER:  Exhibits@veterans --

 2              MR. JORDAN:  Veteran singular, reporters, plural, at .com.

 3              MR. WEBER:  Dot com?

 4              MR. JORDAN:  Yeah.

 5              MR. WEBER:  Got it.  Thank you.

 6              MR. JORDAN:  Thank you.

 7              MS. DEY:  Anything -- anything else?

 8              MR. WEBER:  No, ma'am.

 9              MR. JORDAN:  Mr. Hunt, would you like to order the transcript

10   at this time?

11              MR. HUNT:  I got my own transcript, brother.

12              MR. JORDAN:  Dr. Weber, would you like to order the transcript

13   at this time?

14              MR. WEBER:  I'm going to consult with my client.

15              MR. JORDAN:  Understood.  I have nothing further.

16              MS. DEY:  Okay.  If there's nothing further, it is 2:37 p.m.

17   Eastern Time, and we are off the record.

18

19

20

21

22

23

24

25
```

```
 1              IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

 2                             CIVIL DIVISION

 3

 4      ERIN SMITH, ET AL.           )

 5            PLAINTIFFS,            )

 6                                   )

 7      VS.                          )     CASE NO. 1:21-CV-02170 (FYP)

 8                                   )

 9      DAVID WALLS KAUFMAN, ET AL.)

10            DEFENDANTS.            )

11

12       ****************************************************

13       CERTIFICATE OF NON-STENOGRAPHICALLY RECORDED PROCEEDING

14            VIDEOTAPED DEPOSITION OF ERIN SMITH

15                         MARCH 6, 2025

16

17       AT THE REQUEST OF THE SCHEDULING ATTORNEY AND PURSUANT TO FEDERAL

18   RULES OF CIVIL PROCEDURE 28, 30, AND ANY OTHER APPLICABLE RULES, I,

19   TRACI FRAZIER, A NOTARY PUBLIC IN AND FOR THE STATE OF MARYLAND, DO

20   HEREBY CERTIFY:

21

22       THE WITNESS, ERIN SMITH, WAS DULY SWORN BY ME IN A NON-

23   STENOGRAPHIC PROCEEDING THAT TOOK PLACE AS FOLLOWS:

24       LOCATION:  REMOTE, ONLINE AUDIO AND VIDEO

25       DATE:      MARCH 6, 2025
```

ERIN SMITH V. DAVID WALLS-KAUFMAN, ET AL.    MARCH 9, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1       TIME:      10:01 A.M., EST

2       EVENT:     DEPOSITION

3       THE TESTIMONY AND PROCEEDING WERE NON-STENOGRAPHICALLY RECORDED

4   BY THE SCHEDULING ATTORNEY USING ELECTRONIC AUDIO AND/OR AUDIOVISUAL

5   RECORDING METHODS THROUGH ZOOM SOFTWARE.

6

7       THE NON-STENOGRAPHIC AUDIO AND/OR AUDIOVISUAL RECORDING MADE BY

8   THE SCHEDULING ATTORNEY IS INTELLIGIBLE, ACCURATE AND TRUSTWORTHY AND

9   IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE WITNESS. ALL PARTIES

10  WHO ATTENDED THE PROCEEDING AGREED TO SKRIBE, INC.'S TERMS AND

11  CONDITIONS AND AGREED TO THE PROCEEDING BEING RECORDED NON-

12  STENOGRAPHICALLY USING ELECTRONIC AUDIO AND/OR AUDIOVISUAL RECORDING

13  METHODS.

14

15      THE NON-STENOGRAPHIC AUDIO AND/OR AUDIOVISUAL RECORDING AND THIS

16  CERTIFICATE WERE ELECTRONICALLY DELIVERED TO ALL PARTIES WHO ATTENDED

17  THE EVENT ON OR ABOUT MARCH 14, 2025, AND THIS CERTIFICATE MAY BE

18  FILED WITH THE COURT, PER FEDERAL RULE OF CIVIL PROCEDURE 30.

19

20      THE AMOUNT OF TIME USED BY EACH PARTY AT THE DEPOSITION IS AS

21  FOLLOWS:

22      ATTORNEY 1: DAVID P. WEBER

23      DURATION OF EXAMINATION: 29 MINUTES

24      ATTORNEY 2: RICHARD J. LINK

25      DURATION OF EXAMINATION: 0 MINUTES



ERIN SMITH - MAY 01, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

1          ATTORNEY 3: HUGHIE D. HUNT

2          DURATION OF EXAMINATION: 176 MINUTES

3          THE AMOUNT OF THE CHARGES TO THE SCHEDULING ATTORNEY FOR

4     PREPARING THE ORIGINAL NON-STENOGRAPHIC RECORD IS $_____.

5

6          THE NON-STENOGRAPHIC AUDIO AND/OR AUDIOVISUAL RECORDING WAS

7     ELECTRONICALLY DELIVERED TO THE WITNESS OR TO THE ATTORNEY FOR THE

8     WITNESS FOR REVIEW AND SIGNATURE ON MARCH 14, 2025, AND THE STATEMENT

9     OF CHANGES WAS RETURNED BY EMAIL BY APRIL 25, 2024 (OR) WAS NOT

10    RETURNED BY THE WITNESS OR BY THE ATTORNEY FOR THE WITNESS. IF

11    RETURNED, THE STATEMENT OF CHANGES IS ATTACHED HERETO.

12

13         I FURTHER CERTIFY THAT I AM NOT RELATED TO ANY OF THE PARTIES TO

14    THIS ACTION BY BLOOD OR MARRIAGE AND AM IN NO WAY FINANCIALLY

15    INTERESTED IN THE OUTCOME OF THIS MATTER.

16

17

18

19

20

21

22

23

24

25

ERIN SMITH, ET AL. v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

MARCH 6, 2025

1    STATE OF *Maryland*

2    COUNTY OF *St. Mary's*

3

4    THE ATTACHED DOCUMENT, ERIN SMITH, ET AL. v. DAVID WALLS KAUFMAN, ET

5    AL., DATED MARCH 6, 2025, AND CONTAINING 135 PAGES, IS A TRUE AND

6    CORRECT COPY OF AN ELECTRONIC RECORD PRINTED BY ME OR UNDER MY

7    SUPERVISION. AT THE TIME OF PRINTING, NO SECURITY FEATURES PRESENT ON

8    THE ELECTRONIC RECORD INDICATED ANY CHANGES OR ERRORS IN AN ELECTRONIC

9    SIGNATURE OR OTHER INFORMATION IN THE ELECTRONIC RECORD AFTER THE

10   ELECTRONIC RECORD'S CREATION OR EXECUTION.

11

12   THIS DECLARATION IS MADE BY ME UNDER PENALTY OF PERJURY AND SIGNED

13   THIS *10th* DAY OF *March* . 2025

14

15                                        NOTARY SEAL

16

17   *Traci Frazier*

18   NOTARY PRINTED NAME

19                                    ┌─────────────────────────┐
                                      │      TRACI FRAZIER        │
20   *Traci Frazier*                   │ Notary Public - State of Maryland │
                                      │      St Mary's County     │
21   NOTARY SIGNATURE                  │ My Commission Expires Feb 8, 2028 │
                                      └─────────────────────────┘
22

23   NOTARY COMMISSION NUMBER _____

24

25

**Skribe**

ERIN SMITH, ET AL. v.
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

MARCH 6, 2025

1  STATE OF *Maryland*

2  COUNTY OF *St. Mary's*

3

4  BEFORE ME, A NOTARY PUBLIC, ON THIS DAY PERSONALLY APPEARED:

5  ATTORNEY 1: DAVID P. WEBER

6  ATTORNEY 2: RICHARD J. LINK

7  ATTORNEY 3: HUGHIE D. HUNT

8  WITNESS: ERIN SMITH

9  LAST FOUR NUMBERS OF VALID GOVERNMENT-ISSUED ID 4955, ISSUED BY THE

10  STATE OF VIRGINIA.

11  COUNSEL PRESENTED TO ME TO BE THE PERSONS WHOSE NAMES ARE SUBSCRIBED

12  TO THE FOREGOING DOCUMENT AND, BEING BY ME FIRST DULY SWORN, DECLARED

13  THAT THE STATEMENTS THEREIN CONTAINED ARE TRUE AND CORRECT.

14

15                                                NOTARY SEAL

16

17  *Traci Frazier*

18  NOTARY PRINTED NAME

19

20  *Traci Frazier*

21  NOTARY SIGNATURE

22

23  NOTARY COMMISSION NUMBER:

24

25

TRACI FRAZIER
Notary Public - State of Maryland
St Mary's County
My Commission Expires Feb 8, 2028

 1                    **STATEMENT OF CHANGES**

 2          **TO NON-STENOGRAPHICALLY RECORDED PROCEEDING**

 3    WITNESS NAME:        ERIN SMITH

 4    DATE OF PROCEEDING:   MARCH 6, 2025

 5    **Timecode        Page & Line           Change              Reason**

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

ERIN SMITH V. CONTEC, INC. MARCH 6, 2025
DAVID WALLS KAUFMAN, ET AL.
DEPOSITION OF ERIN SMITH

```
 1  I, ERIN SMITH, HAVE REVIEWED THE NON-STENOGRAPHIC RECORD AND HEREBY

 2  AFFIX MY SIGNATURE THAT IT IS INTELLIGIBLE, ACCURATE AND TRUSTWORTHY

 3  AND IS A TRUE RECORD OF THE TESTIMONY GIVEN BY ME ON MARCH 6, 2025,

 4  EXCEPT AS NOTED ON THE PREVIOUS PAGE(S).

 5

 6                               _____

 7                               ERIN SMITH

 8

 9  THE STATE OF _____

10  COUNTY OF _____

11

12        BEFORE ME, _____, ON THIS DAY

13  PERSONALLY APPEARED ERIN SMITH KNOWN TO ME OR PROVED TO ME UNDER OATH

14  OR THROUGH _____, (DESCRIPTION OF IDENTITY CARD

15  OR DOCUMENT) TO BE THE PERSON WHOSE NAME IS SUBSCRIBED TO THE

16  FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT THEY EXECUTED THE

17  SAME FOR THE PURPOSES AND CONSIDERATION THEREIN EXPRESSED.

18

19        GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS _____ DAY

20  OF _____, _____.

21

22                               _____

23                               NOTARY PUBLIC IN AND FOR

24                               THE STATE OF _____

25
```