**EXHIBIT** 3

Part 1



MARYLAND:

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ERIN SMITH, ET AL.

PLAINTIFF,

VS.                              CASE NO. 21-CV-02170

DAVID KAUFMAN, ET AL.,

DEFENDANT.

---

REMOTE DEPOSITION VIA ZOOM AND
HOSTED BY VETERAN REPORTERS, INC OF
DAVID CHADWICK WALLS-KAUFMAN, D.C.

THURSDAY, FEBRUARY 27, 2025
10:03 A.M.

GOODWIN WEBER PLLC
11115 LAKE VIEW LANE
SUITE 1698
BERLIN, MARYLAND 21811

VETERAN
REPORTERS

855.667.0077
540.667.4114
VETERANREPORTERS.COM

**2**

```
1           APPEARANCES
2  ON BEHALF OF THE PLAINTIFF,
3  ERIN SMITH, ET AL.:
4  RICHARD J. LINK, ESQUIRE
5  GOODWIN WEBER PLLC
6  11115 LAKE VIEW LANE
7  SUITE 1698
8  BERLIN, MARYLAND, 21811
9  TELEPHONE: 301.850.1600
10 FACSMILE: 301.850.3374
11 EMAIL: RICHARD.LINK@GOODWINWEBERLAW.COM
12
13 ON BEHALF OF THE PLAINTIFF,
14 ERIN SMITH, ET AL.:
15 DR. DAVID P. WEBER, ESQUIRE
16 GOODWIN WEBER PLLC
17 11115 LAKE VIEW LANE
18 SUITE 1698
19 BERLIN, MARYLAND, 21811
20 TELEPHONE: 301.850.1600
21 FACSMILE: 301.850.3374
22 EMAIL: DAVID.WEBER@GOODWINWEBERLAW.COM
23
24
25
```

**4**

```
1              INDEX
2                    Page
3  DAVID CHADWICK WALLS-KAUFMAN, D.C.:
4  DIRECT EXAMINATION BY MR. LINK      6
5
6
7           EXHIBITS
8  Exhibit              Page
9
10         NONE MARKED
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1            APPEARANCES
2  ON BEHALF OF THE DEFENDANT,
3  DAVID KAUFMAN, ET AL.:
4  HUGHIE D. HUNT, II, ESQUIRE
5  KEMET HUNT LAW GROUP
6  7845 BELLE POINTE DRIVE
7  GREENBELT, MARYLAND, 20770
8  TELEPHONE: 301.982.0888
9  FACSMILE: 301.982.0889
10 EMAIL: HUGHIEHUNT@KEMETHUNTLAW.COM
11
12 OBSERVERS:
13 ERIN SMITH
14 ANTHONY MICHAEL SHORE
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
1      REMOTE DEPOSITION VIA ZOOM AND
2   HOSTED BY VETERAN REPORTERS, INC OF
3      DAVID CHADWICK WALLS-KAUFMAN, D.C.
4      THURSDAY, FEBRUARY 27, 2025
5          10:03 A.M.
6       COURT REPORTER:  My name is Tamara
7  Adams. I am with the, I am the court reporter who
8  will be taking today's deposition. I am with the
9  National firm of County Court Reporters. Today's
10 the 27th day of February, 2025 and the time is
11 approximately 10:08 a.m. We are meeting virtually
12 via Zoom to take the deposition of Mr. David
13 Walls Kaufman, in the matter of Aaron Smith et al
14 versus David Kaufman et al, case number 21-CV-
15 02170. Will counsel please identify yourself for
16 the record stating your name, firm, address, and
17 whom you represent?
18       MR. HUNT:  Good morning for the
19 record. My name is Hughie Hunt. I represent Dr.
20 David Walls Kaufman, the address is 7845 Belle
21 Point Drive, Greenbelt, Maryland 20770.
22       MR. WABER:  Good morning? This is
23 Dr. David Weber, one of the attorneys for the
24 plaintiffs. I'm with the law firm, Goodwin Weber
25 PLLC, with the address of 11115 Lake View lane,
```





855.667.0077
VETERANREPORTERS.COM

6

1  number 1698 Berlin, Maryland 21811.
2        MR. LINK:  This is Richard Link on
3  behalf of the plaintiff at the same business
4  address. Also with us is our client, Aaron Smith.
5        COURT REPORTER:  Thank you. Will
6  the deponent please state your full name and
7  complete address for the record?
8        DEPONENT:  Dr. David Chadwick
9  Walls Kaufman, address, 2302 Halls Grove road,
10  Gambrills, Maryland 21054.
11        COURT REPORTER:  Mr. Walls
12  Kaufman, can you please raise your right hand? Do
13  you solemnly swear or affirm that the testimony
14  you are about to give today will be the truth,
15  the whole truth, and nothing but the truth, so
16  help you God?
17        DEPONENT:  I do.
18        COURT REPORTER:  We are now on the
19  record.
20  DAVID CHADWICK WALLS-KAUFMAN, D.C.,having been
21  duly sworn by the Notary, was examined and
22  testified as follows:
23  DIRECT EXAMINATION
24  BY MR. LINK:
25    Q.  Good morning Dr. Walls Kaufman? Richard

7

1  Link, can you hear me okay?
2    A.  I can.
3    Q.  We're doing this deposition remotely. I
4  do want to go over some ground rules before we
5  get started. Everything we say is going to be
6  transcribed by the court reporter. Do you
7  understand that?
8    A.  I do.
9    Q.  If at any time you're not having,
10  you're having difficulty understanding me, please
11  ask me to repeat the question. Ii will be a
12  little bit more cumbersome with Zoom, but it, we
13  can still get this done, but please ask me to
14  repeat if you do not hear the question or do not
15  understand the question. Okay?
16    A.  Yes.
17    Q.  If you answer a question I think I
18  would accept that you understood my question
19  before you answered that. Do you agree with that?
20    A.  Yes.
21    Q.  It's important when I'm doing a
22  deposition that you wait for me to complete the
23  questions that I ask before responding. I in turn
24  will try to wait for you to complete your
25  response before asking a follow up question.

8

1  Understood?
2    A.  Yes.
3    Q.  At any time we need to take a break,
4  for example, to use the restroom, I would, I'm
5  okay with that. I would ask however, if there is
6  a question pending that you answer the question
7  that I've asked before we take the break.
8  Understood?
9    A.  Yes.
10    Q.  Are you today under the influence of
11  any alcohol, medication, anything that would
12  affect your ability to understand what we're
13  doing today?
14    A.  No.
15    Q.  You have with you; Mr. Hunt is your
16  counsel of record?
17    A.  Yes.
18    Q.  You also have with you Mr. Shore. What
19  is his current role in your case in that?
20    A.  He is a high school friend and he's
21  also an attorney.
22    Q.  Is there anybody else present with you
23  besides Mr. Shore?
24    A.  No.
25        MR. WABER:  This is David Weber

9

1  speaking on behalf of the plaintiffs. We would
2  object to Mr. Shore being present. He is no
3  longer counsel of record in this matter. He filed
4  a line withdrawing and he does not have any
5  business being here and is not authorized to
6  render advice in this federal court matter.
7  Again, I defer to Mr. Hunt on how to resolve
8  that. We're certainly not going to postpone the
9  deposition, but we are noting our objection for
10  the record.
11        MR. HUNT:  I'm not asking for you
12  to postpone the deposition and he's not advising
13  Dr. Kaufman. As you know, depositions are public
14  just like a court proceeding. Anybody can be
15  present, can't exclude somebody from the
16  deposition. I mean, at least I'm not aware of any
17  case law to suggest that. If you want to point me
18  in that direction, I'm happy to take a look at it
19  and resolve it. But as long as I've been
20  practicing depositions have been public affairs.
21        MR. WABER:  We're noting our
22  objection for the record.
23        MR. HUNT:  Understood.
24  CONTINUATION OF DIRECT EXAMINATION
25  BY MR. LINK:



10

1   Q.  Dr. Walls Kaufman or Dr. Kaufman, what
2 do you prefer?
3   A.  Dr. Kaufman is easier.
4   Q.  Dr. Kaufman, have you ever had your
5 deposition taken before?
6   A.  Yes.
7   Q.  How many times?
8   A.  Once.
9   Q.  What kind of case?
10   A.  I'm not sure what you would call it.
11   Q.  Well, was it a malpractice case? A tort
12 case contract case?
13   A.  I, I guess you'd call it a malpractice
14 case.
15   Q.  Is that Superior Court or some other
16 place?
17   A.  I don't know.
18   Q.  When was it?
19   A.  I'd say 1990 February.
20   Q.  That's the only time you've given a
21 deposition in your life?
22   A.  Yes, I believe so.
23   Q.  Note before I asked you about that
24 case, you were or a chiropractor?
25   A.  I'm sorry.

11

1   Q.  You were a chiropractor by profession?
2   A.  Yes.
3   Q.  In connection with being a
4 chiropractor, did you ever represent depositions
5 in connection with a personal injury case or
6 anything like that?
7   A.  Yes.
8   Q.  How often, how frequently do you do
9 that?
10   A.  I think just once.
11   Q.  Do you know what, when, in what court
12 you were in?
13   A.  DC Court.
14   Q.  When was that?
15   A.  Maybe 1998. I'm not sure.
16   Q.  In connection with your 1994
17 deposition, were you a party or just a witness to
18 that case?
19   A.  I was a party.
20   Q.  Were you the plaintiff, the person
21 doing the suing or were you the defendant, the
22 person being sued?
23   A.  I was the defendant.
24   Q.  Do you remember who was the plaintiff
25 in that case?

12

1   A.  Tierney McCracken...
2   Q.  Did that case go to trial?
3   A.  It did not.
4   Q.  Did it settle before trial?
5   A.  Yes.
6   Q.  What was the nature of the case about?
7 What was the plaintiff claiming?
8   A.  Well, she changed her accusation three
9 times, so I'm not really sure what the last one
10 was.
11   Q.  Well what is your memory of the ones
12 that she alleged?
13   A.  First rape, then sexual assault and
14 lastly that I was treating her as a psychiatrist.
15   Q.  Was Mr. McCracken a patient of yours?
16   A.  I knew her over the course of 10 years
17 and she was a patient twice. I'm not really sure
18 if she was a patient at the time.
19   Q.  Would it be fair to say she alleged in
20 her paperwork or her complaints to the court that
21 she was your patient?
22   A.  Yes.
23   Q.  Did you in fact have a sexual
24 relationship with her?
25   A.  Yes.

13

1   Q.  As I understand it, one of the
2 allegations she made was that you physically
3 assaulted her or something of that nature. Is
4 that accurate?
5   Q.  Are you asking if that's what she
6 alleged?
7   A.  Correct, yes.
8   Q.  What is your response to that?
9   A.  That I did not.
10   Q.  With respect to the rape, is it your
11 understanding that McCracken was claiming there
12 was a coerced or non-consensual relationship?
13   A.  Yes.
14   Q.  Other than the non-consensual sexual
15 activity, your understanding, was there any other
16 basis from her assault claim?
17   A.  I'm not sure I understand the question.
18   Q.  Sure. Assault is when somebody touches
19 you without permission. Do you understand that?
20   A.  Okay. Yes.
21   Q.  Other than her claim of not having, do
22 you understand, let me ask you this. What is your
23 understanding of the basis for her assault?
24   A.  I'm not sure.
25   Q.  I'm not saying you agree with it, but







14

1  what did she allege? What did she claim?
2    A.  I'm really not sure I remember.
3    Q.  Is that the only time in your
4  professional career you've been sued?
5    A.  Yes.
6    Q.  Did you have a lawyer for that case?
7    A.  Yes.
8    Q.  Who was that?
9    A.  Frank Dunham.
10    Q.  D-U-N-H-A-M?
11    A.  Yes.
12    Q.  How long did the litigation last from
13  the time you got served until it got settled?
14    A.  I really don't remember.
15    Q.  Do you recall that the case went up to
16  the DC Court of Appeals at one point?
17    A.  I don't. Oh wait, yes, I do remember. I
18  do remember we did appeal that.
19    Q.  Are you aware there's a reported
20  decision from the DC Court of Appeals on that
21  situation?
22    A.  Am I aware that there's a report?
23    Q.  There's was decision from the highest
24  court in DC pertaining to that case. Are you
25  aware of that?

16

1  described?
2    A.  Yes.
3    Q.  That was not at a police station or was
4  that your residence?
5    A.  No, that was in my office.
6    Q.  What happened after that in connection
7  with the allegations?
8    A.  She changed her story.
9    Q.  She changed it from what to what?
10    A.  She said that I didn't rape her, but
11  that I sexually assaulted her.
12    Q.  Well, did MPD or anybody at any
13  prosecutor's office charge you with that?
14  Anything in connection with that?
15    A.  No, not to my knowledge.
16    Q.  Did you ever have to appear in court?
17  Were you arraigned or advised of charges against
18  you in connection with that?
19    A.  No.
20    Q.  Did you retain counsel in connection
21  with that?
22    A.  That was Mr. Dunham.
23    Q.  If I can summarize what you just told
24  me, the total involvement as far as the criminal
25  part of that case, and you spoke one time to an

15

1    A.  Yes.
2    Q.  Given how long appeals take, would you
3  agree that the litigation went on for at least
4  two, maybe three years?
5    A.  I honestly don't remember.
6    Q.  The reported decision mentioned that
7  there was a criminal case, or excuse me, that the
8  plaintiff had reported a sexual assault to MPD.
9  Do you recall that?
10    A.  Yes, I do.
11    Q.  What became of that complaint?
12    A.  An officer appeared at my office and
13  asked to speak with me and I spoke with him and
14  he asked me about it. He said that she had
15  accused me of rape and I said, "Look at the
16  outlaw, the, the layout of my office. You can see
17  it can't happen except in a bathroom." Where did
18  she say it occurred?" I said, "Don't tell me
19  anything, I will make you a bet that she didn't
20  go and get herself tested for a, like post rape
21  evidence." He said, "No, she did not," and he,
22  and he left.
23    Q.  Sometime around the early to mid-
24  nineties you had a conversation with a
25  metropolitan police officer that you just

17

1  MPD officer and then it went away. Is that your
2  testimony?
3    A.  That charge went away?
4    Q.  Was there any other charges that didn't
5  go away?
6    A.  Well, she changed her accusation to
7  sexual assault.
8    Q.  What did she claim?
9    A.  That I had, assaulted her.
10    Q.  Did she claim you grabbed certain part
11  of her body, kissed her? Like what is her, what
12  was her claim?
13    A.  I don't know.
14    Q.  Well, was the charge ever rendered in
15  connection with that a criminal charge?
16    A.  I believe so, yes.
17    Q.  Was that in DC Superior Court or some
18  other claims?
19    A.  Yes, DC Superior Court.
20    Q.  What were you charged with?
21    A.  I don't know that I was charged with
22  anything. That was what she accused me of.
23    Q.  What, and when you were in Superior
24  Court, what was the accusation?
25    A.  I don't think it went to court. She





18

1  sued me for that.
2  Q.  I had asked you, and I wanted to make
3  sure I was clear. You're saying she pursued a
4  civil case for sexual assault?
5  A.  Yes.
6  Q.  I thought you told me that she also
7  pursued a criminal case for sexual assault. Did I
8  get that wrong?
9  A.  Yes.
10  Q.  She never pursued any criminal case?
11  Just a civil case as far as you recall?
12  A.  I, I really can't, I can't remember, I
13  don't know the difference.
14  Q.  Well, you know, a civil case is about
15  money damages. You're aware of that, correct?
16  A.  Yes. So I would say that her second
17  case, her second allegation was a civil case.
18  Q.  Did you pay money to make her go away?
19  A.  Yes, I did.
20  Q.  How much did you pay her?
21      MR. HUNT:  Objection. I'm not sure
22  if that settlement was confidential.
23  A.  It was.
24  Q.  Mr. Hunt, have you, I'm sorry, just to
25  interrupt a follow up on that. Have you reviewed

19

1  the settlement personally, Mr. Hunt?
2      MR. HUNT:  No.
3      MR. WABER:  Then I don't
4  understand what the basis for your objection is,
5  Mr. Hunt.
6      MR. HUNT:  Because I assume that
7  every settlement is confidential and he just
8  testified that it's confidential. I mean, do you
9  want to have an in camera review of the
10  settlement agreement from I believe 30 years ago?
11      MR. WABER:  I think since how it
12  involves an assault, it's quite relevant to this
13  matter.
14      MR. HUNT:  If we could take a
15  minute, I can see if we can locate that
16  agreement. If you want to give me a minute to
17  speak with Dr. Kaufman?
18      MR. WABER:  We can keep moving on
19  the deposition.
20      MR. HUNT:  Okay.
21      MR. WABER:  We, when we take a
22  break, we can do that, but I guess I'm not trying
23  to be difficult, but...
24      MR. HUNT:  I didn't say you were.
25  I get it. Okay? But even if it is confidential,

20

1  Mr. Kaufman is here pursuant to the legal
2  obligation to be here and I believe that it
3  probably would pierce any confidentiality, but we
4  could let a judge make that decision if we have
5  to.
6  CONTINUATION OF DIRECT EXAMINATION
7  BY MR. LINK:
8  Q.  Dr. Kaufman, I was actually just
9  getting started and asking you about prior
10  testimony of prior litigation. Have you told me
11  about all the prior court cases that you have
12  been involved in with the exclusion of whatever
13  happened after J6, which we'll talk about?
14  A.  Yes.
15  Q.  Your current address, you said you
16  lived in Gambrills, Maryland?
17  A.  Yes.
18  Q.  How long have you lived there?
19  A.  Since, since October last year.
20  Q.  Last year was 2024. Who do you live in
21  your current residence with, if anybody?
22  A.  I'm just renting.
23  Q.  Who are you renting from?
24  A.  Dr. Nadine Soga.
25  Q.  Is your landlord?

21

1  A.  Yes, and a friend.
2  Q.  Is she a romantic friend?
3  A.  Yes.
4  Q.  On the topic of who you live with,
5  anybody else besides that person?
6  A.  No.
7  Q.  Where did you live before October 2024?
8  A.  At Crofton Village Apartments.
9  Q.  Recall the address?
10  A.  Well, Crofton Village Apartments. My
11  apartment was, 904T2.
12  Q.  How long did you live there?
13  A.  A year.
14  Q.  That takes, it takes us back to 2023
15  approximately?
16  A.  Yes.
17  Q.  Where did you live before that?
18  A.  Two months in jail.
19  Q.  Was that the DC jail or some other
20  jail?
21  A.  That was, Fort Dix, New Jersey.
22  Q.  What about before that?
23  A.  411 East Capitol Street.
24  Q.  How long had you lived at 411 East
25  Capitol?





855.667.0077
VETERANREPORTERS.COM

22

1    A.  Since I think about 1988.
2    Q.  Were you living at that address, 411
3  East Capitol as of January 6th, 2021?
4    A.  Yes.
5    Q.  Do you currently have a business
6  address?
7    A.  No.
8    Q.  When did you last have a business
9  address?
10    A.  Until I went to jail.
11    Q.  That was in the summer of 23?
12    A.  Yes.
13    Q.  What is your date of birth?
14    A.  October 26th, 1956.
15    Q.  You're a US citizen?
16    A.  Yes.
17    Q.  Do you have your driver's license in
18  Maryland or someplace else?
19    A.  Maryland.
20    Q.  When did you get a Maryland license?
21    A.  I'm not sure. I guess, I guess last
22  fall.
23    Q.  October 2024? Around the time you
24  moved?
25    A.  I, I can't remember.

23

1    Q.  Before that where was your driver's
2  license?
3    A.  Washington, DC.
4    Q.  How long, you can tell us, did you have
5  a DC driver's license?
6    A.  Probably since 1983.
7    Q.  How tall are you?
8    A.  Five foot, 10 or 11.
9    Q.  How much do you weigh?
10    A.  One hundred and eighty-five.
11    Q.  Was your weight more or less the same
12  as of January 6th, 2021?
13    A.  The same.
14    Q.  What's your eye color?
15    A.  Brown.
16    Q.  Hair color. What do you believe your
17  hair color to be?
18    A.  I don't know. Gray, black.
19    Q.  You consider yourself what?
20    A.  I'm sorry?
21    Q.  Do you consider yourself Caucasian?
22    A.  Yes.
23    Q.  As we sit here today, you don't have
24  any facial hair. As of January 6th, 2021, you
25  didn't have any facial hair. Is that accurate?

24

1    A.  Yes.
2    Q.  Ever been married?
3    A.  Yes.
4    Q.  How many times?
5    A.  Once.
6    Q.  How did your last marriage terminate?
7    A.  Divorce.
8    Q.  What is your ex-wife's name?
9    A.  Tracy K. Warren.
10    Q.  Were you divorced in DC Superior Court?
11    A.  Yes.
12    Q.  Approximately when?
13    A.  I think the summer of 2018.
14    Q.  How long were you married?
15    A.  August 20th, 2004, until then.
16    Q.  How many children do you have?
17    A.  One.
18    Q.  Age?
19    A.  Twenty.
20    Q.  How far did you go in school?
21    A.  Doctorate.
22    Q.  Starting with, where did you attend
23  high school?
24    A.  Bethesda Chevy Chase High School.
25    Q.  Graduated in what year?

25

1    A.  1975.
2    Q.  Next, where did you attend school?
3    A.  Montgomery Junior College.
4    Q.  Did you attend a degree from there?
5    A.  No, I did not.
6    Q.  Where did you go after Montgomery?
7    A.  Scott College.
8    Q.  Did you attain a degree from there?
9    A.  I did not.
10    Q.  Where is Scott College?
11    A.  Davenport, Iowa.
12    Q.  Where did you attend after Scott
13  College?
14    A.  Palmer College of Chiropractic.
15    Q.  Where is that located?
16    A.  Davenport, Iowa.
17    Q.  When did you obtain your, is it a
18  Doctor of Chiropractic Medicine?
19    A.  Yes.
20    Q.  When did you obtain that?
21    A.  October, 1980.
22    Q.  My understanding, you did not need to
23  obtain a BS or BA to attend chiropractic college?
24    A.  At that time you did.
25    Q.  How many years of undergraduate school





855.667.0077
VETERANREPORTERS.COM

**26**

1  did you do?
2      A.   Two years.
3      Q.   How long was Chiropractic?
4      A.   Four years. I did it in three.
5      Q.   What did you study as an undergrad?
6      A.   I was a dual major my first year in
7  English and fine art. My second year at Scott
8  College, I took a, did two years of science
9  courses in one year in order to get into Palmer.
10     Q.   At some point you obtained your
11  Chiropractic license. Was that in DC for the
12  first time?
13     A.   No, the first license I acquired, I
14  acquired was in Maryland.
15     Q.   Ballpark, what year was that?
16     A.   1981 or 1982.
17     Q.   Where did you next obtain a license?
18     A.   Washington DC.
19     Q.   Ballpark, approximately when?
20     A.   1982, 1983.
21     Q.   Any other jurisdictions where you
22  obtained a chiropractic license?
23     A.   No.
24     Q.   As a chiropractor, did you work as a
25  sole practitioner or did you have a partnership

**27**

1  or how did your practice go?
2      A.   Sole practitioner.
3      Q.   That the entire time that you
4  practiced?
5      A.   Yes.
6      Q.   When is the last time you worked as a
7  chiropractor?
8      A.   I guess it was, I guess it was before I
9  went to jail.
10     Q.   Sometime of 2023?
11     A.   Well, I went to jail in July but I
12  guess I, I was wrapping up the practice in the
13  months running up to that.
14     Q.   Did you sell your practice?
15     A.   I was not able to sell my practice, no.
16     Q.   Why were you not able?
17     A.   Because of these allegations against
18  me. My practice was worthless.
19     Q.   Do you have any intention of returning
20  to chiropractic medicine?
21     A.   I am trying to make up my mind about
22  that. Since I only have a license in the district
23  and I'm shunned in district society, I don't see
24  how it's possible.
25     Q.   Why do you say you're shunned in

**28**

1  district society?
2      A.   Because I've been called a police
3  killer.
4      Q.   Any other reason?
5      A.   No other reason.
6      Q.   When you last practiced chiropractic
7  medicine, what was the name of the business that
8  you had?
9      A.   Capitol Hill Chiropractic Center.
10     Q.   Is that a LLC or some type of
11  corporation?
12     A.   At some point in time it was
13  incorporated, but I had let that lapse.
14     Q.   Were you the sole owner of it when it
15  was last in business?
16     A.   Yes.
17     Q.   What was the business address of that
18  entity.
19     A.   411 East Capitol Street, Southeast
20  Washington DC 20003.
21     Q.   Did you also reside at that location?
22     A.   I did.
23     Q.   A note from the public record that it
24  says your chiropractic license was reprimanded in
25  February of 2024. Does that sound accurate?

**29**

1      A.   Yes.
2      Q.   Is it your understanding you could
3  still practice chiropractic medicine
4  notwithstanding the reprimand?
5      A.   Yes.
6      Q.   Is that the only time in your
7  professional career that you've had a
8  disciplinary activity on your license as a
9  chiropractor?
10     A.   My license had lapsed once before,
11  maybe twice due to a bureaucratic snafu. So, I
12  don't know if a reprimand was, was given for
13  that.
14     Q.   When was that approximately?
15     A.   It happened twice. One time in the
16  eighties and one time in the nineties.
17     Q.   Do you have professional discipline,
18  the most recent professional discipline had to do
19  with your conviction in federal court, correct?
20     A.   I've never had a professional
21  discipline before. The only one was that
22  February, 2000, the one that you, you mentioned a
23  few years ago or, two years ago.
24     Q.   When you were last performing
25  chiropractic services, you're saying that your





---

30

1 business was no longer incorporated in DC or any
2 place else?
3    A.   Right.
4    Q.   Have you ever been in the military?
5    A.   No.
6    Q.   National Guard, anything like that?
7    A.   No.
8    Q.   It appears that in addition to being a
9 chiropractor, you also are an author. Is that
10 accurate?
11    A.   Yes.
12    Q.   Have you published books, articles,
13 what have you published?
14    A.   Both.
15    Q.   Do you have a regular publication where
16 you've contributed articles or pieces?
17    A.   Yes.
18    Q.   What publication and I guess I'm dating
19 myself, publication and sort of but, I'm
20 including online articles or websites when I use
21 the word publication. What entities or companies
22 or organizations have you regularly published
23 before the Washington Post?
24    A.   The Washington Times, American Thinker,
25 flopping ACEs, international Chiropractic

---

31

1 Association.
2    Q.   I obviously know what the newspapers
3 are. When is the last time you contributed to the
4 Washington Post?
5    A.   Early 2000s.
6    Q.   What kind of pieces did you write for
7 them?
8    A.   I wrote about chiropractic and health
9 issues and commentaries on the city, living in
10 the city.
11    Q.   How about for the Washington Times?
12 What kind of pieces did you write for that paper?
13    A.   Commentaries on living in the city.
14    Q.   Can you give us an example?
15    A.   I can't, I really can't remember.
16    Q.   Did you ever write about MPD?
17    A.   I don't think so.
18    Q.   American Thinker, what is that?
19    A.   It's a, political, philosophical,
20 current events online magazine. Oh, I also
21 contributed, fiction pieces to Liberty Island
22 Magazine and Cinder Q Literary Magazine.
23    Q.   When is the last time you contributed
24 to American Thinker?
25    A.   Recently. Last, last year or early this

---

32

1 year.
2    Q.   In a sentence, can you tell us what the
3 substance of the article was about?
4    A.   The debate had come up about the
5 national debt and I wrote an article about the
6 national, the American national debt being $37
7 trillion was equal to one outlets estimate of all
8 the money in the world.
9    Q.   How many pieces do you believe you
10 contributed to the American Thicker?
11    A.   I'm really not sure. Maybe, maybe four
12 or five.
13    Q.   Were they all of the political nature
14 genre?
15    A.   Political or philosophical.
16    Q.   Does the American Thinker have a
17 political agenda?
18    A.   Not that I know of.
19    Q.   What is Flo, you said you contributed
20 something, Floppy Access?
21    A.   Flopping, ACE, Flopping ACEs.
22    Q.   What is that?
23    A.   A online magazine.
24    Q.   What have you contributed to them?
25    A.   I can't remember.

---

33

1    Q.   When was the last time?
2    A.   Probably two or three years ago. No,
3 longer than that. Four years. Four or five years.
4    Q.   What was the substance of your last
5 piece?
6    A.   I can't remember.
7    Q.   Is that an online publication?
8    A.   Yes.
9    Q.   You mentioned the International
10 Chiropractic Association. What is that?
11    A.   It's a professional association for
12 chiropractors.
13    Q.   What's your relationship with them?
14    A.   I'm a member. I have offered my
15 services as an officer, but I'm not an officer.
16    Q.   Are you on the board?
17    A.   No.
18    Q.   Have you ever been?
19    A.   I was offered a, a substantial position
20 in the 1980s and I didn't take it.
21    Q.   Are you aware you're still listed on
22 their website as having a connection with that
23 organization?
24    A.   Well, I am a member.
25    Q.   Do you attend meetings?





34

1   A. No.
2   Q. Do you get paid to attend meetings?
3   A. I do not. I don't attend meetings.
4   Q. You must, you've also published books,
5   yes?
6   A. Yes.
7   Q. How many?
8   A. Two.
9   Q. The names?
10   A. Caesar America's one Party Rule and
11   Robot Archangel, and another one is coming out
12   before too long.
13   Q. Do you have the same publisher for both
14   books?
15   A. No.
16   Q. Taking that, and then you're going to
17   tell me about the third one, but Cesar Americas,
18   would this fall on the genre of science fiction?
19   A. No.
20   Q. What would you characterize it to be?
21   A. Political drama.
22   Q. I'll give you more than a sentence.
23   Give me a few sentences. What the plot and the
24   story behind Caesar Americas is, please?
25   A. It was, it, focused on a, a stolen

35

1   presidential election and a long-term uprising
2   between right and left, finding common ground
3   because of health concerns, and that led to
4   interesting political developments.
5   Q. When did you write that book?
6   A. I wrote that between 1992 and 1998.
7   Q. Come back to that. Your second book was
8   Robot Archangel?
9   A. Yes.
10   Q. Two sentences. What was that about?
11   A. That is 600 years in the future.
12   Humankind's final resolution with artificial
13   intelligence going from dystopia to utopia, a
14   happy ending.
15   Q. Is that science fiction or something
16   else?
17   A. Science fiction.
18   Q. The third book you said you're about to
19   publish is what?
20   A. The theory of everything.
21   Q. When is that to be published?
22   A. I don't know yet.
23   Q. Do you have a publisher?
24   A. Yes. Well, two Amazon wants it, but I
25   might go back to my other publisher, Defiance

36

1   Press.
2   Q. Where does that...
3   A. I'm having a meeting today with my
4   literary agent, so I really, it's sort of in
5   limbo, but I'd like to come out as quickly as
6   possible, and that's, Amazon wants it.
7   Q. What is The Theory of Everything about?
8   A. Well, The Theory of Everything is
9   trying to find a center point for everything
10   human. I'm trying to approach it from, instead of
11   the astrophysics and quantum physics side, a
12   humanitarian explanation of what that is.
13   Q. Humanitarian explanation of what
14   exactly?
15   A. The Theory of Everything is the theory
16   that you can find one functional point that
17   defines everything human and probably maybe
18   everything in existence.
19   Q. Is this, sounds like a fictional book?
20   A. No, this is nonfiction.
21   Q. The Fires Press, what books did they
22   publish for you?
23   A. They published Robot Archangel.
24   Q. Are you working now at any place?
25   A. No, I, I'm, I'm focusing on, on, my

37

1   writing.
2   Q. You said the last time you worked was
3   when you were a chiropractor in 2023,
4   approximately?
5   A. Yes.
6   Q. Do you have any hobbies?
7   A. Oh, I'd like to also mention another
8   book that I'm about to complete, is called
9   Political Conflict and Human Realization.
10   Q. Is that a nonfiction book?
11   A. Nonfiction.
12   Q. Do you have a publisher for that?
13   A. No, it's not finished.
14   Q. What is that book about?
15   A. Political conflict and human
16   realization.
17   Q. I had seen an interview with you where
18   you said you described yourself as a student of
19   stolen elections. Would you agree with that?
20   A. That I'm a student of stolen elections?
21   Q. Yes.
22   A. I'd be very interested in them because
23   of what, partly what I study.
24   Q. What do you study?
25   A. Well, if you're taking a whack at the





VETERAN REPORTERS

855.667.0077
VETERANREPORTERS.COM

38

1 theory of everything, everything's on the table.
2 Certainly human realization and anything that
3 leads to human realization.
4    Q.  Have you read books about stolen
5 elections?
6    A.  No. I've read books about history and
7 philosophy.
8    Q.  Is there a particular period of history
9 that you're interested in when it comes to this
10 topic?
11   A.  No.
12   Q.  Is there a particular philosopher that
13 you're interested in when it comes to this topic?
14 Who, what have you read about stolen elections?
15 What books, articles?
16   A.  The only, the only thing, I haven't
17 read anything in particular on stolen elections.
18 I wrote a novel about stolen elections.
19   Q.  Well I'll make it bigger political
20 conflict. What book or philosophers have you read
21 written about as it pertains to political
22 conflict?
23   A.  Oh, you're really restricting it if you
24 talk about what I've written publicly about or
25 written in my books.

39

1    Q.  Well, I'll just start. What have you
2 studied? What have you read about?
3    A.  Well, I mean, I'm trying to say I'm
4 interested in everything. So I'll read anything,
5 especially if it's, you know, in the canon of,
6 you know, philosophy or, political authorities.
7 But I generally stay away from contemporary
8 stuff. I'm looking at timelines; I'm looking for
9 patterns. So, you know, the, the, the whole
10 pantheon of philosophers and political thinkers.
11 Nothing really contemporary.
12   Q.  I was going to ask you about any
13 hobbies you have outside of being a chiropractor
14 and author. What hobbies do you have?
15   A.  Tai Chi, writing, reading, going to the
16 driving range sometimes, I'm a little interested
17 in food, I like old movies.
18   Q.  Did you also have a band?
19   A.  Yes, I did.
20   Q.  What music instrument do you play?
21   A.  Oh yeah, music, guitar and a little
22 piano.
23   Q.  Are you still in a band? Do you still
24 perform?
25   A.  No, but I've been thinking about

40

1 getting back into it. I've been contacting some
2 of my old band mates.
3    Q.  Let's talk about Tai Chi. What is Tai
4 Chi?
5    A.  Wow. Wow. Tai Chi is a meditation based
6 art using non-movement and very small movements
7 to follow into the rabbit hole of existence, and
8 I'm not kidding.
9    Q.  What kind of movements or non-movements
10 are you talking about?
11   A.  Slow choreograph movements called
12 postures that are done in a meditative way or
13 standing meditation. Instead of sitting
14 meditation, you do standing meditation.
15   Q.  When did you start practicing Tai Chi?
16   A.  When I was 16.
17   Q.  Is this sort of like going to yoga
18 class when you learned it or how did you acquire
19 knowledge about Tai Chi?
20   A.  From a teacher at our high school, he
21 actually ran the, the theater and we were looking
22 for a, a faculty member to be so that we could
23 form a club and he volunteered and his art was
24 Tai Chi, so I started learning it there.
25   Q.  You've been practicing Tai Chi from age

41

1 16 until today, and you're approximately 67, 68?
2    A.  Just turned 68.
3    Q.  How many days a week do you engage in
4 Tai Chi?
5    A.  Daily.
6    Q.  Have you taught Tai Chi?
7    A.  Yes.
8    Q.  Do you have a regular class that you
9 have given?
10   A.  Not anymore. It fell apart after these
11 accusations.
12   Q.  When and where did you teach Tai Chi?
13   A.  I taught Tai Chi starting in 1992,
14 every Saturday for free on the capitol grounds.
15 Then I also had a class for free on Saturdays in
16 Lincoln Park, and I think I did that for about 28
17 years.
18   Q.  Were these outdoor classes?
19   A.  Yes.
20   Q.  Did people pay you for your time?
21   A.  No, those were free classes.
22   Q.  How long did the classes last?
23   A.  Each time?
24   Q.  Approximately?
25   A.  About two hours.



VETERAN
REPORTERS

855.667.0077
VETERANREPORTERS.COM

**42**

1    Q.   What, can you summarize what's involved
2  in the practice of Tai Chi without getting into
3  all the philosophy? I'm just interested in the
4  physical aspect. What do you do?
5    A.   So you, you teach people the, the
6  choreographed postures and you teach them how to,
7  how to meditate.
8    Q.   What are the choreograph, you said
9  choreographed postures. What does that mean?
10    A.   It's called the form. There's 37
11  postures.
12    Q.   Are they standing, sitting? Both?
13    A.   No sitting. You're stepping from one
14  leg onto the other leg, back and forth. While
15  you're doing the choreographed form.
16    Q.   When you say choreographed form. Are
17  there certain steps, sort of like a dance routine
18  has steps when you do Tai Chi?
19    A.   Yes, 37 steps.
20    Q.   Do you consider Tai Chi to be a martial
21  art?
22    A.   Yes.
23    Q.   Can you use Tai Chi for purposes of
24  self-defense?
25    A.   Yes.

**43**

1    Q.   Have you ever done that?
2    A.   No, not really.
3    Q.   Does Tai Chi involved the use of any,
4  objects, sticks, anything like that?
5    A.   There's Tai Chi sword, there's Tai Chi
6  saber, there's Tai Chi staff, there's Tai Chi
7  fan, there's Tai Chi spear. I once knew Tai Chi
8  sword. I don't, I've forgotten it, the form, and
9  I knew Tai Chi staff and I've forgotten that too.
10    Q.   Staff like S-T-A-F-F?
11    A.   Uh-huh (Indicating affirmatively).
12    Q.   Have you taught each of these
13  techniques?
14    A.   No, I haven't. I've only taught the,
15  the form. I've never taught sword or staff. I
16  forgot them too quickly.
17    Q.   You say you've taught the form. What
18  does that mean?
19    A.   That means teaching the 37
20  choreographed movements.
21    Q.   With respect to your legs and lower
22  extremity, would it be fair to say that part
23  affects you, is balancing and moving your body
24  weight between your legs?
25    A.   Yes.

**44**

1    Q.   Is there any part of the lower
2  extremity movements that you can summarize
3  besides what I just said in terms of shifting
4  weight between your legs?
5    A.   I, I don't understand the question.
6    Q.   Sure. Are you trying to balance
7  yourself when you're doing Tai Chi?
8    A.   Yes.
9    Q.   Besides balance and shifting weights,
10  what else are you focused on when you're doing
11  Tai Chi in your legs?
12    A.   Well, you're trying to use the, the
13  legs a lot for health reasons.
14    Q.   Is there kicking involved?
15    A.   Hardly.
16    Q.   Is there crouching involved?
17    A.   I'm sorry?
18    Q.   Crouching, C-R-O-U-C-H?
19    A.   Yes. There's one posture, two postures,
20  three postures that you could say yes. Have some
21  sort of a crouch.
22    Q.   Each of these postures, I assume they
23  have the 37, each have a name?
24    A.   Yes.
25    Q.   With respect to your upper extremity,

**45**

1  your arms, leg and hands, what do you doing when
2  you do Tai Chi?
3    A.   You're doing a, a choreograph sequence
4  of movements that, the Chinese philosophy says
5  are, designed to cultivate Chi and move Chi
6  through, the, the internal organs and the limbs
7  in a certain way that is beneficial to health
8  else.
9    Q.   One other thing. Would this involve
10  extending your arms, raising your arms?
11    A.   You don't raise your arms much,
12  because, I don't know. It's just not, it's not
13  done very much.
14    Q.   What are you doing with your arms when
15  you're doing these three seven techniques?
16    A.   You're following the choreography.
17    Q.   Are there any of these fast movements?
18    A.   No. There's a style called Chen style
19  that I don't do. It's not really Tai Chi that
20  does fast movements.
21    Q.   Are you, do you have a rank, like a
22  black belt or, I don't know if there's a similar
23  rating system, but do you have a rank?
24    A.   Chinese martial arts doesn't have a
25  belt system.




46

1    Q.  The answer is no; you don't have a
2  rank?
3    A.  I don't have a rank, no.
4    Q.  If you're expert at it, notwithstanding
5  the rank, do they call you like maven of Tai Chi?
6    A.  No, I mean, there's famous masters who
7  are, you know, who were called grand masters, and
8  then it seems, you know, ordinary teachers will
9  call themselves master or their teachers will
10  call them or their students will call them
11  master. My Tai Chi grand teacher was, you know,
12  didn't like any of that. He called himself, he
13  was just a, he was a professor and he, he was,
14  called Professor Jones and my teacher, his senior
15  student, he was, you know, we just called him
16  Ben, Ben Low.
17    Q.  Have you ever published anything about
18  Tai Chi?
19    A.  Yes.
20    Q.  What publications?
21    A.  I think it was called Tai Chi Magazine.
22    Q.  Approximate once or more than once?
23    A.  I'd say maybe I published three things.
24    Q.  When is the last time you published
25  that?

47

1    A.  I'm going to say the mid-nineties.
2    Q.  What was the general substance of what
3  you were writing about?
4    A.  Someone had written in and criticized
5  the, Jon Ming, professor Jon Ming's style of Tai
6  Chi and said it was really hard on the knees. I
7  responded with an article pointing out that that
8  wasn't the case. I outlined the sources of knee
9  problems, the four sources of knee problems.
10    Q.  Anything else you recall about what you
11  published?
12    A.  No, not really.
13    Q.  Do you consider yourself an expert in
14  Tai Chi?
15    A.  Well, that's for others to say. I know
16  more than most.
17    Q.  Other than Tai Chi, have you, do you
18  have any experience in any other martial arts?
19    A.  No.
20    Q.  Other than Tai Chi, do you do anything
21  else in terms of getting fit?
22    A.  I do some pushups and sometimes I shoot
23  basketball hoop, other than those, no.
24    Q.  We have been going for approximately
25  two hours, if my math is correct, I was going to

48

1  take about a five-minute break just to break this
2  up. We can use the restroom.
3        MR. HUNT:  Sounds good.
4        COURT REPORTER:  It is 11:24 a.m.
5  and we are off the record.
6  (OFF THE RECORD) (11:24 a.m.)
7  (WHEREUPON, a short break was taken.)
8  (ON THE RECORD) (11:34 a.m.)
9  CONTINUATION OF DIRECT EXAMINATION
10  BY MR. LINK:
11    Q.  Dr. Kaufman, I wanted to follow up on a
12  couple things. We, when we broke, you were
13  talking a little bit about your Tai Chi and the
14  37, moves that you used as a Tai Chi order,
15  correct?
16    A.  Yes.
17    Q.  Are you familiar with a move called
18  Repulse Monkey?
19    A.  Yes.
20    Q.  What is that?
21    A.  It is a backward step and as you step
22  backward, you leave your hand out in front of you
23  almost like you're, like a mine and leaving your
24  fingertips, touching an imaginary piece of glass
25  in front of you. So as you step back, you leave

49

1  your hand out in front of you and it's a sequence
2  of moves, either three or five or seven where
3  you're, doing this, gesture.
4    Q.  Are you able to just demonstrate where,
5  while you're seated there, what it looks like?
6  The record would reflect; it looks to me as a lay
7  person that you're pushing your arms forward in a
8  rotating fashion bent at the elbow. Is that
9  accurate?
10    A.  As you're stepping back so that your
11  arm has no net, forward action, you are actually
12  stepping away from your hand, not pushing out
13  against anything.
14    Q.  Got it. What is, there's a, those calls
15  step forward, punch low, and maybe that's not the
16  term, you know, it has, but it, does that sound
17  familiar?
18    A.  Yes. It's called low punch.
19    Q.  What exactly is that?
20    A.  You are squatting down and extending a,
21  a punch that would be directed at the leg or the
22  knee.
23    Q.  Is that a punch with a closed fist as
24  we would think of it?
25    A.  Yes.

  

50

1    Q.  Can you just briefly demonstrate while
2  you are on Zoom? What that would look like when
3  you punch, how do you punch? Like, describe the
4  movement of your arms if that's a better
5  question?
6    A.  It's, professor Jang used to describe
7  it as it's like, pulling a, a gun out of a
8  holster and presenting it like in a Western.
9    Q.  But when present the gun then the gun
10  goes parallel to the floor? Your ankle parallel
11  to the floor?
12    A.  Well you're punching down the, your arm
13  is, is aimed downward.
14    Q.  I will give you one more. There's
15  something called embracing tiger and return to
16  the mountain. What does that involve?
17    A.  Let me think. Tiger return to the mail.
18  Oh yeah. yes, that's, that's a posture.
19    Q.  I'm not going to go through all three
20  seven. But you would agree that many of the moves
21  that you expert in involve use of your hands and
22  your arms?
23    A.  Yes.
24    Q.  Is that an accurate?
25    A.  Yes,

51

1    Q.  Let me direct your attention to January
2  6th, 2021. Do you remember that day?
3    A.  Yes.
4    Q.  Did you did you take any medication or
5  any substances that day before you went to the
6  capital or the thing you acknowledged doing?
7    A.  No, I did not.
8    Q.  That was a Wednesday. Is that accurate?
9    A.  I don't remember.
10    Q.  Were you in good physical shape that
11  day?
12    A.  Yes.
13    Q.  Were you under the care of any doctor
14  for any reason that day?
15    A.  No, but I've had ongoing shoulder
16  problems.
17    Q.  You're saying before that day you had
18  ongoing shoulder problems?
19    A.  Mm-hmm (indicating affirmatively.) Yes.
20    Q.  Right or left?
21    A.  Right.
22    Q.  Are you right or left hand dominant?
23    A.  Right.
24    Q.  Were you working full time before
25  January 6/2021?

52

1    A.  Yes.
2    Q.  Were you able to perform all your
3  duties as a chiropractor before January 6/2021?
4    A.  I have to look out for my shoulder.
5    Q.  Were you able to see your patients and
6  treat them as needed before January 6/2021?
7    A.  Yes, but I have to modify anything I do
8  with my right arm.
9    Q.  How so?
10    A.  It's, it's not up to snuff and you
11  know, part of that comes from, from chiropractic
12  work, so, I, I just can't, my, my right arm is
13  subpar. you know, I definitely don't want to get
14  in a fight, with anything. My, my arm is probably
15  right arm is probably 50 percent what it, what it
16  should be.
17    Q.  Any doctor told you your arm was 50
18  percent of what it should be?
19    A.  I have got, stem cell stem, cell
20  treatments for it.
21    Q.  Before January 6th, he treated you for
22  your right shoulder?
23    A.  No one treated me for my right
24  shoulder. I would, I would get chiropractic
25  adjustments and have my shoulder adjusted.

53

1    Q.  The stem cell you, would be after
2  January 6/2021?
3    A.  Yes.
4    Q.  I just want to be accurate what I'm
5  hearing. Before January 6/2021, you had
6  complaints of right shoulder problems. You
7  attribute that at least in part to your work as a
8  chiropractor, but you did not have treatment for
9  it before January 6th, 2021. Is that accurate?
10    A.  I've had shoulder issues, for 20 years
11  and, they've gotten, it's gotten worse and I've
12  had colleagues work on it, you know, whenever I
13  could.
14    Q.  These are chiropractors?
15    A.  Yes.
16    Q.  Other than your shoulder that you just
17  told us about. Any problems with your health
18  before January 6th, 2021?
19    A.  None that I can think of now.
20    Q.  You're wearing glasses. Do you wear
21  contacts as well?
22    A.  I don't.
23    Q.  You wear glasses for near or far?
24    A.  For reading and close up.
25    Q.  In January 6/2021, you had no problem





855.667.0077
VETERANREPORTERS.COM

54

1  with distance vision?
2      A.  No, I did.
3      Q.  No problem with distance vision?
4      A.  Yes. I had no problem with distance
5  vision.
6      Q.  How about your hearing? How was your
7  hearing?
8      A.  Very good.
9      Q.  When did you first decide to attend the
10  events of the Capitol on January 6th, 2021?
11      A.  Well, I'm not sure when they started,
12  but from my house, I could, I could hear, hear a
13  crowd and I wondered, you know, what it was
14  about. So I can't remember if I looked on the TV,
15  if I turned on the TV to find out what was going
16  on or what. But in any event, I got my phone and
17  went down there as I often do for many, many
18  different types of protests.
19      Q.  Were you watching the events on TV
20  before you decided to attend?
21      A.  As I said, I, I don't remember. I don't
22  remember that. I know that I heard the crowd and
23  I don't remember if I turned on the TV to find
24  out what was going on. I think I just went down
25  there.

55

1      Q.  Did you know that there was going to be
2  some type of rally that day?
3      A.  No.
4      Q.  Were you aware that there was a speech
5  given by President Trump that day?
6      A.  No.
7      Q.  Did you attend the speech of President
8  Trump?
9      A.  No. I was home.
10      Q.  When you said you heard things from
11  your house, just give me, I'm generally familiar
12  where the Capitol Street is, but how far is your
13  residence from say, where the crowd was?
14      A.  I, I lived at Fourth and East Capitol,
15  so the Capitol grounds were four blocks away.
16  That's why I gave Tai Chi classes there for all
17  of those years.
18      Q.  What did you hear?
19      A.  Just, you know, the sound of a, a big
20  crowd.
21      Q.  Can you tell us the words that were
22  being used?
23      A.  No, it's just, you know, you're too far
24  away, but, you know, oftentimes, you know, when
25  there's a protest, in my neighborhood, my old

56

1  neighborhood, you could, you could hear it. You
2  can't hear what people are saying. You just, you
3  can, you can tell there's a crowd and they're,
4  they're doing something.
5      Q.  You agree you knew what the purpose of
6  the crowd was that day. Yes?
7      A.  No, I don't agree.
8      Q.  Your testimony is before you crossed
9  the building, you had no idea why people were
10  gathering outside the Capitol?
11      A.  Yeah, I don't remember. Right. I don't
12  remember knowing anything about it. Just
13  wondering what the heck was going on.
14      Q.  Did you attend with anybody else?
15      A.  No.
16      Q.  Did you tell anybody you were going?
17      A.  No.
18      Q.  At any time while you were on the
19  Capitol grounds, from the time you were there
20  until the time you left, did you see or
21  communicate with anybody who you had known before
22  that day?
23      A.  No.
24      Q.  Tell us what you observed as you made
25  your way from your residence to the Capitol?

57

1      A.  As I, as I walked down the street, I
2  could see there was a crowd and as I approached,
3  I took out my phone and I kept, you know,
4  recording as I was walking towards the crowd.
5      Q.  What did you observe?
6      A.  A huge crowd of people.
7      Q.  Did you hear anything they were saying?
8      A.  No. I mean, you know, it's just a dent.
9      Q.  When you arrived close to where the
10  crowd was, did you hear anything they were
11  saying?
12      A.  No.
13      Q.  You would agree there were people there
14  with signs...
15      A.  Yes.
16      Q.  ...and other things?
17      A.  Yes.
18      Q.  Your memory, what the what did the
19  signs say?
20      A.  Well, they were obviously Trump, Trump
21  signs.
22      Q.  Can you be any more specific than that
23  about the signs that you saw?
24      A.  Flags, various Trump signs.
25      Q.  Did you see signs that said "Stop the





58

1 seal?"
2    A.  Yes.
3    Q.  More than one?
4    A.  Yes.
5    Q.  What did you do after you arrived to
6 where the crowd was?
7    A.  I wanted to get into the crowd as deep
8 as I could and see what, people were saying and
9 what they, what they wanted, what their motives
10 were, why, why they were there, what they were
11 saying. What was happening.
12    Q.  What did you learn?
13    A.  That they were there to protest the,
14 the election.
15    Q.  Anything more particular you learned
16 besides that?
17    A.  Well, in general that's what it was.
18    Q.  What was going on in the Capitol
19 building that day?
20    A.  I, you know, made my way up to the, the
21 portico, the top of the portico to see what was
22 going on. That's where, because mostly people
23 were just standing around and talking, talking to
24 one another, you know, drinking coffee and stuff
25 like that. So, I made my way to the top of the

59

1 portico to see what was going on.
2    Q.  What time was this?
3    A.  I have no idea. I'd have to look at the
4 timestamp on my phone.
5    Q.  Would you agree with sometime early
6 afternoon?
7    A.  Yes.
8    Q.  Without holding you to the exact times?
9    A.  Yes.
10    Q.  My question is, what was going on
11 inside the building that day?
12    A.  I have no idea. I had no idea anybody
13 was inside.
14    Q.  Did you come to learn what was going on
15 inside Dr. Kaufman?
16    A.  Before I went inside?
17    Q.  Yes.
18    A.  No, I had no idea anybody was inside.
19 There were a large, a large body of police on the
20 portico guarding the doors, so I have no idea
21 anybody was inside. I would've been shocked.
22    Q.  Would've been shocked about what?
23    A.  That they were inside.
24    Q.  Who's that?
25    A.  Protestors.

60

1    Q.  Were you aware that the House and
2 Senate were there that day?
3    A.  No.
4    Q.  Do you consider yourself a politically
5 engaged person?
6    A.  Yes.
7    Q.  Before January 6th, 2021, where did you
8 get your news?
9    A.  Mostly, well, I didn't have cable.
10 Gosh, I don't know. Local news, talking with
11 friends, you know, I wasn't busy on the internet.
12 That's a good question.
13    Q.  Your testimony is you're not aware of
14 what was going on inside. You're not aware what
15 was going inside the building, you met with
16 protestors, or I guess they identified as
17 protestors and they told you that, and they must
18 have told you why they were there?
19    A.  Well, I wasn't really engaged in, in,
20 you know, dialogue with anyone at that point in
21 time. I just wanted to get up where things were
22 happening and see what was happening from a
23 historical standpoint.
24    Q.  What was historical?
25    A.  Well, you know, as I, as I said to

61

1 friends afterward, I said, you know, they will be
2 talking about this for 3000 years. So and that
3 was everything. You know, the George Floyd
4 protest, the political conflict that was
5 happening in the country and in the, in the, in
6 Washington DC. So I was going to lots of
7 different protests just to, just to be there to
8 see what was going on.
9    A.  When you said they were going to be
10 talking about this, what is this?
11    A.  The political conflict that's happening
12 in the country now. Biden, Trump, all the back
13 and forth.
14    Q.  You would agree, can we agree that
15 before January 6th, 2021, you were aware that
16 there had been an election, a national election
17 in November of 2020?
18    A.  Yes.
19    Q.  Did you keep up to speed on the events
20 leading up to and after the election, including
21 the news of reported news of who won and who
22 lost?
23    A.  Yes.
24    Q.  Where did you obtain that information?
25    A.  From those sources that I described



62

1 earlier. Like I said, I didn't, I didn't have
2 cable TV, so, TV, you know, local TV, regular TV,
3 friends, oh, you know, I mean, the thing is, you
4 know, when you're, you know, when you're engaged
5 with patients, you know, you're, everybody's
6 talking about everything. So, you know, having a,
7 a chiropractic office like mine with what we call
8 open adjusting, where there's, there's no walls,
9 you know, there's no privacy, because you, if
10 somebody brings you a baby to adjust
11 chiropractically, you want people to ask, wow,
12 why is he adjusting a baby? A baby doesn't have
13 back pain. So with open adjusting, it's, it's a
14 lot of fun. It's a, it's a big discussion.
15    Q.  What websites did you frequent before
16 January 6th 2021?
17    A.  I don't remember frequenting any.
18    Q.  Did you ever read any local newspapers?
19 We have two?
20    A.  Definitely. Yes.
21    Q.  Which ones?
22    A.  Power Post most often.
23    Q.  When you approached the building, you
24 saw the crowd, you saw signs, you heard people,
25 were they, were people chanting things?

63

1    A.  Yes.
2    Q.  Shouting things?
3    A.  Yes.
4    Q.  What kind of things were they yelling
5 or chanting?
6    A.  I don't really remember. Lots of stuff.
7    Q.  Nothing?
8    A.  Yeah, I don't really remember anything
9 in particular.
10    Q.  With respect to the Capitol itself,
11 when is the last time you had been in the Capitol
12 building before January 6th?
13    A.  I think maybe like, maybe six years
14 before that.
15    Q.  Just in a sentence, what was the
16 purpose of your going there?
17    A.  Well, you know, I've probably taken 500
18 walks around the capitol, you know, just, at
19 night or daytime, just for something to do
20 because it's so beautiful. I think I just walked
21 in one of those days just to have a look.
22    Q.  When you walked in, did you have to go
23 through security?
24    A.  Yes.
25    Q.  What did that involve?

64

1    A.  I, I can't remember in particular, but,
2 you know, I would equate it with entering any,
3 any capital building or any, any, you know,
4 Russell senate office building, you know,
5 Longworth building, Rayburn building, all of
6 them. You know, you got to take your stuff out
7 and walk through the screener.
8    Q.  Do you recall being after you were
9 there to see?
10    A.  I'm sorry, I'm sorry?
11    Q.  Do you remember after you were there to
12 see?
13    A.  You mean that other time that I, I
14 walked into the Capitol?
15    Q.  Yes. About six years before?
16    A.  No, I, I don't think I, I was, I didn't
17 go in to see anyone. I just, you know, went in to
18 peek in.
19    Q.  Back to January 6th, did you observe
20 any barricade structures, anything like that as
21 you approached the building?
22    A.  Well, I did not because I was, you
23 know, holding up my phone and walking, walking
24 forward, you know, making a video. Looking at
25 that, you know, that video later, all of those

65

1 barriers had been moved aside. So I wasn't
2 looking for barriers. The barriers had been moved
3 aside and I was on my phone holding it and
4 looking at a little screen as I was walking
5 forward, making sure I was taking a good shot.
6    Q.  Why did you record it?
7    A.  Because they will be talking about this
8 for 3000 years.
9    Q.  When is the last time you had been to
10 the Capitol before, outside the Capitol before
11 this?
12    A.  That's very difficult to say. I, I take
13 walks, I took walks around there all the time.
14    Q.  When you were last there before January
15 6th, were there barriers that were moved?
16    A.  Would you repeat the question please?
17    Q.  When you were last at the Capitol,
18 before January 6th, were the barriers moved, as
19 you said they were on when you saw that on
20 January 6th?
21    A.  Well, there were, there were, there
22 usually aren't barriers there.
23    Q.  Did you have an understanding as to the
24 purpose of the barriers?
25    A.  Well, these are lightweight barriers



66

1  that, you know, I think that they can put up,
2  that Capitol police can put up at their
3  discretion to both maybe barricade people or to,
4  you know, extend lines or wrap lines around. It's
5  those sort of lightweight, freestanding barriers.
6     Q.  Got it. Do you have an understanding as
7  far as why those lightweight, freestanding
8  barriers were there?
9     A.  Well, as I said, and the only reason I
10  knew this is because I later reviewed my video.
11  Those barriers were not in place. They were moved
12  aside. There were no barriers standing when I,
13  that I remembered when I walked towards the
14  Capitol down on January 6th.
15     Q.  How large would you estimate the crowd
16  was?
17     A.  Wow. I, I have, I have no idea.
18     Q.  Did you see a police presence?
19     A.  No, I saw no police presence. The only
20  police presence I saw was up on the portico, and
21  that's why I wanted to go up there.
22     Q.  Why?
23     A.  Because I wanted to see the interaction
24  between protestors and the police. What was being
25  said? what was the motivation and what was going

67

1  to happen.
2     Q.  What did you observe? I assume you got
3  close enough to see what was going on, yes?
4     A.  Yeah, well, it was just a bunch of
5  people standing around and some of them talking
6  with the police.
7     Q.  Did you see the "Interaction between
8  the police and the public" when you...
9     A.  Yes, I did. I was standing right in
10  front of it. I wanted to see it.
11     Q.  What did you observe?
12     A.  Very collegial.
13     Q.  Did you, Dr. Kaufman have an
14  understanding as far as why the police were
15  there?
16     A.  Well, I, I mean, technically no. I
17  mean, but you know, you've got a, a huge crowd
18  there and they're protesting the election. Why
19  wouldn't you have, you know, police there?
20     Q.  Was this US Capitol MPD or what police
21  do you recall seeing?
22     A.  I, I don't, I don't recognize specific,
23  I don't remember specifically.
24     Q.  You would agree that you entered the
25  Capitol building that day through the Rotunda

68

1  Divorce? Accurate?
2     A.  Yes.
3     Q.  Before entering the rotunda Capitol,
4  were you on the portico, the landing outside of
5  the entrance?
6     A.  Yes.
7     Q.  Tell us what you remember happening out
8  there?
9     A.  So, I was standing there and, standing
10  beside people who were talking with the police.
11  It was very collegial. I could talk about one
12  conversation I saw. An older gentleman was
13  talking with a police officer, and the police
14  officer said to him, "See, this is what happens
15  when I let you come up." The protestor, the older
16  protestor said, you know, "I'm sorry, guy, you
17  know, they're not listening to me." All three of
18  us laughed and I clapped an officer on the
19  shoulder. Then people were just milling about on
20  the top of the portico. Then all of a sudden,
21  through no verbal or hand sign I saw, they just
22  started surging at towards the police and the
23  doors, and...
24     Q.  Go ahead?
25     A.  Then remember, well, you're, you're

69

1  pinned inside the crowd and you can't get out.
2  The same officer that we had been talking with or
3  that I had been observing the, the conversation
4  with and whom I, I clapped in a friendly way on
5  the, on his, on his arm like, you know, I, I
6  understand life is, life is crazy, people are
7  crazy. He suddenly yelled at me and the, the
8  other guy, he said, "We're about to pepper
9  spray." I didn't know what he was, I didn't
10  actually understand him. I knew he, he said,
11  "We're about to some, some, some something." I
12  didn't know what he meant. I, it was garbled, you
13  know, it was so loud at that point. Then pepper
14  spray got splashed full in my eyes and I
15  realized, oh, he was, you know, being a nice
16  enough guy trying to tell us, you know, look how
17  close your eyes are going to, we're going to
18  pepper spray you. So, I was fully blinded. I, I
19  couldn't see anything and I was, you know, really
20  scared of, I don't think there was a, as I
21  remembered it, there was no railing on those
22  porticos, and they're really high. I was really
23  scared of getting nudged off the edge and ha
24  having no sight at all. So, I was just trying to
25  stay, in the crowd and near the police. So, you





VETERAN REPORTERS

855.667.0077
VETERANREPORTERS.COM

**70**

1 know, the crowd is like this python and it's
2 surging forward and it's relaxed and surging
3 forward. I keep staring down, looking at my feet,
4 waiting for my eyes to clear.
5    Q.   How close were you to the entrance when
6 this...
7    A.   The surge? I was, I was trying to stay
8 close to the police and, and stay, you know, stay
9 in the middle of the portico as best I could.
10   Q.   But there's a, there are large bronze
11 doors there. Yes?
12   A.   Yes.
13   Q.   My question is, how close when you got
14 pepper sprayed or maced, how close were you to
15 the doors?
16   A.   Oh, I mean, I, I would say I was sort
17 of in the middle of the portico. I was in front
18 of where the police were.
19   Q.   You were talking with them?
20   A.   Yes.
21   Q.   Several?
22   A.   Well, I was mostly listening to the
23 conversation. I didn't really, I don't remember
24 participating in the conversation at all, but I
25 just remember laughing at the cop. He was

**71**

1 obviously a very nice guy and just, you know,
2 swatting him in a friendly way on the shoulder. I
3 don't remember talking to speaking myself to
4 anybody, any, any police officers or protestors.
5    Q.   Remember seeing or meeting an older
6 couple?
7    A.   Well, do you mean the, the older
8 gentleman and the woman, at the, at the doors?
9    Q.   Apparently you, you've mentioned in a
10 prior statement that there were older people
11 there. That's what I was asking you about?
12   A.   Yes. So I was just trying to wait, you
13 know, keep away from the portico, stay near the
14 police and, until my eyes cleared. Then, you
15 know, the, the crowd was surging forward and,
16 there's a, the, the main entrance, was incent a
17 little bit. So in that incent, me and this, these
18 older elderly gentlemen and the elderly woman
19 were being crushed up against the, the doors.
20 They were both turning red, and I mean, there
21 were long periods where you could not breathe. So
22 I grabbed the man, he said, "I'm going down,
23 brother, I'm going down." I, I, you know, I can't
24 take it. I don't know what he said. I said, "I
25 know you can." I grabbed him by the scruff of his

**72**

1 jacket and as best I could, pulled him out of
2 that in the angle of that incent and moved him
3 aside, out of the way because the pressure,
4 seemed to be going towards the doors. I was
5 grabbing the woman and going to do the same thing
6 for her. The crowd surged. So I just put my arms
7 up and formed a box around her to protect her as
8 best I could.
9    Q.   Did you ever get their name?
10   A.   No.
11   Q.   What happened next?
12   A.   The doors opened up and, there's a
13 Plexiglas, there's a bulletproof Plexiglas thing
14 there. The doors opened up and, they, they waved
15 me in and I went in. The reason I, the only
16 reason I went in is because I thought they were
17 doing me a solid because they saw that I was
18 trying to save the lives of these, these two old
19 elderly people. They were, you know, I couldn't
20 see, I could barely see. I think at that point I
21 maybe had 15 percent vision, and I was thinking,
22 what do they see behind me that I don't, you
23 know, they opened the door, I'm going in.
24   Q.   Who opened the door?
25   A.   Capitol Police.

**73**

1    Q.   When you went there, did you enter with
2 this couple or any, the woman or the man or
3 anybody like that?
4    A.   Well, I, you know, like I said, I could
5 barely see. I went in and I turned around, to, to
6 meet her or, you know, or help her.
7    Q.   Did she come in with you?
8    A.   I don't know. I don't know because I
9 could barely see.
10   Q.   Well, did, when you got back in you
11 were at the doorway, would you agree?
12   A.   When I was inside the Capitol?
13   Q.   Yes.
14   A.   Yes, I was, I was by the door. But
15 there were about 13 police there.
16   Q.   Right.
17   A.   I don't really remember that except
18 that, in, in my criminal trial, they showed
19 pictures of me coming into Capitol. So it's, it's
20 been refreshed in my memory that there are about
21 13 cops there.
22   Q.   I just want to make sure I heard what
23 you said. Are you saying that you believed you
24 were let into the building that day because
25 somebody was showing you a gesture of goodwill



74

1 because you were assisting this woman and this
2 man?
3     A.   That, yeah, that was my, that was, my
4 impression. I mean, otherwise why would the doors
5 open up?
6     Q.   Did you see the same two people, the
7 husband, the man and the woman when you were
8 inside the building at any time?
9     A.   You know, I only, you know, I'm looking
10 through an aperture of, you know, chemical
11 blindness and I could describe the guy. I don't
12 know that I ever saw the woman's face because she
13 was faced away from me and getting crushed into,
14 into that, the angle of the inset. I don't know.
15 I don't even know if they were together. I just,
16 they were just being, they were going to
17 suffocate. He was almost purple.
18     Q.   When you made your way to the doors,
19 did you have to go up a flight of stairs or
20 several flight of stairs?
21     A.   Well, the portico, the portico has a
22 long advance of steps, but I, I don't remember
23 any, any steps on the portico. As I said, I was
24 just trying to burrow forward so that I stayed in
25 the middle.

75

1     Q.   Would you agree you had to burl up to
2 where the door was?
3     A.   I was just moving forward with the
4 police. I was trying to stick with the police.
5 The last thing I wanted was to be moved sideways
6 to the left, because I knew I was on the left
7 side and, and get pushed off blind off the
8 portico. I have, what is that, 20, 25 feet? I
9 don't know. I know it's, it's, it's roadway down
10 there because I know that part of the Capitol
11 very well. I used to, as I said, I taught Tai Chi
12 down there and we'd go into that area to get out
13 of the wind from a cold winter morning. So if I
14 got pushed off, I was going to be pushed onto
15 maybe a car or onto the roadway.
16     Q.   Dr. Kaufman, did you go there with the
17 intention of going into the building that day?
18     A.   Hell no.
19     Q.   Did you wind up in the building that
20 day?
21     A.   Did I wind up in the building that day?
22     Q.   Yes.
23     A.   Yes. I was let in by Capitol Police and
24 I only went in because I thought they were doing
25 me a solid and trying to get us out of the way

76

1 because we were being crushed.
2     Q.   Did you have an understanding as far as
3 to why the officers were using mace on you and
4 the others that day before you entered the
5 building?
6     A.   Of course.
7     Q.   What was the reason?
8     A.   Deter the crowd. The crowd had started
9 to surge for some reason. Like I said, I was
10 there, nothing I saw that was said, no hand
11 signals, nobody saying, come on, let's go. It
12 just started surging. So I think that it was for
13 a crowd dispersal.
14     Q.   When you got into the building, there
15 were tons of entrance. What did you observe?
16     A.   I turned around and, and waited for
17 instructions from the police that let me in. You
18 know, now that I'm in the Capitol, what do I do?
19     Q.   Did you obtain instructions?
20     A.   No, they were paying no attention to
21 me. They were having a, they were having a, a
22 spirited conversation with some guy.
23     Q.   Do you recall what the substance of the
24 spirited conversation was?
25     A.   I have no idea.

77

1     Q.   Was that between a police officer and a
2 protestor?
3     A.   Yes. I assume the guy was a protestor.
4     Q.   Did you observe anything physical
5 occur?
6     A.   No, not really. Just like I said, a
7 spirited conversation. I have no recollection
8 specifically of what, about what they were
9 talking about. It seemed like the protestor
10 wanted something and the cop was trying to
11 explain himself or, or procedure or something.
12     Q.   How long had you been on those steps
13 before you entered the building?
14     A.   I would say, I mean, it feels like I'm
15 just grasping, I would say half an hour.
16     Q.   In that half an hour you were talking
17 to people?
18     A.   No, like I said, at first when I was up
19 there, I was just, you know, trying to see what
20 the interaction was between protestors and the
21 police. Then the crowd started surging and then
22 we got pepper sprayed, and then I was just trying
23 to huddle with the cops and not get pushed, you
24 know, anywhere, you know, stay on solid ground in
25 the middle because I, I really couldn't see.



78

1    Q. Did you come to learn before you made
2  your way into the building that day, the reason
3  why these protestors were there?
4    A. Well, yeah. Yeah.
5    Q. What did you learn?
6    A. Well, they were protesting the, the
7  validation of the election.
8    Q. Did you come to learn what was
9  happening as you were making your way into the
10 building?
11   A. Well, I was let into the building.
12 Then, you know, I waited for the cops to tell me
13 what to do and nobody was paying any attention to
14 me. The cops completely ignored me. I thought
15 that, you know, somebody would've said, you know,
16 wow, you know, we saw you, you know, with the old
17 man and the, and the woman, you know, wow. You
18 know, that was, that was a close call, blah,
19 blah, blah. But, you know, there was absolutely
20 nothing. So then I said, well, now what will I do
21 with myself? Then I turned around and I was
22 amazed to see, you know, my vision is slowly
23 coming back. Now I can kind of see like 20
24 percent. I was absolutely stunned to see the
25 place, you know, one third of the way full of

79

1  people with their phones and, you know, going
2  around and, you know, using the strobes on their
3  phone, and their people were saying, "We are
4  inside the Capitol. We are inside the Capitol."
5    Q. What kind of regalia were they wearing?
6    A. Well, they just, you know, it was just
7  like ordinary people, you know, I'm assuming that
8  they're, protestors because they're, they're not
9  dressed as in police uniforms.
10   Q. Do you remember people wearing MAGA
11 hats or Trump shirts, things like that?
12   A. Yes. Yes.
13   Q. More than a few?
14   A. I'd say. I'd say one third.
15   Q. My question is, I'm not sure I got an
16 answer. Did you come to learn what was going on
17 that day in terms of what Congress was doing?
18   A. I, I was not aware that Congress was
19 there or, or anything else. All I had learned,
20 learned at that point in time was that, they were
21 protesting the election. People were protesting
22 the election.
23   Q. When you made your way in, you said
24 that the officer was ignoring you?
25   A. Officers.

80

1    Q. Officers, okay. Did you ever ask them,
2  "Hey, what about the old lady I'm trying to
3  help", or worse to that effect?
4    A. Well, like I said, I mean, I could
5  barely see when I came in and I was standing
6  there for a while. I don't know if she came in
7  after me or what. Then, you know, I just said,
8  well, you know, now what do I do with myself? I
9  figured, you know, I got to, I got to find a way
10 out of here. I relied on my old memory of the
11 building from, back when I was a, a gopher for
12 the Joint Economic Committee. I knew I couldn't
13 go out the door as I came in, so I, I knew that
14 there was an obscure door on the, that would be
15 the south side, on the house side. It was, I was
16 on the upper floor, so I'd have to go down to
17 the, the, the downstairs floor. So when the cops
18 didn't tell me anything to do, I just started
19 walking to try and find my way down to that, that
20 doorway and get out.
21   Q. You mentioned that you were a gopher.
22 Was that your actual job title?
23   A. No, assistant to the, probably like
24 assistant to the director.
25   Q. How long did you have that position?

81

1    A. Nine months.
2    Q. Would it be fair to say that you became
3  familiar with the layout of the Capitol building
4  during your nine months there?
5    A. Yes, because I had to make deliveries.
6  Mail deliveries twice a day, morning and
7  afternoon.
8    Q. You would actually have to deal with
9  both chambers in that position? I'm just going by
10 the job title. You would've to deal with both the
11 house side and the senate side?
12   A. Yes, and it was mostly on the house
13 side. Not that many deliveries, I don't know why,
14 to the Senate side. It was also delegated among,
15 you know, the, the, like four, four staff
16 assistants.
17   Q. Interesting.
18   A. You didn't, you didn't make deliveries,
19 you didn't make the morning and afternoon
20 delivery yourself every day.
21   Q. As a gofer, this is sounds like the
22 days before email and texting and whatever you
23 would deliver letters, envelopes, et cetera, from
24 person to person in that building?
25   A. Yes.



82

1  Q.  Did you become familiar with the
2  stairwells, entrance exits, things of that
3  nature?
4    A.  Yes, and that's what I was trying to
5  rely upon what I recall.
6    Q.  You said that you were trying to rely
7  upon that after you entered the building?
8    A.  Yes.
9    Q.  Your purpose was...
10    A.  When nobody told me what to do, I
11  wanted to get out of the building.
12    Q.  Your testimony is you had no intention
13  to remain in the building?
14    A.  No.
15    Q.  Where did you next go then?
16    A.  I started making my way towards the
17  speaker's office because I remembered, I thought,
18  I remembered there was an obscure staircase
19  somewhere around her office that I could get
20  downstairs and get out that.
21    Q.  As of January 2021, who was the
22  speaker?
23    A.  Nancy Pelosi.
24    Q.  How long does it take from the Rotunda
25  to get to the speaker's office in terms of a

83

1  walk?
2    A.  Well, you know, you had, you had people
3  in there and, and you know, the crowd would stop
4  moving. So, so how long? I mean, I don't know. I
5  mean, I would say that all in all, I think I was
6  probably in there for about a half an hour.
7    Q.  What I heard you say is you got in and
8  you thought there would be a good idea to go
9  towards the speaker's office, that would be that
10  of Speaker Pelosi. You made your way towards her
11  office?
12    A.  I was looking for the stair, the
13  staircase, an obscure staircase that I knew went
14  downstairs, and, as I remembered it, there was a,
15  a side entrance that I could get out of. That's
16  where I was going.
17    Q.  As you made your way towards the
18  speaker's office, did you hear what, if anything,
19  the crowd of people, you said you were surprised
20  to see this crowd. Did you hear what they were
21  saying?
22    A.  I, you know, I don't really know that,
23  you know, there was no organized chanting or
24  anything like that. It was really, you know, some
25  people were yelling. Most of the people I think

84

1  were, you know, really in sightsee, you know, as
2  sightseers.
3    Q.  Did anybody make any reference to the
4  Speaker Pelosi, as you made your way towards her
5  office?
6    A.  No. One guy kicked at the door
7  violently and everybody yelled at him, " Stop.
8  Don't do that. Don't break anything. Don't hurt
9  anything." I remember them saying, "We don't do
10  that."
11    Q.  Did you hear protestors use the word
12  Nancy in a pejorative way as they made their way
13  down the quarters that day, Dr. Kaufman?
14    A.  No, not that I remember.
15    Q.  Did any of the protestors with whom you
16  communicated share your views on Speaker Pelosi
17  that day?
18    A.  I, I didn't, I didn't...
19        MR. HUNT:  Objection to form of
20  the question. You can answer.
21        DEPONENT:  Can I answer or no? I
22  don't...
23        MR. HUNT:  Yes, you can answer.
24    A.  Okay. I didn't, I didn't have any, any
25  discussions with anyone.

85

1    Q.  As somebody who I think you consider
2  yourself politically engaged, and among other
3  things that published articles, did you have an
4  understanding as far as the views of the people
5  in the building that day towards Speaker Pelosi?
6        MR. HUNT:  Objection to the form
7  of the question. You can answer.
8    A.  Not in particular, no.
9    Q.  If I were to tell you there were
10  certain people who were adamantly opposed to
11  Speaker Pelosi, including those who were at the
12  building that day, was that notion surprising?
13        MR. HUNT:  Objection to the
14  formative question. You can answer.
15    A.  No, but I'll say for myself, the only
16  reason I was, I was there at all was, because
17  I've written a book, you know, about this kind of
18  political upset and only was I interested in
19  going there for the historical impact. Anybody
20  that goes inside or thinks they're going to, you
21  know, do anything to Nancy Pelosi, they've got
22  their head up their ass, and don't do it.
23    Q.  You made your way down the, from the
24  Rotunda toward the speaker's office. What
25  happened next?



VETERAN
REPORTERS

855.667.0077
VETERANREPORTERS.COM

86

1    A.   So I, you know, I, I don't, you know,
2    memory is failing me, so I've got to go different
3    places, you know, it's like a, like a, a little
4    bit of a maze. I came upon the speaker's office
5    and, just, you know, out of historical curiosity,
6    I went in there and also, you know, the obscure
7    staircase might've been in her office complex. So
8    I went in there as again, hunting for that, that
9    staircase, and then went out because I didn't
10   find it and I kept searching.
11       Q.   To be clear, you went into the, her
12   office where presumably she has her desk?
13       A.   Yes.
14       Q.   Her telephone and her computer?
15       A.   Yes. As I recall that, that obscure
16   staircase, I'd have to keep going South to
17   towards the, the end of the building on the house
18   side. As I recall that, that staircase was facing
19   that outdoor wall and underneath another
20   staircase. So I was always trying to find my way
21   south to the end of the building.
22       Q.   Would you agree that in order to go
23   into the speaker's office, you had to make a
24   detour from your search for the staircase?
25       A.   No, because I couldn't remember exactly

87

1    where the staircase was. So I entered into the
2    speaker's office. There's a, you know, a, a
3    grouping of, of offices, and I thought the
4    staircase might be in there.
5        Q.   You would agree you were not invited
6    into the speaker's office?
7        A.   Of course.
8        Q.   Who else was in there when you went in?
9        A.   Protestors.
10       Q.   How many?
11       A.   Well, I mean, in the hall, you know, in
12   the, the hallways, I'd say probably like 14.
13       Q.   What did you observe them doing?
14       A.   They were walking around, you know, and
15   looking around, you know, you know, talking shit
16   but, you know, it's like, you're not really with
17   anybody. I mean, people are just, they're moving
18   from room to room, like, like sight seasons, you
19   know. Like I said, so they're in motion and I'm
20   in motion because I'm looking for the staircase.
21   So I didn't really engage with anybody. There was
22   a conference room and there was a computer on it
23   and, you know, people were just sort of, you
24   know, staring at this. I did too, you know, out
25   of, you know, historical moment.

88

1        Q.   Stared at a computer?
2        A.   Yeah, it was a laptop.
3        Q.   My understanding is you took a
4    photograph of that laptop, is that accurate?
5        A.   Yes, I did. Historical moment.
6        Q.   You said the people were talking shit,
7    those were your words. What does that mean? What
8    words you hear, was talking shit?
9        A.   Well, just, you know, I, nothing really
10   specific comes to mind. You know, you've got all
11   of these people and some of them are talking and
12   some of them are responding, you know, to one
13   another. None of them seem to know each other.
14   So, you know, as to specific things that they
15   said, you know, I would just qualify, quantify it
16   as, you know, just talking shit.
17       Q.   Can you give me an example?
18       A.   No, not specifically. I don't really
19   recall anything. You said people were calling
20   Nancy. I do kind of recall that maybe that's, you
21   know, that's something like Nancy.
22       Q.   The room where you went to go shoot the
23   picture of the laptop, is that separate from the
24   office where her desk is or is it the same room?
25       A.   I don't really remember. I don't really

89

1    remember specifically where that was.
2        Q.   How long did you remain in her office?
3        A.   I think I, I think I might have stepped
4    in and out of her office because it didn't, it
5    wasn't going to lead to the staircase, the
6    staircase.
7        Q.   Did you have a view of Speaker Pelosi
8    at that time?
9        A.   Did I have a view of Speaker Pelosi?
10       Q.   Yes?
11       A.   Physically?
12       Q.   In person to go to, as the Speaker of
13   House. Did you have a view of her, like opinion?
14       A.   Oh, a view of her?
15       Q.   Mm-hmm?
16       A.   Well, you know, she's a pretty doggone,
17   capable woman.
18       Q.   Is that it
19       A.   Yeah. I mean, I, you have to
20   understand, I think that, you know, anybody who
21   is in there and thinks that they're going to do
22   anything constructive or, you know, anything that
23   contributes to the political narrative has their
24   head up there. I mean, I wrote a novel on a
25   stolen election, you know. So and, you know, it



VETERAN
REPORTERS

855.667.0077
VETERANREPORTERS.COM

90

1  wasn't, it wasn't this scenario at all, but you
2  know, it, if anyone has going to steal an
3  election, you know, they, they know that they can
4  do it. A stupid, you know, protest at the Capitol
5  is, is not going to get anything done.
6      Q.  Would you view the elections being
7  stolen, Dr. Kaufman?
8      A.  I, I really, I really hadn't, you know,
9  made up my mind. You know, I would have to wait
10  and see the evidence and see the discussion.
11      A.  Did you have a view on maybe in the
12  past whether Bernie Sanders had been robbed of an
13  election? Have you ever given a view on that?
14      A.  Yes, I told them, I, I definitely did.
15  I, I told the FBI that I thought that his
16  election had been that they had stolen it from
17  him.
18      Q.  Who's they?
19      A.  The Democrat party. Whoever makes those
20  decisions for the Democrat party, they stole it
21  from Bernie early, you know, his early momentum.
22  They stole his early momentum.
23      Q.  Did you also have a view as far as
24  whether there were states that had robbed Trump
25  of certain votes in 2020?

91

1      A.  I, you know, I may have an opinion, but
2  you know, you, you just, you just wait and see
3  what people are doing. I'm not going to lead a, a
4  protest and, and, and say it's, it's this way or
5  that, you know, I think it'll, it'll come out in
6  time.
7      Q.  Had you ever previously expressed the
8  view that the same thing happened in the 2020
9  election, that it happened to Bernie Sanders in
10  2016?
11      A.  I would say I probably did. You know,
12  jocular talk and loose talk and you know, just in
13  laughing about things with friends.
14      Q.  Wasn't that the reason you were in the
15  Capitol building out there, Dr. Kauffman?
16      A.  No, no. Like I said, I never would've
17  entered that building, had I not been waived in
18  by police and in the context of saving a little
19  old man and a little old woman, and presuming
20  that they saw through the Plexiglas window that I
21  was doing a, that, that I was doing a solid and
22  they were trying to help us. That's the only
23  reason I went in. You got to be stupid to think
24  that something like that is going to, you know,
25  upset the, the gears of, of government.

92

1      Q.  I've heard another possible reason why
2  you were in the building that day, had something
3  to do with your desire to report on it, maybe
4  acting a journalist. Did you view yourself as
5  being a journalist or somebody who was going to
6  report on it that day?
7      A.  Well, you know, Western Civil, you
8  know, I, I write about philosophy. I write about,
9  you know, political turmoil, human realization,
10  political events, human events, history, what's
11  going on here? Is there a pattern? I believe
12  there is, and in that interest. But no, I'm not
13  a, a, I didn't consider myself an online
14  journalist or anything, but definitely getting
15  grist for the mill for, you know, what I'm very,
16  very interested in and what I will spend the rest
17  of my life writing about.
18      Q.  Do you remember giving statements to
19  the FBI right after you were arrested?
20      A.  Yes. Yes. I gave a lengthy statement
21  without counsel.
22      Q.  Were you honest and truthful when you
23  gave that statement?
24      A.  Yes.
25      Q.  Have you had a chance since that time,

93

1  June of 2022, I believe to go over what you said?
2      A.  No.
3      Q.  In retrospect, is there anything that
4  you believe you didn't or not fully complete and
5  accurate about?
6      A.  I, I can't think of anything...
7      MR. HUNT:  Objection to the form
8  of the question. I mean, he didn't even see the
9  document but you can answer it.
10      Q.  Talking about your, what you told the
11  FBI when you were interviewed for about an hour
12  and a half, by an officer?
13      A.  I, I have never reviewed it, and, but I
14  stand by it.
15      Q.  After you were in Speaker Pelosi's
16  office, there was a mention that something broke
17  or there was a sound or something breaking. Do
18  you remember that?
19      A.  Yes.
20      Q.  What happened?
21      A.  So after I left the speaker's office
22  and you know, and looking everywhere for the, for
23  the staircase, I came out into the main hall and
24  was going to continue my movement South, where I
25  remembered the staircase. As I was, I approached



94

1 that and there was a lot of people so that I
2 couldn't go any farther. Later I realized, I,
3 later I came to realize that was at the Speaker's
4 gallery, and so I backed up and I'm thinking, you
5 know, well, now what am I going to do? You know,
6 how am I going to get out? I heard a big bang. I
7 didn't bother looking because I thought that
8 sounded like a gunshot and whatever happened, it
9 has nothing to do about it now. So I didn't even
10 bother looking around at first. I just stood
11 there and just wondered what, you know, what the
12 heck do I do now? Because that was the staircase
13 that, that, at least one of them that I
14 remembered. I thought I remembered a smaller
15 staircase. But I, I, you know, I pretty much
16 looked everywhere and, and, yeah, that group of
17 people was, was blocking the staircase and I had
18 no idea that there were, that there were cops
19 there too.
20      Q.  But you found the staircase?
21      A.  Well, I knew that staircase was there,
22 but I thought there was a smaller staircase. But
23 I just, I didn't know what to do. I didn't know
24 where to look next.
25      Q.  My question is; did you take the

95

1 staircase?
2      A.  No, I, I'm telling you that that
3 staircase to the speaker's gallery, to the, I
4 think it's called the House Gallery or Speakers
5 Gallery, there was a, a crowd of people in there
6 and a crowd of, of protestors. They weren't doing
7 anything. It was just a big clot of humanity that
8 wasn't moving. So, rather than stand there with
9 them, I moved back and was leaning against the
10 wall and thinking about, you know, what I was
11 going to do.
12      Q.  You said, you heard a sound, you
13 thought it was gunfire, thought about it. What
14 did you next to do?
15      A.  Well, the, you know, then, you know,
16 there's an uproar there. So at some point in
17 time, like maybe five minutes later, I look back
18 and now I can see it's a whole squad of police on
19 the, on the stairs. There, you know, you know,
20 milling about, milling about, and you know,
21 they're saying, "They shot her! They shot her!
22 They shot her." So, I, I tried to, you know, make
23 my way forward and, and see, you know, what the
24 heck was going on, what were people talking
25 about. Then I saw Ashli Babbitt on the stairs

96

1 and, you know, the cops around her and the
2 protestors. They were saying, you know, "Why did
3 you shoot her? Why did you shoot her?" It was
4 hard to pick out because it was, again, it was a
5 dent. The cops were, were you know, talking to
6 the protestors and the protestors were talking
7 back to the cops.
8      Q.  Before you heard the sound of gunfire,
9 did you see what the people were doing in the
10 hallway?
11      A.  They were just standing there.
12      Q.  How far were you from this crowd?
13 Crowded people?
14      A.  So as I recall, when I turned into that
15 area where the staircase would've been, I could
16 see glass doors you know, wooden and glass doors
17 ahead over the, the heads of the protestors. I, I
18 don't remember, you know, if I'm imagining that
19 it's a gallery or, you know, I, I put my memory
20 of that there later on. But the crowd was just
21 standing there. They weren't really, they weren't
22 doing anything. I didn't join them. I was
23 standing, you know, a good way behind them and
24 just seeing that nothing was happening. They
25 weren't going anywhere. So I just pulled back and

97

1 around the corner and where I couldn't see what
2 was going on, and that's when I heard the
3 gunshot. So I wasn't even sure if it was a
4 gunshot at the, at the time, but I, you know, I
5 said, you know, well, whatever the heck that is,
6 there's nothing to be done about it.
7      Q.  Did you see a set of doors there?
8      A.  I think so. I think over the crowd of
9 people, you know, I could see a transom, a glass
10 transom in, in a wooden frame.
11      Q.  Was the door open?
12      A.  I couldn't see the, you know, the, the
13 crowd was too big.
14      Q.  Did you hear anything the crowd was
15 saying?
16      A.  I don't really know that they were,
17 they were saying anything.
18      Q.  Did it appear that the crowd was trying
19 to get through the doors to you?
20      A.  It did not. I did not even realize that
21 they were stuck. I thought, you know, there was
22 just a big crowd, you know, at the stairs and
23 nobody was, you know, moving. Maybe there were
24 people coming up, maybe there were people going
25 down. It was just a big, you know, log jam.

