**EXHIBIT 3**

Part 2

98

1    Q.   While the crowd was gathered at these
2  doors, the log jam, other than standing there,
3  what were you doing?
4    A.   Nothing.
5    Q.   Did you have your phone out?
6    A.   Yes.
7    Q.   Did you videotape it?
8    A.   I tried to and later on, I, I real, I
9  don't know, I must have pushed the wrong button,
10  but I have very few images from when I realized
11  what was going on, that Ashli Babbitt had been
12  shot, and the crowd reaction and the, the cop's
13  reaction. I took probably about six, attempts to
14  take a, a still shots and video. I guess I just,
15  I pushed the wrong button. They, they, I, they
16  didn't take them. I didn't remove them, so.
17    Q.   What kind of phone did you have at the
18  time?
19    A.   iPhone.
20    Q.   How long had you had it?
21    A.   I don't remember. I, I don't have that
22  phone anymore. I, I turned it over to the FBI.
23    Q.   Got it.
24    A.   I gave them, I gave them all of my
25  instructions on how to get into the phone and

99

1  they, they have that phone. I never got it back.
2  I granted them complete access to the phone.
3    Q.   What happens next? You heard the gun
4  fire, take us what you did next.
5    A.   Okay, where do you want me to start?
6    Q.   You heard gunfire, you were like, what
7  was that?
8    A.   Yeah, and I just stood there and I
9  didn't look. Then, you know, the, the, just the,
10  the sound of that, that crowd, got bigger and
11  bigger. So I looked around and approached to see,
12  you know, what, what was going on. That's when I
13  saw Ashli Babbitt. So, you know, there was
14  discussion back and forth between the crowd and
15  the cops. The cops were trying to medivac her
16  out. The discussion was, would they take Ashli
17  Babbitt? Would they medivac her out towards us on
18  the landing, on the upper landing, or with a
19  medevac her down the stairs and out, which is the
20  way that I had wanted to go? So that
21  discussion went on, I don't know, you know, back
22  and forth for a long time. I don't know, maybe 15
23  minutes. So finally the cops decided and the
24  crowd decided that she should be medivac, backed
25  out, not down the stairs, but up past us. So, the

100

1  crowd and the cops, the crowd, you know, we said,
2  " Back up. Back up. Everybody back up." So
3  everybody in the crowd backed up to make room so
4  that Ashli Babbitt could get Medivac out past
5  that crowd, out the way I had come in from the,
6  the rotunda. So then, I lost sight of what was
7  going on and then they, for some reason, they
8  decided to switch it up and they decided to
9  medivac down the stairs. So then they were medivacking
10  her down the stairs. Then reinforcements came
11  around the corner the way I had come from the
12  Rotunda, and they gave us orders to get out and
13  we immediately started going out.
14    Q.   You said 15 minutes, and I'll take that
15  as an estimate, but you would agree you waited,
16  you were up in the area where this had occurred
17  for a good period of time?
18    A.   Yes.
19    Q.   You would agree at that point you were
20  not looking for exit or attempting to exit the
21  building?
22    A.   I would've liked to have exited the
23  building, but at this point in time now, I was
24  talking, I was talking directly with people and
25  having, trying to have conversations with them to

101

1  find out what they had seen and what had happened
2  before that. I had not, I had not done that. I
3  did that here.
4    Q.   What did you discuss?
5    A.   Well, there were three guys who
6  apparently had seen Ashli Babbitt shot point
7  blank, and they were extremely distressed. So I
8  said, " What happened?" You know, what happened,
9  what, what was going on? Each of them gave me a
10  version of how Ashli Babbitt had been shot. One
11  guy was particularly distressed, and I asked him,
12  and he was they were all walking away, they were
13  walking away from, you know, the, the group of
14  people and just sort of, I think trying to, to
15  deal with, you know, their reaction, their
16  emotional reactions to what they had seen. So
17  that's when I was talking with them, you know,
18  when we were apart from the, the crowd there.
19  Then I, I as I said, there was one, one fellow in
20  particular that, I, I knew, I said, oh boy, this
21  guy is, he's, he's on the verge of PTSD.
22    Q.   Describe that guy?
23    A.   He was, I, I think he had sort of
24  lighter brown, sandy, not blondish, but you know,
25  medium range blonde hair. What I remember is he



855.667.0077

VETERAN
REPORTERS                    VETERANREPORTERS.COM

**Page 102**

1 was very, very built, very, very muscular.
2     Q.   Did you ever attain his name?
3     A.   No, I didn't. But to make a long story
4 short, he was the guy I walked out with because
5 God was telling me, this guy's going to snap
6 David. Stay with him, you know, talk this guy
7 down, lead him out of the building, you know,
8 talk him down, don't let him get wound up. So
9 that, that's what I was doing. I walked out with
10 him. I, I waited for him and I, I think I took
11 his arm a couple of times and put my arm around
12 him a couple of times. I said, "It's okay. It's
13 okay. It's all right. It's okay." Oh, so anyway,
14 that guy kept getting chucked by officers as we
15 went. Every time he gets chuck, I, I was thinking
16 like, oh my God, this is like a test from God.
17 God is testing me. God is testing him. This is,
18 this is not going to be good. Don't chuck him.
19 The cops kept, that guy got chucked about five
20 times before we got to the, the door they wanted
21 us to exit from. He got Chuck one last time and
22 he turned and he was going to punch that police
23 officer. I grabbed him, I jumped on him. I said,
24 "No, don't do it!" So, anyway, long story short,
25 that's the guy.

**Page 103**

1     Q.   When you were up in the area, I guess
2 to call it the speaker's lobby, did you notice
3 the condition of the doors at any time?
4     A.   I did not. I did not. I had no idea she
5 had been shot through the glass that I, I,
6 that's, that I, I couldn't see, I couldn't see
7 you know, because of the crowd. I only saw that
8 when I saw online a couple of years later I saw
9 online where the gun had, had gone off and gone
10 through the glass and shot Ashley. So I had no
11 idea of any of those details other than what I
12 had learned from those three fellows that I saw
13 as that, that were acting like, and talking like
14 eyewitnesses and, and me trying to engage them
15 and, and see what they had seen.
16     Q.   Did you obtain the names of any of the
17 people that you communicated with?
18     A.   No.
19     Q.   As we sit here today, do you know the
20 names of anybody you were dealing with at that
21 location?
22     A.   No.
23         MR. WABER:  Hey, Mr. Link. It
24 seems like a good place. We're getting up on 1
25 o'clock, take a quick break. I don't know. It

**Page 104**

1 seems like you got a lot left. I don't know. How
2 long are we going to go? I know, if you want to
3 take a little like lunch break because it seems
4 like you just starving.
5         MR. LINK:  I'm okay with lunch.
6         DEPONENT:  I have a, I have a hard
7 appointment at 4 o'clock with my literary agent.
8         MR. HUNT:  We can discuss that.
9 You got to, I think they get seven hours or
10 something like that. So?
11         MR. LINK:  Want to come back at
12 1:30p.m. I don't see the time?
13         MR. HUNT:  Yes, it's 12:56 p.m.,
14 so 1:30 p.m. should work.
15         MR. LINK:  Court reporter, are you
16 reading that because you're not been part of
17 this. You're okay with that?
18         COURT REPORTER:  Yes, I'm fine
19 with that. Right now the time is 12:57 p.m. and
20 we are off the record.
21 (OFF THE RECORD) (12:57 p.m.)
22 (WHEREUPON, a short break was taken.)
23 (ON THE RECORD) (1:38 p.m.)
24         COURT REPORTER:  We are on the
25 record at 1:38 p.m.

**Page 105**

1 CONTINUATION OF DIRECT EXAMINATION
2 BY MR. LINK:
3         MR. LINK:  The record will reflect
4 We had a lunch break, 1:38 p.m. Dr. Kaufman, I'm
5 just going to follow up before I go on the
6 chronology. What kind of clothes were you wearing
7 on January 6th, while you were at the Capitol?
8     A.   I think I was wearing jeans and I was
9 wearing a favorite cold weather motorcycle
10 jacket.
11     Q.   The colors of that jacket are what?
12     A.   Red, white, and black.
13     Q.   How long have you had that jacket?
14     A.   Since probably 2008.
15     Q.   That jacket has some history to it as I
16 understand it. Is that accurate?
17     A.   Yes.
18     Q.   This is, what history you had had with
19 that jacket?
20     A.   I had been in a motorcycle crash on it
21 with it.
22     Q.   When was that?
23     A.   As I'm thinking back maybe 2010. I
24 hadn't been on a motorcycle since I was a kid. I
25 was out visiting a band member of mine in San



106

1 Francisco. We took a leisurely ride and luckily I
2 bought a full outfit and then that day crashed.
3 Haven't been on a motorcycle again since.
4    Q.   As I understand it, you attribute that
5 jacket to saving your life, it's affecting you?
6    A.   Yes, definitely. But more the full face
7 helmet that I just bought.
8    Q.   Not familiar with motorcycle jackets. I
9 imagine they have extra padding in certain
10 places?
11    A.   Yes.
12    Q.   Where?
13    A.   Elbows.
14    Q.   Why did you choose that jacket to go to
15 the Capitol building?
16    A.   Because it's warm, it's my favorite
17 jacket.
18    A.   Any other reason?
19    A.   No.
20    Q.   You mentioned that you were present
21 when you heard the sound of gunfire. As a doctor,
22 did you do anything to, render aid or offer
23 render to render aid at that point?
24    A.   Well, as I said, I'm not sure that I, I
25 knew that it was gunfire. I, I, in fact, I think

107

1 at the time I wasn't sure that it was gunfire.
2    Q.   Did you come to learn that there was a
3 shooting?
4    A.   Yes.
5    Q.   You said you hung around there for 15
6 minutes or so. You did learn what happened?
7    A.   Yes.
8    Q.   At that point or at some point, did you
9 offer to render aid or assistance?
10    A.   No, I really couldn't get to the body
11 and she was getting, she was getting
12 resuscitation from the police. I've never done
13 CPR, so I wouldn't want to have, you know,
14 complicated the works.
15    Q.   You, where we left off in the
16 chronology is, and I think this is where I was
17 talking about. You came to learn that there was a
18 shooting, you were talking to people. What
19 happened next?
20    A.   Then were, the reinforcements arrived
21 and ordered people to leave and we left, we were
22 leaving. I was walking alongside this, this
23 fellow who had an eye witness to Ashley
24 Babbitt's shooting. A little, a little voice told
25 me that he was going to have, he was going to

108

1 snap. He was suffering from PTSD.
2    Q.   This person was shorter stature than
3 you?
4    A.   I don't think so. I think it was maybe
5 slightly bigger.
6    Q.   You tend to learn that somebody by the
7 name of Mr. Taylor Toronto? Are you aware of that
8 person?
9    A.   The only reason I, I know of that name
10 is from this lawsuit.
11    Q.   When you gave your testimony earlier
12 about somebody who you thought was having PTSD
13 like symptoms, that was not Mr. Toronto?
14    A.   I, I think I saw an interview with Mr.
15 Toronto and that was not the man who I thought, I
16 walked out with, with, who I thought had PTSD,
17 PTSD.
18    Q.   What was this man exhibiting that made
19 you think he had PTSD?
20    A.   He was in, he was in shock and, you
21 know, he was going through significant emotional
22 strain when he was talking about it, he kept, he
23 kept talking about the fact that they had, they
24 they had shot her, they had shot her for no
25 reason. It was just an impression, just an

109

1 impression I had about him.
2    Q.   You made your way towards the exit?
3    A.   Yes.
4    Q.   You made your way towards the exit
5 where Police officers in some way directing you
6 to leave the exit?
7    A.   They were lining the corridor.
8    Q.   What were they saying?
9    A.   Not really anything.
10    Q.   How did you know it was time to leave?
11    A.   They told us, they said, you know, so,
12 "Okay, everybody out," are words to that effect.
13 Again, we were lined up against the wall to make
14 room for the, the medivac of Ashley Babbitt. Then
15 I noticed that they were going the other way. It
16 was at that point in time that the reinforcements
17 arrived and said, "Okay, everybody out!" We all
18 did. I did.
19    Q.   Would it be fair to say that you were
20 escorted out?
21    A.   No, I would say we, we were leaving at,
22 of, around the court. The police were lining the,
23 the way out. but no, we were not escorted out. I
24 was happy to be leaving.
25    Q.   You said reinforcement arrived. Can you



110

1  describe the reinforcements that arrived?
2      A.   Yes. It was police officers in full
3  riot gear.
4      Q.   They had arrived shortly after the
5  incident in front of the speaker's office?
6      A.   Yes.
7      Q.   Were these MPD officers?
8      A.   I think so.
9      Q.   You agree that MPD officers have,
10  excuse me, clothing or lettering on their
11  clothing that identifies them as MPD officers?
12      A.   Yes, but you've got to understand this
13  is sensory overload, so I'm not sure who they
14  were. I'm honestly, I'm not sure who they were.
15      Q.   Many of them had helmets?
16      A.   Yes.
17      Q.   Those helmets had shields on them?
18      A.   Yes.
19      Q.   Many of them had their sticks?
20      A.   Yes.
21      Q.   Anything else you recall about how they
22  appeared?
23      A.   Boots, knee pads, elbow pads, I believe
24  they all had body armor.
25      Q.   Body armor meaning what?

111

1      A.   Kevlar.
2      Q.   Can you describe the trek you took from
3  the speaker's office to the exit? What happened?
4      A.   We were, I was being, retraced on my
5  steps back towards the rotunda, but I guess they,
6  they took us out on the house side entrance. I
7  had come in, in the main entrance and I believe
8  that they led us to the, or formed a, a corridor
9  to the house side entrance, the South entrance.
10      Q.   "They" being the police officers formed
11  a corridor?
12      A.   Yes.
13      Q.   Did you have an understanding as to why
14  they were asking anybody, everybody to leave?
15      A.   It's pretty obvious, you know, get out
16  of the building. You don't want the building
17  damaged, you don't want people hurt.
18      Q.   Did you see signs of damage?
19      A.   No. Thank goodness.
20      Q.   Did you see signs of the people getting
21  hurt?
22      A.   Only Ashley Babbitt.
23      Q.   When the time came for you to leave,
24  were the police officers saying leave or words to
25  that effect more than once?

112

1      A.   Yes, I do believe so. That was the only
2  time I saw any, any confrontation with police.
3  But the police, the reinforcements were chucking
4  people. That was the only conflict I, I saw with
5  my own eyes.
6      Q.   Chucking meaning what?
7      A.   Shoving them. Shoving people.
8      Q.   Can you describe?
9      A.   Entirely unnecessary, because people
10  were, people were filing out peaceably.
11      Q.   Is it your testimony that all the
12  communications between the rioters and the police
13  were peaceable as you made their exit that day?
14      A.   Well, there was, there was no threat of
15  anybody doing anything. As I said, you know, at
16  the gallery there was a crowd there. they were
17  cooperating with police. There was a, you know,
18  discussion and uncertainty about how to medevac
19  Ashley Babbitt out. Then they were going to come
20  up towards us and then they changed their mind
21  and they started, you know, moving her down and
22  then reinforcements arrived and I saw, I saw with
23  my own eyes, I saw no other conflict. The only
24  other conflict I could say was the heated
25  exchange between when I was first led into the

113

1  Capitol with the police and the man that I
2  described before, who was engaging the police in
3  the discussion, you know, some sort of a, you
4  know, heated discussion. I saw no other, other
5  conflict with police. Police were walking calmly
6  through the crowd, you know, through the
7  corridors. You know, people were asking them what
8  to do. I may have asked a police officer; how do
9  I get out of here? He said something, but yeah.
10  So until the reinforcements arrived, I saw no, no
11  other engagements with the police.
12      Q.   I'm sticking now with the time period
13  when you're exiting the building. I think you
14  gave prior statements that your stepfather had
15  recommended or taught you that when he tell you
16  to do something, you should do it. Is that...
17      A.   That was my stepbrother. My
18  stepbrother, yeah. He always said, you know,
19  who's ever the most calm with the police wins.
20      Q.   As you were exiting the building that
21  day, did you see your, the other individuals
22  interact with the police in a calm and respectful
23  manner?
24      A.   Yeah. Yeah. They were, they were
25  leaving the building and they weren't causing any



114

1  trouble, but the, as I said the cops were, were
2  chucking people and they chucked. This guy that I
3  was walking out with, that I was concerned about,
4  he got chucked more than anybody else. I saw it
5  was about five times, and every time I could, I
6  could see him, you know, get spun up. I was like,
7  oh my goodness. Oh my goodness.
8      Q.  Did you hear other members of the crowd
9  say to the police, get a real job or worse to
10  that effect?
11     A.  Yes.
12     Q.  Did you hear these other people say,
13  you need to join us, you're on the wrong side, or
14  worse to that effect?
15     A.  I don't, not that I recall.
16     Q.  What else, besides what you do recall,
17  did you hear them saying to the police as they
18  were exiting the building that day?
19     A.  Not really anything, you know, I was
20  concerned with this, this, this guy I was walking
21  out with, and you have to understand sensory
22  overload, you know, you can only absorb so much.
23     Q.  What was the exit you were being led
24  to?
25     A.  I believe it was the house side

115

1  entrance. So there's the senate side entrance on
2  the north end of the building, the main portico
3  and the middle, and the house side, which is on
4  the south side.
5      Q.  At any point, while you were not on the
6  quarters, did you have any interaction with the
7  police before you got to the final exit part?
8      A.  Yes, I was chucked by a police officer.
9      Q.  How did you respond to that?
10     A.  Well, you know, with the Ashley Babbitt
11  upset, and, you know, I mean, I'm talking to
12  these people who claimed that, you know, she was
13  shot for no reason in cold blood. I was a little
14  upset.
15     Q.  Did you say...
16     A.  I might have said, I think I might've
17  said something. I, I think I might've said, you
18  know, don't push, me something like that.
19     Q.  "Dude get your fucking hands off me
20  son!" Like something you would've said?
21     A.  I don't think so.
22     Q.  You said you were upset?
23     A.  So, I, I'd say, you know, it's, it's
24  really straining, you know, to, to you know, to
25  have seen that.

116

1      Q.  Tell us what happens next?
2      A.  We were walking, walking towards the
3  exit of the building, and the, the man I was
4  walking with was chucked, I think for about the
5  fifth time. As far as I was concerned, it looked
6  like he had snapped. He raised his fist up and he
7  was cussing at the officer, and he was, I was
8  fully convinced he was going to hit him, and so I
9  jumped on him to, to block his, to block his
10  swinging the arm at the, at the police officer. I
11  said, "No, no, don't do it!" He did not.
12     Q.  Do you know what led up to the
13  confrontation, or did you observe what led to the
14  confrontation between that person and the police
15  officer?
16     A.  Yes, I was walking out with him and he
17  was chucked by the cops by about five times. You
18  know, within steps of the door, the, the last one
19  came and I, I, you know, you know, you had that
20  feeling if you knew it was going to happen.
21     Q.  Then what happened?
22     A.  After, when I jumped on him, I was
23  pulled from behind and I have no idea who pulled
24  me, but it just became like a mosh pit and I was
25  being pulled from all sides, and I was just

117

1  trying to, I was just trying to spread eagle my
2  legs and bend at my waist and, and spread my
3  hands out and grab onto people and grab onto
4  anything I could to prevent from losing my
5  balance and going, going down underneath people's
6  feet.
7      Q.  Then what happened?
8      A.  I was, you know, pulled in every, every
9  conceivable direction and I was just trying to
10  keep my balance. Then I was pulled violently from
11  behind and my jacket was coming up over my head
12  and it just followed with the pole and stood up
13  and walked out of the building.
14     Q.  When you say you stood up, were you on
15  the ground?
16     A.  No, no. I bent the knees bent at my
17  waist, you know, and, and just trying to not, not
18  go down underneath feet and boots and stuff.
19     Q.  Do you remember any words that you used
20  while you were in that part of, during that
21  encounter that you just told us? Do you remember
22  any words that you used?
23     A.  No.
24     Q.  Did you say anything?
25     A.  I don't think I said anything.



118

1   Q.  Well, when the police officer had this
2  encounter with the gentleman who you were taking
3  under your wing so to speak, did you say anything
4  at that point?
5   A.  Only to the, to the man. I was
6  concerned about the PTSD guy. All I said was,
7  "No, don't do it!"
8   Q.  Anything else...
9   A.  No.
10   Q.  ...you recall saying?
11   A.  No, I didn't recall him saying anything
12  else.
13   Q.  Any other remarks, statements, verbal
14  things that you remember hearing while you were
15  in that situation?
16   A.  I was just trying to keep my feet. My
17  mom died in December 21st this past year, and she
18  had accelerated Alzheimer's from a head wound
19  that we, we never figured out what happened. My
20  thought was, don't go down, don't smack your head
21  on that marble or a knee pad or a boot or
22  anything else. I was just trying not to, not to
23  go down.
24   Q.  Do you remember the police officer
25  saying anything while this was going on?

119

1   A.  In this stretch of time where I'm just
2  trying not to lose my balance?
3   Q.  The stretch of time is what, just for
4  clarity's sake, I'm only focused on the stretch
5  of time where you were in the exit of the
6  building?
7   A.  Did a police officer say anything to
8  me?
9   Q.  Do you recall the officer saying, "Move
10  back. Move back," repeatedly?
11   A.  No.
12   Q.  Are you saying that didn't happen or
13  you just have no memory of it?
14   A.  I don't remember anything, anybody
15  saying anything to anyone, to me or anything. I
16  was just trying to keep from smacking my head on
17  something.
18   Q.  You were trying to keep your balance?
19   A.  Yes.
20   Q.  Did you find your Tai Chi skills were
21  useful while you were doing that?
22   A.  Definitely.
23   Q.  How so?
24   A.  That's sort of like the, the, the
25  center of, of Tai Chi as a martial art is you

120

1  become very heavy and hard to move. One of my
2  friends described it as like an old dog that
3  doesn't want to get up from its nap. So, you
4  know, you relax and you, you spread out and you
5  bend your knees and yes, I definitely think it
6  helped me.
7   Q.  How about, I think when we started this
8  deposition a few hours ago, you said that Tai Chi
9  can be used for defense, self-defense. Did you
10  view that, your skills at Tai Chi being useful in
11  terms of how you were interacting with everybody?
12   A.  Well, you know, we call it rooting or
13  sinking, you know, relax and sink. I was just
14  trying to relax and sink as best I could and
15  spread out as best I could and grab a hold of
16  anyone, that was, you know, pushing or pulling
17  me.
18   Q.  You say relax and sink, like S-I-N-K?
19   A.  Yes. Relax and sink.
20   Q.  What does that mean?
21   A.  Through years of, of practice in Tai
22  Chi, you become very, very, it's hard to
23  describe.
24   Q.  You exited the building after that
25  encounter?

121

1   A.  Did I enter the building after that
2  encounter?
3   Q.  You exited?
4   A.  Yes, I exited the building.
5   Q.  Would you agree you were thrown out,
6  pushed out, forced out of the building?
7   A.  No, you know, there was just that, just
8  that, you know, when somebody grabbed me from
9  behind and, and you know, I just felt like a, you
10  know, different people were, were grabbing me
11  from all directions. I had no idea who it was or,
12  you know, if it was, if it was police or if it
13  was protestors. I had no idea. I was just being,
14  you know, pulled and turned and I was just trying
15  to hold my balance. So somebody pulled on me
16  really hard and they pulled me in the direction
17  of the doors. I don't think it was a police
18  officer because the police officers were to the
19  side and this was more an of a direction from the
20  protestors, or maybe another protestor was trying
21  to save me. I don't know. But anyway, I was
22  pulled very strongly from behind and I turned
23  with it and then stood up and walked out. So I
24  was not escorted out, I was not pushed out, I was
25  not dragged out. I caught my balance and walked



122

1  out. The only reason I, I stopped at all or there
2  was any delay was I, I could not let that guy
3  haul off and hit a police officer.
4      Q.  When you got outside, did you notice
5  whether you had any injuries?
6      A.  I, I don't notice that I had any
7  injuries. I've never thought about it but to my
8  knowledge I never had any injuries.
9      Q.  As we sit here today, do you know the
10  names of anybody who was present when you had
11  this encounter at the exit that day?
12      A.  No, I know the names of no one.
13      Q.  I take it you've watched video of the
14  exit of the building that day?
15      A.  Yes.
16      Q.  Looking at the video, do you recognize
17  anybody?
18      A.  No. I know it's all there as I've
19  described it.
20      Q.  The statements that I'm aware of that
21  you have given in connection with what happened
22  that day are one; you gave a statement to the FBI
23  and two, you gave some type of statement by a
24  talk show by the name of David Shilling or
25  Schiller?

123

1      A.  The Shilling Show.
2      Q.  Other than those two statements, have
3  you given any other statements about what did or
4  didn't happen that day. Dr. Kaufman?
5      A.  Well, I didn't give an official
6  statement, but one day I was at lunch at a
7  sidewalk cafe and inside of the Capitol and a
8  couple of reporters were there, and they were
9  asking us as neighborhood people, and I didn't
10  tell them who I was, or maybe, maybe I did, but I
11  didn't act, I didn't say that, you know, I had
12  been in there, but I was just talking about it
13  from the neighborhood standpoint and what I had
14  heard about it. I'm told that that has surfaced
15  somewhere. So that's out there somewhere.
16      Q.  Surfaced on public media like a YouTube
17  thing?
18      A.  I only heard about it secondhand.
19      Q.  When you mentioned it was surfacing
20  somewhere, where had it surfaced to?
21      A.  I don't know. I just heard that, that
22  someone said that they had seen me answering,
23  answering some questions. I never saw it myself,
24  so just, I'm just being technical if that might
25  be out there.

124

1      Q.  But I'm, I recall that the FBI asked
2  you about some YouTube interview that might have
3  been present, before you met with them. Do you
4  recall them asking you that?
5      A.  Yes, they had asked me. It was, I think
6  they're talking about, and what I'm responding to
7  is in reference to that, as I understand it. They
8  said that there were some clips, video clips of
9  me on my instructional Tai Chi website that had
10  been done and that were done by one of my
11  students. I removed them because I just, I wanted
12  everything I could clean everything I could
13  because I was getting death threats and people
14  around me were afraid of me being killed because
15  of the accusation that I was a cop killer.
16      Q.  You're telling us here today that you
17  removed the interview from the YouTube channel?
18      A.  Yes. It was on, it was on Tai Chi. It
19  had nothing to do with the January 6th.
20      Q.  Why would you remove something about
21  Tai Chi?
22      A.  Because it was helping to identify me
23  and Capitol Hill and, just giving details about
24  me that I wanted, I, I didn't want out there, so
25  I had those under my control and I took them

125

1  down.
2      Q.  Did you have a student who ran your
3  YouTube channel?
4      A.  Yes.
5      Q.  Who was that?
6      A.  Bettina Staff.
7      Q.  Do you still have a YouTube channel?
8      A.  I'm not sure. I'm, I'm trying to
9  trying to convert everything into one place in
10  one website. So we're doing that now. I'm not
11  very technical about these things, so I'm not
12  sure if the, if the Tai Chi website is still up
13  or not, but it's going to be pulled into another
14  website.
15      Q.  When the FBI asked about this issue, do
16  you remember telling them that you did not know
17  how that YouTube channel came to be deleted?
18      A.  Well, I, I just, you know, technically
19  speaking, I know, you know, I told, I told Bet to
20  take it down.
21      Q.  Today you're telling us that you
22  directed somebody to take that down?
23      A.  Yes.
24      Q.  You're telling us you were aware at the
25  time that you were, wanted to take it down?



126

1    Q.  Yes, yes. I think that she had done a,
2  a quick interview with me and I was in my
3  motorcycle jacket, and that's how I was
4  originally identified. So, knowing that thread, I
5  said, we better take that down.
6    Q.  Why did you not want to be identified?
7    A.  Are you kidding?
8    Q.  I'm asking?
9    A.  Well, you know, I've gotten over 30
10  death threats. So I'm just trying to, you know,
11  erase the, the trail if that's how they found me.
12  Well, I don't want to help any other whack job
13  try and find me.
14    Q.  Was there anything else on your YouTube
15  channel or your social media that you deleted
16  besides that?
17    A.  No.
18    Q.  Did you delete any videos that you took
19  on January 6th, 2021?
20    A.  I don't, I never posted any videos, but
21  I never deleted them from my phone and the FBI
22  had, you know, all that I had.
23    Q.  After January 6th, 2021, you still
24  considered to see patients in your office in
25  Washington, DC?

127

1    A.  Yes. Yes.
2    Q.  Did you, did they ask you about your
3  involvement in the events of that day?
4    A.  No. Some of the Republican students,
5  patients would say, "Are you okay?" No. No one,
6  no one really brought it up but distinctly I saw
7  a drop in my patient volume, lost a lot of long
8  time patients.
9    Q.  None of your patients ever discussed
10  this issue with you?
11    A.  Nothing that I, I really remembered.
12  But then I think I saw from your side that you
13  had a couple of people who were going to say
14  that, you know, I discussed with them, and I
15  think I only discussed it in general terms to my
16  knowledge at the time. You know, I, I don't think
17  that they, that, you had accused me of being a
18  cop killer yet.
19    Q.  The answer is you have no memory of
20  that coming up in your conversation with
21  patients?
22    A.  No. I can remember two, two
23  conversations but they were pretty, like I said,
24  they were rather general.
25    Q.  In your interview with David Shilling,

128

1  you mentioned that you had developed blue Baboon
2  fleet after January 6th. Is that the term you
3  used?
4    A.  That I had developed what?
5    Q.  Baboon fleets?
6    A.  Oh, oh, well, yeah. Maybe sometimes I
7  get, creative in my, in my verbiage. Yeah. You
8  know, death threats and, coming to my house and
9  taking pictures and maybe they were going to post
10  it online.
11    Q.  Going back to what happened in the exit
12  way that day. Do you have any recollection of any
13  encounter with any particular police officer?
14    A.  No.
15    Q.  I'm going to try to share my screen.
16    MR. WABER:  We'll see how good you
17  really are, Link.
18    MR. LINK:  You got jokes.
19    MR. WABER:  I've struggled with
20  this for the last year.
21    MR. LINK:  Can anybody see; can
22  the members see this?
23    MR. HUNT:  I can see; I can see
24  it.
25    MR. LINK:  All people can see it?

129

1  Okay. I'm going to stop here and for clarity's
2  sake, I am at frame 21. Everybody can see there's
3  a number in the lower right margin? Hello?
4  (WHEREUPON, the Deponent examined the document
5  previously mentioned.)
6    A.  I see a number. I see two, two images,
7  two frames, and one of them has identification
8  marks in the upper right. The one the, the image
9  on the left has identification marks on the upper
10  right.
11    Q.  There's a page number at the bottom. Is
12  that visible to everybody?
13    A.  I don't see a page number.
14    MR. WABER:  Mr. Link, we can see
15  your cursor, so if you just want to move your
16  cursor to where.
17    MR. HUNT:  Yes, I can see that.
18  You mean that 21? I can see it, but just for the
19  record, I don't know if you want to offer, you
20  got two things up here. You want to just explain
21  what they are?
22    MR. LINK:  Yes, I'll do that. I
23  just want to make sure we can see first. Yes, so
24  I'm offering, this is a synchronized video from
25  Brent Fredericks, the left being a body came from



130

1 Jeffrey Smith, the right being a public access
2 video, the surgeons.
3     MR. HUNT: A public access video
4 that's not from the government.
5     MR. LINK: Correct.
6     MR. HUNT: Yes. We would object to
7 that for the record, but go ahead.
8     MR. LINK: Well, right now it's
9 just offering it for purposes of identifying what
10 I'm showing the witness.
11 CONTINUATION OF DIRECT EXAMINATION
12 BY MR. LINK:
13     Q. Dr. Kaufman, do you see yourself in the
14 image on the screen?
15     A. Yes.
16     Q. I think, what the expert did is, showed
17 you and red and officer by the name of Jeffrey
18 Smith and Blue, somebody by the name of Taylor
19 and Green, and I think you said you see these
20 marks?
21     A. Yes.
22     Q. You see these marks?
23     A. Yes, I do.
24     Q. What you see on the screen, which is
25 page 21 of the document I just identified, does

131

1 that appear to be you?
2     A. Indicated by the red line?
3     Q. Yes.
4     A. Yes.
5     Q. I going to scroll forward. I am now
6 stopping at page 38. Do you see page 38?
7     A. Yes.
8     Q. Is that you? I'm looking on the right
9 picture. That's you?
10     A. Yes.
11     Q. There's a gentleman who is, let's say,
12 wearing a leather jacket with what appears to be
13 somebody's hand on their backside. Do you see
14 that? On my cursor there?
15     A. Okay. Okay, so the yellow sleeve, black
16 border with a hand, right?
17     Q. I just want you, is it, does this
18 appear to be the person you've been talking
19 about? Who is the one you thought was getting
20 PTSD? Or my question is...
21     A. I have, I have no idea because I don't
22 know what the orientation here is.
23     Q. I'm on picture 49. Does that help you
24 anymore?
25     A. No, I still, I still am not sure where

132

1 we are when and where we are.
2     Q. If I scroll through, I'm going to
3 scroll through this, and if I'm going to ask you
4 after I scroll through this, if this helps
5 orientate you as to what, as far as where you
6 are?
7     A. Can you just let it run?
8     Q. This is a PDF. No, not this one. I can
9 show you something else.
10     A. Okay. Yeah, there we go. Now you can
11 see I'm, I'm sort of, losing, losing my feet
12 here. So yeah, that was probably the guy, after I
13 had, jumped on him. So yeah, this looks like
14 where I'm being pushed and pulled all over the
15 place.
16     Q. Let me back up then. I wanted to
17 orientate you. I'm at screen 69. Do you see that?
18     A. Yes.
19     Q. Does that orientate you and my question
20 is the gentleman with apparently brown, sandy
21 hair, is that the one that you were concerned
22 about?
23     A. That that could be him.
24     Q. Now that you're looking at this, what
25 were you doing and thinking at this particular

133

1 moment?
2     A. I, I don't recall. If that's the guy
3 and you know, he, I had stopped him. You know, I,
4 I don't recall at all. But like I said, I, I just
5 started feeling myself getting moved around and I
6 was just trying to stop from being, from falling.
7     Q. The person to your right, do you
8 recognize that person?
9     A. I do not.
10     Q. Do you know that, do you know, do you
11 recognize the Tyler Toronto?
12     A. I, I wouldn't know, I wouldn't know Mr.
13 Toronto.
14     Q. Would you agree at the beginning of
15 the, would you agree that you had almost reached
16 the exit and then turned around while you were in
17 the exit way?
18     A. Yes.
19     Q. Why did you turn around?
20     A. Because he was going to hit a cop.
21     Q. Do you recall again, what, the word he
22 were, I just want to make sure when we go back
23 and read this some, we know what we're talking
24 about. I would call him the gentleman in the
25 leather jacket because it appears that's what he




134

1 was wearing. That leather jacket person, did you
2 recall him saying or screaming anything?
3     A.  Yeah, he was screaming at the cop. He
4 had his fist raised and it seemed like he was
5 right on the verge of hitting the cop. He was
6 yelling at the cop right in his face.
7     Q.  What were the words that were being
8 used between the two of them?
9     A.  I don't, I don't remember.
10     Q.  You would agree as the video moves
11 forward that you move away from the exit, which
12 would've been behind you towards the building?
13     A.  Well, it looks here like I'm being
14 pushed.
15     Q.  I'm just asking first of all that your
16 movement was away from the door. Would you agree?
17     A.  I don't know where the, the door is. Is
18 the door behind me?
19     Q.  I will help you with that.
20     A.  I hope we both agree that I'm not
21 really in control of where I'm going at this
22 point.
23     Q.  I'm just trying to establish, you know,
24 where, I'm talking about where the door is.
25     A.  I have no idea where the door is. So

135

1 I'm assuming this metal frame with the light on
2 it, that's the door?
3     Q.  Think I could safely represent as a
4 metal detector was, I was going to try to leave
5 you to where the direction of the door was.
6     A.  Yes.
7     Q.  I guess this, the image on your left on
8 that page number 574 on the left is a body
9 camera. Does that help orientate you as far as
10 where the door is?
11     A.  Is, is that the door in the background?
12     Q.  With the bright lights?
13     A.  Yes.
14     Q.  That appears to be you to the right of
15 the screen on the left picture?
16     A.  Yes.
17     Q.  I just want to scroll through while I
18 went all the way down here so you can just
19 orientate yourself as far as where we are in the
20 building. Dr. Kaufman, does that help orientate
21 you?
22     A.  Yes. Yes.
23     Q.  I have to take myself take it back to
24 the beginning. I'm going to stop here at 118, and
25 the cursor, I have on Dr. Kaufman and on the

136

1 gentleman with the leather jacket. You see that?
2 Hello?
3     A.  Yes.
4     Q.  At this particular point, frame 119,
5 having looked at this, does this, do you have any
6 memory of what you were thinking your thoughts
7 were at this point?
8     A.  No.
9     Q.  Would it appear to you that the, did it
10 appear to you that the person in the leather
11 jacket was being somewhat aggressive towards the
12 police?
13     A.  Well, from this video, yes. But from my
14 perspective down in the crowd, I don't have any,
15 I don't have any, any memory of that, any
16 perspective or any, any memory of it. In my mind
17 it was, I stopped him and then I was trying to
18 keep from going down.
19     Q.  I'm going to scroll forward. I think
20 you've told us now to the effect that you were
21 pulled forward or pulled into this is. Is that
22 your testimony?
23     A.  Well, I would say that, you know, it's
24 sensory overload and basically, I, I remember
25 three steps trying to stop him, trying to keep my

137

1 balance being pulled from behind, regaining my
2 balance, and leaving the building.
3     Q.  Let we scroll forward on 163 forward.
4 This video on the right, do you see yourself
5 being pulled or pushed?
6     A.  My body is acting like it is. Yeah.
7     Q.  You know where you stand spatially your
8 body was moving towards the exit door?
9     A.  Yeah.
10     Q.  The video on page 221. Do you
11 acknowledge that maybe you have a particular
12 memory, but you had some type of encounter with
13 one of the police officers who was standing right
14 in front of you?
15     A.  No.
16     Q.  You don't remember that?
17     A..  No.
18     Q.  You did see a bunch of people who were
19 there with their either cell phones or some other
20 type of recording equipment that day. Do you
21 remember that?
22     A.  No.
23     Q.  You don't recall that? You don't
24 dispute that?
25     A.  No.





855.667.0077
VETERANREPORTERS.COM

**138**

1    Q.  You don't dispute that, do you? That
2  people have recording equipment out?
3    A.  Do I dispute that people have recording
4  equipment out?
5    Q.  Correct.
6    A.  I don't know.
7    Q.  I am showing you frame number 267,
8  you're going to see yourself in the red and white
9  jacket on the right side?
10    A.  On the, on the right side, yes.
11    Q.  In blue there is well represent is
12  Officer Jeffrey Smith. Do you see that?
13    A.  I'll take your word for it.
14        MR. HUNT: Objection. Counsel
15  knows he's not allowed to testify.
16    Q.  Well, do you have any reason to dispute
17  that's Jeffrey Smith?
18    A.  Of course. I don't know what Jeffrey
19  Smith looks like. I have no idea who that is.
20    Q.  Fair enough. Do you agree that you had
21  an interaction with the police officer who's got
22  a blue line on them that day?
23    A.  Not that I recall at all.
24    Q.  I'm going to start; I'm going to stop
25  at page 282 on the left side of the screen. Is

**139**

1  that you?
2    A.  Yes.
3    Q.  The timestamp on the body cam is
4  14:56:36. My question is; do you recall that you
5  were exiting the building that day at
6  approximately 2:56 p.m.?
7    A.  Yeah, I was trying to exit the building
8  at about that time.
9    Q.  You were there, just was shown in 282
10  on the right, fairly and accurately show what the
11  scene of the lobby or exit way was that day at
12  about 2:56 p.m.?
13    A.  Yes.
14        MR. HUNT: Objection.
15        MR. LINK: What's the objection on
16  that?
17        MR. HUNT: Well it's a public
18  access video, so, a larger authenticity
19  objection. No objection to the body-worn camera
20  video supplied by the government.
21  CONTINUATION OF DIRECT EXAMINATION
22  BY MR. LINK:
23    Q.  Do you recall that the exit way, and
24  I'm calling it the exit way because I don't know
25  if it has a better terminology, was filled with

**140**

1  MPD police officers and protesters at about 2:56
2  p.m., as you recall on January 6th, 2021?
3    A.  Yes.
4    Q.  Have you've been in the Capitol, you
5  worked in the Capitol and the architecture, the
6  lighting, the paneling, the marble, does that
7  appear to be inside the Capitol, US Capitol
8  Building?
9    A.  Yes.
10    Q.  I am stopping at frame number 285,
11  actually 286. I'll stop at. Do you recognize,
12  that's, appears to be your red and white
13  motorcycle jacket on the body-worn camera on your
14  left?
15    A.  Yes.
16    Q.  On the right side, there was an open
17  source video. Now that you look at this, do you
18  remember, if not the details, the substance of
19  any words that were being exchanged between you
20  and the police officers who were on the scene?
21    A.  No.
22    Q.  Without asking the substance of what
23  was said, were words being exchanged between you
24  and the police officers?
25    A.  No, not that I'm aware of.

**141**

1    Q.  Do you agree that the police officers
2  had their batons out?
3    A.  Yes.
4    Q.  It was your testimony given earlier
5  today that you observed that the police officers
6  were trucking people or to that effect?
7    A.  Yes.
8    Q.  Do you recall as I drill through this
9  screen number 288 to 294 that the officer who is
10  standing in front of you made contact with your
11  left shoulder?
12    A.  No.
13    Q.  If it occurs on the video, do you have
14  any reason to dispute it?
15        MR. HUNT: Objection to the form
16  of question. Again to the public access video.
17        MR. LINK: You can have a standing
18  objection. We can deal with authenticity later,
19  but I just...
20        MR. HUNT: You can, he might need
21  to ask the question again. Mr. Link, I'm sorry. I
22  think Mr. Kaufman; Dr. Kaufman is kind of got a
23  loss there.
24  CONTINUATION OF DIRECT EXAMINATION
25  BY MR. LINK:



142

1    Q.   My question is what, there is a, page
2  285. On screen, page number 285, I was asking you
3  whether you recall that the officer in front of
4  you had made contact with you, and my next
5  question is if it appeared on the video, would
6  you have any reason to dispute it?
7    A.   I don't have any recollection of, of
8  any particular person touching me at any
9  particular time. I would not dispute that I was
10 being touched.
11   Q.   Going forward, would you agree that as
12 we scroll forward from 288, that you're moving in
13 the direction of the police officer who's
14 standing in front?
15   A.   Where's 288?
16   Q.   Two, I'll start at 288.
17   A.   Is this 288?
18   Q.   Yes
19   A.   All right. I would say I was being
20 pushed towards the police officer.
21   Q.   Do you know where the pushing came
22 from?
23   A.   Well I'm losing my balance towards the
24 police officer.
25   Q.   I am scrolling this. I had asked you

143

1  this a moment ago about another screen, but on
2  page 305, it appears you're standing face to face
3  with the officer who is highlighted in blue?
4    A.   Are we rather face to face here? You're
5  asking me?
6    Q.   Do you agree with that?
7    A.   Yes.
8    Q.   Any words exchanged, anything you
9  remember about this encounter?
10   A.   No.
11   Q.   I'm going to stop again at frame number
12 380. On the left is a body camera on the right,
13 it appears to be the public source video. Do you
14 see your white and red jacket on the body cam on
15 the left?
16   A.   Yes.
17   Q.   Those appear to be the jeans you were
18 wearing?
19   A.   Oh, I don't know.
20   Q.   Were you, while you were standing here,
21 we were scrolling a little bit past...
22   A.   Those, those are legs down there. Okay.
23 Yeah, I don't know if those are my jeans, but
24 it's so confused. But yeah, I, I see my jacket.
25   Q.   Are you, I'm just making it, trying to

144

1  make it clear from up to 387, it looks like
2  there's a jacket on top of jeans?
3    A.   Yes.
4    Q.   You see there's a baton in frame number
5  386?
6    A.   That's on the left?
7    Q.   Correct.
8    A.   I don't see a baton. Oh, yeah, yeah.
9  Okay. Yes, I see that.
10   Q.   What were you doing with respect to the
11 batons as you were in this scene?
12   A.   I can't see that I'm doing anything.
13   Q.   Frame number 388, I'll represent to you
14 that there's going to be an expert witness who
15 says that's your left hand on the baton. I just
16 want to offer you the chance. Do you have, do you
17 agree, disagree, or can't say?
18   A.   Where's my left hand? Oh, there? Okay.
19 That's, that's supposed to be my hand?
20   Q.   Yes. I'm going from...
21   A.   I've got, I've got...
22   Q.   ...thirty-eight...
23   A.   ...recollection and it's the, the
24 picture's so tangled that, but anyway, I have no
25 recollection, no recollection.

145

1    Q.   Just, I'm going to go from 384 forward
2  to 390. Do you have any reason to dispute that
3  you were grabbing onto officer's baton?
4    A.   Well, I was just trying to grab
5  anything to stop getting, you know, pitched
6  around, you know, before I had, you know, gone
7  through being squeezed in a crowd and you know,
8  where you can't breathe. So I'm just trying not
9  to, just trying to keep my feet in any way that I
10 could.
11   Q.   When you're, when, I'm showing you now
12 frames number 399, 398 to 399, do you agree or
13 disagree that your left hand on the baton and I'm
14 going to put a cursor?
15   A.   I can't tell.
16   Q.   Do you dispute that you were using your
17 hands to swing the baton in the direction of the
18 police officers who were standing in front of
19 you?
20   A.   Yes, I do dispute that.
21   Q.   Why?
22   A.   Because I didn't do it. It didn't
23 happen. It would be insane to do it.
24   Q.   Did the baton that the officers were
25 wielding strike any police officers as you were





146

1 engaged in these encounters?
2    A.  One more time?
3    Q.  Did the baton strike the police officer
4 in front of you?
5    A.  Did the baton you are indicating with
6 the cursor?
7    Q.  Correct?
8    A.  I have no idea. I can assure you, you
9 don't have any video of me hitting anybody.
10    Q.  I'm going to show you frame number 398.
11 Do you see your, again, your red and white
12 motorcycle jacket where I have the cursor?
13    A.  Yes.
14    Q.  Do you see what appears to be a baton
15 where I have the cursor?
16    A.  Yes.
17    Q.  Do you see what appears to be a hand
18 where I have the cursor?
19    A.  It could be.
20    Q.  If I was to tell you that there's an
21 expert who will say, based upon his examination
22 and his compelling of this video, that that's
23 your hand, what is your response to that?
24    A.  Looking at it here, I'm not sure whose
25 hand that is.

147

1    Q.  I'm on video 398. I'll ask the same
2 question moving forward, just a few frames to
3 frame number 402. Is that your hand on the baton
4 that just we just saw move about?
5    A.  I would definitely dispute that.
6    Q.  I'll just stop here frame 404 change,
7 where I have the cursor, does that appear to be
8 your red and white motorcycle jacket?
9    A.  Or is it somebody standing behind me
10 with a MAGA hat? I don't know.
11    Q.  I'm on frame 417. Would you agree
12 that's you with the red and white motorcycle
13 jacket?
14    A.  That looks like my motorcycle jacket.
15    Q.  That frame 418, that's, that is the
16 sleeve where I have my cursor of the
17 motorcycle...
18    A.  Yeah, that my motorcycle jacket.
19    Q.  You'd agree that 418, that's your hand
20 on a baton?
21    A.  Well, technically I'm going to say I'm
22 not sure where that hand is coming from. I'm not
23 going to try and be difficult, but no, I'm not
24 sure what the source of that hand is. That's my,
25 I would agree that's my motorcycle jacket.

148

1    Q.  When you were moving your arms and
2 hands that day, did you move your hand and arm
3 away from the, from your body towards the police
4 officers?
5    A.  No, my intention was don't fall.
6    Q.  I'm at frame number 421. I'm looking at
7 the screen on the left, at the body cam video. Do
8 you agree that that's your hand on the baton?
9    A.  I agree that that's my motorcycle
10 jacket.
11    Q.  Do you have any reason to dispute that
12 that's your hand on the baton?
13    A.  Yes. Because you're insinuating that I
14 hurt someone and I know I didn't.
15    Q.  On the frame number 424. Do you see
16 that?
17    A.  I do.
18    Q.  Again, do you recognize that as being
19 your red and white motorcycle jacket?
20    A.  It, it could be.
21    MR. HUNT:  Mr. Link, just so I'm
22 following through. You say 424, but you're not
23 referring to that video. You are referring to the
24 video on the left side of Mr., Dr. Walls-Kaufman
25 screen. Is that?

149

1    MR. LINK:  That's true.
2    MR. HUNT:  Okay.
3    MR. LINK:  The way I understand
4 the page numbering, it just refers to the whole
5 screen and I'm not trying to be...
6    MR. HUNT:  Yes. I just want to
7 make sure I'm following is what I'm.
8    MR. WABER:  Yes. This is David
9 Weber speaking. I just want Mr. Hunt has this
10 display, this is a PDF slide deck. When we're
11 referencing the page numbers, it is true that
12 there are multiple images on the page, but each
13 page has each of these images. When it references
14 page 424 in the lower right, all of these images
15 are on page 424 of Mr. Hunt, so you have this,
16 it's part of the expert's report.
17    MR. HUNT:  Yeah, I know. I just
18 want to know which screen we're looking at. I
19 just want to make sure I'm looking at the right
20 screen.
21    MR. WABER:  The one on the left is
22 the body cam, the one on the right, the open
23 source video.
24    MR. HUNT:  Exactly.
25    MR. WABER:  Okay.




150

1  CONTINUATION OF DIRECT EXAMINATION
2  BY MR. LINK:
3      Q.  I think I was asking you, where the
4  cursor is on the picture on the left on page 424.
5  Is that your motorcycle jacket?
6      A.  I'm not sure. I don't remember any
7  markings like that.
8      Q.  Back three frames of 421. Does that
9  appear to be your motorcycle jacket?
10     A.  Possibly.
11     Q.  It like a technique or a technique
12  motorcycle deck?
13     A.  I don't remember. I haven't seen it in
14  four years.
15     Q.  Just so for purposes of completeness at
16  427. On the left of the screen on the body cam,
17  is that you?
18     A.  Yes.
19     Q.  Would you agree in the prior frames I
20  was showing you from 420, God, wait at least 410
21  to 427. That was you swinging the baton in the
22  direction of the officer who was in front of you?
23     A.  You're saying I'm swinging the baton in
24  those frames?
25     Q.  Moving the baton. I'll do it again from

151

1  410. Actually for completeness I just stopped at
2  439. I'll go, I'll do it to be, I'm trying to be
3  complete. It's 420 to 439. My question, is that
4  you swinging the baton in the direction of the
5  police officer?
6      A.  No, I'm not swinging the baton.
7      Q.  Would you agree that you had a hold of
8  the baton and it was, you moved it in the
9  direction of the police officer who was swinging
10  the front?
11         MR. HUNT:  Objection to the form
12  of question. You can answer.
13     A.  It's a possibility that I had my hand
14  on at the baton, in the effort of reaching out
15  for any port in the storm to keep from losing my
16  balance and going down, being hurt.
17     Q.  Then moving forward. I just want to
18  provide context on this forward so you can see
19  what I'm talking about. Do you agree from, say
20  frame number 420 to 424, you were depicted in the
21  body cam video from 420 to 464, you're depicted
22  on the body cam video on the left of the screen?
23     A.  Yes.
24     Q.  That page 458, that's you and your red
25  and white motorcycle jacket, 458?

152

1      A.  That's my arm and hand.
2      Q.  Your right hand is up like in the stop
3  sign correct?
4      A.  The, the where your cursor is. Is that
5  my hand you're saying?
6      Q.  Yes.
7      A.  No. I won't agree that that's my hand.
8      Q.  How about the left and at the bottom of
9  the screen on the body cam video on the left at
10  458?
11     A.  Yes, that appears to be my hand.
12     Q.  But the last couple brushes on this
13  topic, do you agree or disagree that you struck
14  this officer with the baton and the chest area at
15  least one time?
16     A.  Never, never happened.
17     Q.  Do you agree or disagree with this
18  officer at least one time in the face area with
19  the baton?
20     A.  Would you repeat that please?
21     Q.  Would you agree or disagree that you
22  struck this police officer at least one time in
23  the face area with the baton?
24     A.  Never.
25     Q.  Right. It's 2:55 p.m. I need a five-

153

1  minute break.
2          MR. HUNT:  Can we get 10? I mean
3  it seems like you got a lot more to go through.
4          MR. LINK:  That is fine.
5          MR. HUNT:  Yes.
6          MR. LINK:  After 3 O'clock coffee.
7          MR. HUNT:  Yes, exactly.
8          COURT REPORTER:  We are off the
9  record at 2:55 p.m.
10  (OFF THE RECORD) (2:55 p.m.)
11  (WHEREUPON, a short break was taken.)
12  (ON THE RECORD) (3:15 p.m.)
13         COURT REPORTER:  We're back on the
14  record at 3:15 p.m.
15         MR. LINK:  Dr. Kaufman, I just
16  wanted to follow up.
17         MR. HUNT:  Can you, just to ask a
18  question Mr. Link. How long do you think, I won't
19  hold you to it, but how long do you, another hour
20  or two, or quite some time? You can say quite, I
21  say an...
22         MR. LINK:  I say an hour and a
23  half.
24         MR. HUNT:  Okay.
25         MR. LINK:  It's my best estimate.





154

1      MR. HUNT:  I'm not holding to it.
2  I was just asking.
3      MR. LINK:  Yeah, fair enough.
4  CONTINUATION OF DIRECT EXAMINATION
5  BY MR. LINK:
6      Q.  Dr. Kaufman, do you remember having any
7  other interaction with MPD officers as you exited
8  the building that day?
9      A.  No.
10     Q.  Is this visible to everybody?
11     MR. WABER:  Yes.
12     Q.  This is the same slideshow, although
13 I've fast forwarded a little bit, let me go
14 backwards. Does this appear to be again, the exit
15 way of the Capitol building at about 1456 on
16 January 6th, 2021?
17     A.  Yes.
18     Q.  You would agree that you'd exited and
19 left the building shortly after the interaction
20 that we just spent some time on?
21     A.  Immediately after.
22     Q.  While you were leaving the building
23 that day, did you grab the baton of another MPD
24 police officer? Do you recall that?
25     A.  I had, I had, no, I have no

155

1  recollection memory of that.
2      Q.  Do you see, on the page number 772, do
3  you see the red and white jacket that we've been
4  much discussed today?
5      A.  Yes.
6      Q.  Do you see a right hand above the red
7  line?
8      A.  Yeah, that might be a hand.
9      Q.  If I was to represent you that the
10 video expert will say that that's your right hand
11 on another police officer's baton, would you have
12 any reason to dispute that?
13     A.  Yes.
14     Q.  You would dispute that?
15     A.  Yes.
16     Q.  Why?
17     A.  Because I have no recollection of my
18 hands ever being that high or, or reaching up in
19 any way, you know, other than like a flail.
20     Q.  Do you remember in any way there were
21 punches or fist thrown before you?
22     A.  No.
23     Q.  Let me ask you this question, Dr.
24 Kaufman. Do you have a clear memory of what
25 happened in the exit of the building that day?

156

1      A.  Well, I, I basically remember the four
2  parts of stopping him and, you know, then, then
3  things getting pushed all around, grabbing, being
4  pulled, coming to my balance and then walking
5  out. That's pretty much it. Is that clear? I, I
6  don't know.
7      Q.  You mentioned a few times, I think you
8  used the words sensory overload during the course
9  of today...
10     A.  Yes.
11     Q.  Sensory overload?
12     A.  Yes.
13     Q.  What does that mean?
14     A.  Sensory overload means there's so much
15 stimulation coming in. It's hard for the brain to
16 grab it all.
17     Q.  Perfect.
18     A.  It's so much unusual information that
19 it's hard for the brain to grab it all.
20     Q.  As we sit here and discuss these events
21 from January 6th, 2021, would it be fair to say
22 that your memory might be incomplete?
23     A.  Well, about specific details, yes,
24 there might be some lack of clarity, but there is
25 no lack of clarity about the idea that I did not

157

1  raise my hand against anyone or hurt anyone.
2      Q.  I guess the question is if you don't
3  have a clear memory, how can you be so sure of
4  what it is you've forgotten or what you remember?
5      A.  Because you've, you've got your average
6  information going on, and then I would certainly
7  remember acting out in violence and hurting
8  someone and bringing the world down upon my head.
9  I would certainly remember that.
10     Q.  But you as a doctor would agree that
11 you're basically, doing your own posts after the
12 fact analysis as far as why you might not
13 remember something. Correct?
14     A.  I certainly would remember striking a
15 police officer. I have police in my family, one
16 of my best, a very close friend died in the line
17 of duty. It's just not something I would ever do
18 or come close to doing.
19     Q.  With respect to everything we've
20 discussed today and your deposition, would it be
21 your testimony that your memory is 1000 percent
22 completely and accurate as to all events that
23 occurred?
24     A.  My memory is...
25     MR. HUNT:  Objection to the form



158

1  of the question. You can answer Dr. Kauffman.
2      A.   My memory is 1,000 percent clear that I
3  never raised my hand or hurt or intended to hurt
4  an officer that day. To put it in perspective,
5  you know, my life is 68 years long and a lot of
6  it is very very fuzzy and hazy, but never once in
7  my life have I ever raised my hand to a police
8  officer or tried to hurt them.
9      Q.   I guess I want to talk about what you
10 just told me a little bit, because you said, with
11 respect to the events that we just talked about
12 and spent a lot of time about at the exit, you
13 remember four basic things? I think he used the
14 words four basic things, concerning the gentleman
15 who was having a meltdown in your response?
16     A.   Yes, the highlights.
17     Q.   You would agree that your brain has
18 retained what you, in your own mind feel, are the
19 highlights of the event and have disregarded and
20 or not retained those things that you didn't feel
21 were important? Correct?
22     A.   There is no chance I raised my hand to
23 a police officer or tried to hurt a police
24 officer or do anything to a police officer. I,
25 you know, where my hands were as I was trying to,

159

1  you know, save myself and not getting pushed and
2  shoved all over the place and losing my feet. You
3  know, I can't attest to where my, where my hands
4  were or what I grabbed onto, but I am 1,000
5  percent certain, that sensory overload has not
6  pushed out of my head the fact that I committed
7  any harm against a police officer.
8      Q.   I asked you questions a few moments ago
9  about grabbing a baton. Do you remember those
10 questions?
11     A.   Yes.
12     Q.   I think you told me worse the effect
13 that you didn't, I think your first memory was
14 you didn't grab a baton, correct?
15     A.   I, I don't remember grabbing a baton.
16     Q.   If there's video evidence that disputes
17 that, would you agree that's a sign that you
18 don't have a full and complete memory of what
19 happened that day?
20     MR. HUNT:  Objection to the form
21 of the question. You can answer.
22     A.   Well, you know, when you're getting
23 pushed all over the place and you're grabbing
24 anyone and anything just to keep control of your
25 body and not get hurt, it's a possibility. But

160

1  I'll tell you this. You know, I, I have a
2  reluctance to answer because we have a forensics
3  report that came in and it said that the video
4  that you have your side has been handling is
5  tampered with.
6      Q.   It's okay.
7      A.   So reluctant to go along and agree with
8  anything that you've got my hand put on anything.
9      Q.   Which video do you claim has been
10 tampered with?
11     A.   We have an extensive forensics report
12 and analysis of frame by frame that your video is
13 tampered with.
14     Q.   Do you know which video that is?
15     A.   Video relating to my hands on, on
16 batons.
17     Q.   Do you know who prepared that report?
18     A.   It was, it was forwarded to us as a, as
19 an amicus gesture.
20     Q.   Going through the name. Do you know the
21 name of that person?
22     A.   It's anonymous.
23     Q.   Did you get the letter or did your
24 counsel?
25     A.   My counsel.

161

1      Q.   How specifically was any video tampered
2  with, to use your words?
3      A.   It went through with time signatures
4  and showed how the video had been edited.
5      Q.   Are we talking a body cam or a public
6  access video, or do you know?
7      A.   Public access.
8      Q.   Do you know of anything about the
9  qualifications of the person who stating that
10 there's a bench tampering?
11     A.   Judging from the details, they were
12 pretty sophisticated.
13     Q.   What details?
14     A.   That the video had been tampered with
15 to make it look like I did something that I did
16 not.
17     Q.   What specifically did it make it look
18 like you did that you did not?
19     A.   Well, if I was going to put it in my
20 own words, I would say that the analysis of the
21 video, what the, what the anonymous person had
22 said was that the video was trying to cast me in
23 a very bad light and that the, the video had been
24 edited to put things together that were not, were
25 not in sequential order and we're not real.





855.667.0077
VETERANREPORTERS.COM

162

1    Q.   Is this like in the form of a forensic
2    report or a letter or how does this...
3    A.   A forensic report with frame by frame
4    analysis.
5    Q.   Does this report explain how somebody
6    could do that or how it was done?
7    A.   It did not.
8    Q.   Does the report explain how there could
9    be synchronization of frames if there's been some
10   type of tampering with videos, one of which
11   presumably wasn't tampered with and other was, do
12   you know?
13   A.   I don't know.
14   Q.   Is the person who makes this claim
15   anonymous?
16   A.   Yes.
17   Q.   Do you have any identifying information
18   on this person?
19   A.   No.
20   Q.   Do you have access to this letter or
21   report or whatever it is?
22   A.   Yes.
23   Q.   Do you have a copy with you today?
24   A.   No.
25   Q.   Does your counsel have a copy with him

163

1    today?
2    A.   No.
3    Q.   Where is it?
4    A.   Oh, he may let me.
5         MR. HUNT:  You are referring to
6    me. I don't have it.
7    Q.   Does some other lawyer have it?
8    A.   Yes.
9    Q.   Who?
10   A.   Mr. Shore
11        MR. LINK:  Council we can agree,
12   at least I haven't seen a copy of this?
13        MR. HUNT:  We can agree that both
14   of us haven't seen a copy. I mean...
15        MR. WABER:  For the record, David
16   Weber hasn't seen it either. All of appear, all
17   of counsel of record have not seen this.
18        DEPONENT:  I thought that Hughie
19   had seen it. I thought that we had it had been
20   shared with him, so that was an error, but we've
21   got it.
22        MR. LINK:  Well if you could
23   provide that to your counsel now that I know of
24   its existence so we could look at it.
25        DEPONENT:  Okay.

164

1    CONTINUATION OF DIRECT EXAMINATION
2    BY MR. LINK:
3    Q.   Other than that Gem, is there anything
4    else that makes you dispute the validity of the
5    video evidence that's been provided?
6    A.   You said Jim?
7    Q.   Gem, G-E-M, pejorative term gem. Other
8    than that...
9    A.   I'm sorry, I'm confused.
10        MR. WABER:  He didn't get your
11   joke Link.
12   Q.   Is there any other document which you
13   have or that you're aware of that disputes the
14   authenticity of the video evidence in this case?
15   A.   No.
16   Q.   Have you, Dr. Kaufman, having just
17   looked at this PDF document, having gone through
18   it, is there anything in there that you believe
19   from your own eyeballing it, pairing with what
20   you were there and observed, is there anything
21   that you think was inaccurate in those videos?
22   A.   Oh, I'm not, I'm not sure. I mean, I,
23   you know, I saw, you know, images and, you know,
24   it's just sort of a tangle of, of bodies. So
25   without going through it, I would not want to,

165

1    you know, commit and say yes. It looks all, all
2    kosher to me, especially in the context of, you
3    know, video being tampered in this case, tampered
4    with in this case.
5    Q.   Just, I guess I want to drill down a
6    little more. Is this one video or multiple videos
7    that had been tampered with?
8    A.   It was it; it was multiple videos that
9    had been tampered with.
10        MR. HUNT:  Hey, Mr. Link if you
11   want to give me five minutes, maybe we can try to
12   rustle it. It's got to be somewhere. Let me see
13   if we can rustle it up right quick. Let five
14   minutes.
15        MR. LINK:  I do need to see what's
16   being discussed. Yes, thank You.
17        MR. HUNT:  Okay.
18        MR. LINK:  We're off the video,
19   not, off the record. Off the screen. Off.
20        COURT REPORTER:  Yes, we are, at
21   3:35 p.m.
22   (OFF THE RECORD) (3:35 p.m.)
23   (WHEREUPON, a short break was taken.)
24   (ON THE RECORD) (3:40 p.m.)
25        COURT REPORTER:  We are on the



166

1  record at 3:40 PM
2          MR. HUNT: We took a break
3  regarding a forensics or anonymous forensics
4  report after consultation with prior counsel. The
5  report exists, but it's on a hard drive that he
6  has to extract the report. It's going to take a
7  few days to actually be able to get that, but we
8  should be able to provide it with the next seven
9  days, which would take us to March 4th. Well, I
10  guess it would be what, March 6th?
11          MR. LINK: That's fine. Wait, the
12  March 6th?
13          MR. HUNT: Yes. March 6th. Yes.
14          MR. LINK: Ms. Smith is scheduled
15  while I'm thinking about it, I might never think
16  about it...
17          MR. HUNT: March 6th, I want to do
18  the notice of deposition, probably in the morning
19  as long as that date is still fine, 10:10 a.m.
20          MR. LINK: Can I have a nod from
21  Mr. Erin?
22  (WHEREUPON, Mr. Weber indicated affirmatively.)
23          MR. LINK: Okay. Yes, that that
24  works.
25          MR. HUNT: Okay, perfect.

167

1          MR. LINK: That was on the record
2  where our court reporter
3          MR. HUNT: Yes. She put it on She
4  came back in, went on the record.
5          COURT REPORTER: Yes, it's on the
6  record.
7  CONTINUATION OF DIRECT EXAMINATION
8  BY MR. LINK:
9      Q.  While we're on this brief detour, I'll
10  just round it up and then I'll move on. Do you
11  have any information as far as who would be
12  responsible for tempering videos?
13      A.  Is that for me?
14      Q.  Yes.
15      A.  No, I have no idea.
16      Q.  I understand that you don't have an
17  expert witness who's going to say that videos
18  were tempered in this case, tampered with. Is
19  that true?
20      A.  Hughie?
21          MR. HUNT: I can't answer the
22  question for you so you're going to have to
23  answer the question the best way you know how.
24      A.  Yeah. I had not engaged a, a forensic
25  expert outside yet. I was just saying what this

168

1  case was going to do. But if we're moving
2  forward, I will definitely get a forensic expert.
3      Q.  Let me ask you this, just as the
4  witness, not as a lawyer. If you had truly felt
5  that the allegations in your case were based upon
6  fraud, what I hear you saying, why wouldn't you
7  have done it before today?
8          MR. HUNT: Objection to the form
9  of the question. You can answer.
10          DEPONENT: I can answer?
11          MR. HUNT: Yes, you can answer.
12      A.  So when you falsely accused me you, you
13  know, popped the genie out of the bottle, there's
14  no way I can, I can claw this back. So, you know,
15  just to save myself aggravation and save myself
16  expense, you know, I just pigeonholed this whole
17  farcical case of yours and didn't want to think
18  any more about it, but you can be sure that if
19  this keeps going forward, that we're going to
20  explore that.
21      Q.  Mr. Hunt, if as of when there's a
22  document, I would just reserve the right to it,
23  maybe after we're done with this deposition to
24  ask questions about it since I don't know what
25  I'm about to see.

169

1          MR. HUNT: Okay. Yes, I mean, what
2  I'm hearing is you want to keep the deposition
3  open for submission of the report.
4          MR. LINK: Whatever it is.
5          MR. HUNT: I'm assuming, I mean, I
6  don't know that you can, you want to try to
7  piggyback off of her deposition on that day?
8          MR. LINK: Why not, how long are
9  you going to be? We can talk about timeframes. We
10  don't...
11          MR. HUNT: Yes, I mean, we'll work
12  with you on that. I mean, I'm not worried about
13  that.
14          MR. LINK: Okay. Dr....
15          MR. HUNT: Let the record reflect
16  that. Dr. Weber gave the thumbs up.
17          MR. WABER: I, for the record, I'm
18  basically saying that I am of course willing to
19  be cooperative with opposing counsel. That was
20  what my thumbs up meant that. Mr. Hunt has been
21  very courteous and we're not making any
22  allegation that Mr. Hunt has done anything that
23  we're aware of.
24  CONTINUATION OF DIRECT EXAMINATION
25  BY MR. LINK:

  

170

1    Q.   The YouTube video that you gave
2 testimony about earlier today that you said was
3 destroyed, as best as you can tell us, when was
4 it destroyed?
5    Q.   No, it wasn't. to my knowledge, it has
6 not been destroyed because I'm, I'm not afraid of
7 anything that it shows or says. As I said, just
8 details and giving irresponsible persons more
9 details about my whereabouts.
10    Q.   I'm going to get personal here. You
11 said that it was deleted or taken down that, so
12 you, that's different than destroying it.
13    A.   Yeah, to my knowledge, it was not
14 destroyed. It was simply taken down.
15    Q.   Where is the receipt here today?
16    A.   Ms. Statt would have it.
17    Q.   How do you spell Statt?
18    A.   S-T-A-T-T.
19    Q.   Where is Ms. Statt?
20    A.   She's in Washington, DC.
21    Q.   Can you be more precise?
22    Q.   I don't have her address. I can provide
23 that, that for you. She was a Tai Chi student of
24 mine who could do web stuff.
25    Q.   Like the video still lives on in some

171

1 type of?
2    A.   To my knowledge, yes. I specifically
3 asked her about that a couple of years ago and
4 she says yes. At that time, it was still around.
5    Q.   Do you yourself have a YouTube channel?
6    A.   I think I do. I don't use it, but it's,
7 I want to start using it at some point in time in
8 the near future. But yes, it's, I guess I do, ,
9 it's a, it's a YouTube channel and it's got Tai
10 Chi stuff on it and chiropractic stuff on it.
11    Q.   I know that YouTube channels usually
12 have a name, right?
13    A.   Yes.
14    Q.   What's the name of it?
15    A.   I don't know, but I think it's either
16 Capitol Hill Tai Chi or Dr. David Walls-Kaufman.
17    Q.   In relation to this lawsuit that was
18 filed in August 21. Did you delete the video
19 after you learnt of this lawsuit?
20    A.   Yes.
21    Q.   To back up, you did tell the FBI that,
22 that video, the YouTube video of your interview
23 had been deleted?
24    A.   Yes. Taken down.
25    Q.   Told the court that had been deleted?

172

1    A.   I'm sorry?
2    Q.   You told the sentencing court in US
3 District Court, in DC that the video had been
4 deleted?
5    A.   I, I'd have to review my testimony. I
6 don't, I don't remember off the top of my head
7 remarking on it.
8    Q.   Anything else you deleted in connection
9 with this case besides the YouTube video?
10    Q.   Not to my knowledge.
11    Q.   Let me move on to a different topic. Do
12 you currently own any real estate?
13    A.   No.
14    Q.   At what point do you own 11 East
15 Capitol Street?
16    A.   Yes.
17    Q.   According to the land records of the DC
18 recorder of these?
19       MR. HUNT:  I'm sorry, Mr. Link,
20 let me, I got to deal with that. Sorry, somebody
21 just rang the doorbell me, let me just blow.
22       MR. LINK:  Okay, go.
23       MR. HUNT:  Sorry to interrupt, but
24 please continue.
25    Q.   According to the records of the DC

173

1 recorder of the office, that property was sold in
2 September, 2023?
3    A.   I'm going to refuse to answer.
4       MR. HUNT:  You can answer that
5 question.
6    A.   Okay.
7    Q.   There's public record. Right?
8    A.   Yes.
9    Q.   According to the deed, it was signed by
10 Nervine Sorta, S-O-R-T-A, is that your
11 girlfriend?
12       MR. HUNT:  Objection.
13    A.   No
14       MR. HUNT:  I understand where
15 you're going with this and you're entitled to ask
16 some questions about property owns, but his
17 motivation and all that, that's just, that's
18 collections. It's not a collections case just
19 yet.
20       MR. LINK:  Well, I think we are
21 entitled with this information on the property
22 that he owns.
23       MR. HUNT:  He doesn't own it
24 anymore. He sold it.
25       MR. LINK:  But there would be



174

1 proof of these.
2         MR. HUNT: Yes, but that's
3 collections brother. I got to object on that one.
4         MR. WABER: Mr. Hunt...
5         MR. HUNT: I would like...
6         MR. WABER: Excuse me, Mr. Hunt, I
7 would like to draw to your attention the case of
8 Freeman versus Rudolph Giuliani, 2023 Westlaw
9 11926310, filed in the District of Columbia,
10 United States District Court and signed by the
11 chief judge of the United States District Court
12 indicating that discovery was permitted as to all
13 financial records, prejudgment of another January
14 6th defendant, Mr. Giuliani, and that it was
15 permitted both because it was appropriate
16 discovery as to Mr. Giuliani's motivations and
17 because the plaintiffs were seeking punitive
18 damages. As such a binder of fact, including both
19 the court and the jury were entitled to consider
20 such issues as punitive damages. Both of these
21 findings are identical in our case, and we will
22 be prepared...
23         MR. HUNT: I'm looking at the case
24 right now. What is the Georgia case? I think here
25 we see.

175

1         MR. WABER: Sir, I'm referring to
2 a case involving the chief judge of TDC and it
3 has since been cited by other courts.
4         MR. HUNT: I'm just making sure I
5 got the right case. This is it I think.
6         DEPONENT: Well, is this a January
7 6th case?
8         MR. HUNT: There's no question
9 Mr., Dr. Kaufman. Is there a specific site, like
10 a page you want me to go to or? I mean, I'm
11 trying to look for the actual site. This is, do
12 you have the actual cited place that you want me
13 to go look? Because that's the entire case. I'm
14 assuming there's language you want me to see that
15 says discovery on assets, free judgment is
16 allowed?
17         MR. WABER: Yes. If you go to, I'm
18 confused as to whether it's page six of the
19 Westlaw or Lexis.
20         MR. HUNT: That's it. Let me get
21 the site again. It's, but it Freeman versus
22 Giuliani, correct?
23         MR. WABER: Yes.
24         MR. LINK: The version I have is
25 only three pages for the record.

176

1         MR. WABER: We're on the final
2 page of the decision.
3         MR. HUNT: Yes, I'm okay. Yes. I'm
4 on case text and it's the 2022 decision.
5         MR. WABER: No, this is not a 2022
6 decision. I'll read you what it says. I'm, this
7 is court reporter. May I share the screen?
8         COURT REPORTER: Yes, you may.
9         MR. WABER: Mr. Hunt, you able to
10 see the screen?
11         MR. HUNT: Yes, I can see it.
12         MR. WABER: Here where my cursor
13 is. My contrast here. Defendant's financial
14 condition is relevant both to liability and
15 punitive damages. Plaintiff's argues...
16         MR. HUNT: This is not relative,
17 relevant to liability. Has nothing to do with
18 liability.
19         MR. WABER: The plaintiff's argue
20 these financial records, including changes in the
21 defendant's financial status over time may
22 indicate that defendant has a financial motive to
23 make certain claims to allow him to earn
24 additional income or increase viewership, and
25 then it gives a bunch of sightings.

177

1         MR. HUNT: Yes, but this doesn't
2 have, even if we accept that part, this has
3 nothing to do with liability.
4         MR. LINK: This was; this was pre
5 liability stage in this decision.
6         MR. HUNT: Yes, but what it, just
7 reading that order, it says it has, in that case,
8 his actions had to do with liability and damages,
9 any action. Okay?
10         MR. WABER: You can...
11         MR. HUNT: You can make a record.
12         MR. WABER: Yes, but you can make
13 a record. We can get the judge on the phone now
14 if we have to go ahead asking these questions.
15         MR. HUNT: Go ahead, call the
16 judge.
17         MR. WABER: No, we don't need to
18 call the judge unless you're going to instruct
19 clients and refuse to answer the questions.
20         MR. HUNT: Well, I don't know what
21 I'm going to refuse for him to answer ask. But
22 anytime you go into a this is a TOR case. I've
23 never seen a defendant go into deep detail on a
24 defendant's financial situation. That's why we
25 law...





178

1        MR. LINK: I did well then also
2   perform jury instruction on punitive damages,
3   does allow the jury to consider financial
4   condition of the defendant along all factors. I
5   think under that we review detail to this
6   information.
7        MR. HUNT: Okay.
8        MR. LINK: That's my two cents. I
9   did look at the jury instruction before.
10        MR. HUNT: All right.
11        MR. WABER: I'm sorry, I got hot.
12   It's not you Mr., I know you're doing your job.
13        MR. HUNT: Go ahead.
14        MR. LINK: I was stuck on a deed.
15   CONTINUATION OF DIRECT EXAMINATION
16   BY MR. LINK:
17     Q.   Were you locked up when the property
18   was sold to get to the chain?
19     A.   Yes, I was.
20     Q.   Is that why you had the Devine Sorta to
21   sign the deed?
22     A.   Yes.
23     Q.   Did you finance the sale of the
24   property or the purchase, whatever you wanted to
25   say?

179

1     A.   Yes, I did.
2     Q.   The property was purchased by 411 East
3   Capitol LLC?
4     A.   Yes.
5     Q.   Have you been to the property since you
6   sold it?
7     A.   Yes.
8     Q.   In what connection?
9     A.   I think I picked up mail.
10     Q.   Besides that?
11     A.   I don't believe so. I've been past it.
12     Q.   Before this all went down, did you know
13   Mr. Jeff Levi, who's the president of 411 East
14   Capitol LLC?
15     A.   No, I did not.
16     Q.   According to Mr. Google, he is a
17   specialty lending may be a hard money lender for
18   his company's. Are you aware of that?
19     A.   I think he does real estate. That's the
20   extent of my knowledge.
21     Q.   If you know, do you know why that
22   entity financed the purchase?
23     A.   Well, did I finance the purchase?
24     Q.   Yes. Why did they obtain financing to
25   purchase the property, do you know?

180

1     A.   He told me that he wanted an office
2   closer to home.
3     Q.   Are they paying you every month out of
4   the note?
5     A.   Yes.
6     Q.   Is this a balloon note? It's supposed
7   to come due in 2028? Is that how it's supposed to
8   work?
9     A.   Yes. It has an option for 2030.
10     Q.   How much is he paying you? How much is
11   the buyer paying you?
12     A.   Monthly?
13     Q.   Yes.
14     A.   I think $2,100, $2,200, something like
15   that.
16     Q.   Other than that, do you own any real
17   estate?
18     A.   No.
19     Q.   Have you owned any real estate in the
20   last three years?
21     A.   How many years?
22     Q.   Three years?
23     A.   No.
24     Q.   Do you not own a, have any interest in
25   any business of any kind?

181

1     A.   No.
2     Q.   In connection with your public, your
3   books, do you receive income from that?
4     A.   No. Not really. No.
5     Q.   Like when people go in Amazon and buy
6   your books, you don't get paid?
7     A.   Well, it's on hold. because Amazon
8   wanted to pick up Robot Archangel, so it, it was
9   to be rereleased. That's not happened.
10     Q.   When's the last time you got any money
11   from the books?
12     A.   About a year ago.
13     Q.   How much did you get left? That was in
14   2024?
15     A.   Yes.
16     Q.   How much did you obtain in that?
17     A.   You know, very little. I haven't been
18   able to pro the Robot Archangel came out right
19   when this happened, so I couldn't promote the
20   book.
21     Q.   Less than $10,000. You were about to
22   say very little. I don't know what that means?
23     A.   Yeah, less than a thousand.
24     Q.   You told me earlier today you're not
25   currently employed other than maybe being a


VETERAN
REPORTERS




855.667.0077
VETERANREPORTERS.COM

182

1  writer?
2      A.  Right.
3      Q.  How do you support yourself?
4      A.  The mortgage payment and a social
5  security check.
6      Q.  What, at what age did you start
7  collecting social security?
8      A.  Last year?
9      Q.  Sixty-six?
10     A.  Sixty-seven.
11     Q.  Are you familiar with an answer you
12  called Counsel on Chiropractic Practice?
13     A.  Yes.
14     Q.  Is that different than the organization
15  we talked about earlier today?
16     A.  Yes.
17     Q.  What is the Counsel on Chiropractic
18  Practice?
19     A.  Counsel on Chiropractic Practice is a
20  committee that defines chiropractic practice
21  guidelines.
22     Q.  Did you make money from that entity?
23     A.  No.
24     Q.  Are you a board member of officer or
25  something else with that entity?

183

1      A.  No, I was, I was, treasurer at one
2  point.
3      Q.  Since 21 have you had any paid position
4  with that entity?
5      A.  No.
6      Q.  Ever talked about all the professional
7  organizations that you have any association with?
8      A.  I'm sorry?
9      Q.  Have you told me about all the
10  professional organizations that you're associated
11  with?
12     A.  Yeah. I'm thinking about joining a new
13  one that's, that's dealing with chiropractic
14  education. There's, there's no money associated
15  in any of that.
16     Q.  No money associated with your
17  professional associations?
18     A.  Right.
19     Q.  Do you have a car?
20     A.  Yes.
21     Q.  Do you have a motorcycle?
22     A.  No.
23     Q.  You have a boat?
24     A.  No.
25     Q.  Airplane?

184

1      A.  No.
2      Q.  What kind of car do you have?
3      A.  I have a Hyundai Elantra and I have an
4  Alfa Romeo.
5      Q.  You still look the word I'm familiar
6  with. What year is your Hyundai Elantra?
7      A.  2025. It is a lease.
8      Q.  You're paying monthly on a lease?
9      A.  Yes.
10     Q.  Then Alfa Romeo, is that owned free and
11  clear by you?
12     A.  No. No.
13     Q.  What year is that vehicle?
14     A.  2023.
15     Q.  How much is a 20, how much is an Alfa
16  worth?
17     A.  That car is probably worth I, I don't
18  know. I would say, I'd say $35,000.
19     Q.  You owe any money on it?
20     A.  Yes.
21     Q.  How much do you owe?
22     A.  I think I owe $40,000.
23     Q.  You're underwater on your Alfa Romeo?
24     A.  Probably.
25     Q.  Anything else with an engine in it?

185

1      A.  No.
2      Q.  Does anybody besides 411 East Capitol
3  LLC owe you any money?
4      A.  No.
5      Q.  Did anybody die from whom you expect to
6  inherit?
7      A.  Yes, my mother recently died.
8      Q.  Is that under probate?
9      A.  Yes. Well, actually, I, I don't know.
10  I, I'm not really technically sure if it is under
11  probate. I don't think it is. Oh, my stepmother
12  passed away over a, over a year ago. That is in
13  probate with my sister. That's not going to be
14  much money and neither is my mom's.
15     Q.  Can you give me an estimate where you
16  say not much money?
17     A.  I would say that I, I would probably
18  get $15,000 from my stepmom's estate and my mom
19  had a, a big waive to me, a $67,000 stock
20  portfolio for mutual fund portfolio.
21     Q.  What's your mom's name?
22     A.  Catherine Holt Kaufman.
23     Q.  Step-mother?
24     A.  Phyllis Perry.
25     Q.  P?





186

1    A.  P-E-R-R-Y.
2    Q.  Do you have any other assets of
3 significant time?
4    A.  Yes.
5    Q.  What else?
6    A.  I'm sorry?
7    Q.  What else besides what you told us?
8    A.  Stock portfolio.
9    Q.  Is that under management with somebody?
10    A.  No.
11    Q.  You manage your own stocks?
12    A.  Yes.
13    Q.  What do you estimate that would be?
14    A.  $800.
15    Q.  Same question I had asked you. Any
16 other significant property, is there anything
17 else besides what you told them?
18    A.  No.
19    Q.  You get the balloon belt in 2028 or
20 whenever it comes due, what is your expectation?
21 How much you get?
22    A.  I, I can't remember. I think it might
23 have been maybe $500,000.
24    Q.  You financed like $850,000 in 2023?
25    A.  The purchase price was $1 million.

187

1    Q.  Have you sold, transferred, or given
2 away any property or would say a thousand,
3 $10,000 in the last three years?
4    A.  No.
5    Q.  Other than the house you told us about?
6    A.  No.
7    Q.  Are you current on your car note?
8    A.  Yes.
9    Q.  Where do the, what's the source of
10 funds for that?
11    A.  Bank of America.
12    Q.  How much do you estimate you earned in
13 2024?
14    A.  I would say, it's really hard to say
15 because the practice was bringing in very little
16 money, and my account is in arrears on filing due
17 to Covid. I, I don't, I don't think I made money
18 and 2024 compared with my expenses. My income, I
19 don't think I had income until the car note of
20 the Social Security. So probably maybe $10,000.
21    Q.  Would it be the same or different in
22 2023?
23    A.  Again, she has not done those, those
24 taxes and there was that practice was making
25 very, very little money.

188

1    Q.  Are you saying that you are not current
2 in your tax filing?
3    A.  Yes, that's correct. She filed for
4 extensions.
5    Q.  2023 would've been due. Regardless of
6 that hasn't been filed?
7    A.  I, I don't know.
8    Q.  Do you expect to afford the IRS money?
9    A.  Yes, I do.
10    Q.  How much do you expect to have to pay?
11    A.  I have no idea.
12    Q.  Other than the tax that the car, do you
13 have any other credit?
14    A.  I can't think of any.
15    Q.  Who's your accountant?
16    A.  Justine Wilborn.
17    Q.  Yes, sir. Are you saying your
18 accountant is delinquent or you're delinquent on
19 filing your taxes?
20    A.  She's delinquent.
21    MR. HUNT:  Objection to the form
22 of the question. I mean, ultimately it's his tax
23 responsibility.
24    Q.  Fair enough. I'll take that. Do you
25 have a look for a new accountant?

189

1    A.  No.
2    MR. LINK:  I want to take a little
3 break here. I have to use a little boys room.
4    MR. WABER:  No, you're human after
5 all, I mean.
6    MR. LINK:  I appreciate that.
7    COURT REPORTER:  All right, we are
8 off the record at 4:16 p.m.
9 (OFF THE RECORD) (4:16 p.m.)
10 (WHEREUPON, a short break was taken.)
11 (ON THE RECORD) (4:27 p.m.)
12    COURT REPORTER:  Okay, and the
13 time is 4:27 p.m. We are back on the record.
14 CONTINUATION OF DIRECT EXAMINATION
15 BY MR. LINK:
16    Q.  Just Dr. Kaufman, just a few other
17 follow up questions. Do you have any idea how
18 much you're going to owe when the tax bill comes
19 to you?
20    A.  No.
21    Q.  Has anybody given you an estimate?
22    A.  No.
23    Q.  Do you remember the year that you last
24 filed for taxes?
25    A.  I guess it was three years ago.





855.667.0077
VETERANREPORTERS.COM

190

1    Q.   2021. You recall that April, 2020,
2 October 2022?
3    A.   I don't know, 2021 or 2022 on that.
4 Yeah, I'm just not sure.
5    Q.   You, well, is there any reason other
6 than your accountant issue that you have not
7 taken care of what would've been come due in the
8 last few years in terms of taxes?
9    A.   No. It's just her, it was just that.
10    Q.   Are you aware that taxes are due taxes,
11 returns need to be filed one on extension by
12 October of each year? Are you aware of that?
13    A.   No. My emails were about a month ago
14 and she said everything was okay.
15    Q.   Your testimony about the car, I think
16 you said you is it Bank of America that financed
17 the Alfa Romeo?
18    A.   Yes.
19    Q.   Separate from that, do you have money
20 in the bank?
21    A.   Yes.
22    Q.   Approximately how much?
23    A.   $3,000.
24    Q.   Is that all of your bank checking
25 savings, money market?

191

1    A.   Yes.
2    Q.   The stocks that you manage, is that
3 what some company that you manage on your own,
4 like a platform that you use?
5    A.   Fidelity.
6    Q.   Going well earlier today, it sounded
7 like your LLC is no longer in good standing with
8 the CRA or whatever they call themselves now?
9    A.   Correct.
10    Q.   Do you have any interest with any other
11 ownership interest in any other entity?
12    A.   No.
13    Q.   By entity, your incorporation, LLC
14 partnership?
15    A.   No.
16    Q.   Have you had one in the last three
17 years?
18    A.   No.
19    Q.   Bettina Staff, is that the person who
20 you said is, has connection with the YouTube
21 account?
22    A.   Yes.
23    Q.   Is she an employee or a former employee
24 of yours?
25    A.   She had, she had worked for me in my

192

1 office as my front desk person for a little while
2 before I closed the office.
3    Q.   When did you last work for you?
4    A.   Up until when I closed the office.
5    Q.   How many years?
6    A.   Last, last April.
7    Q.   Like as of January 21, was she an
8 employee of yours?
9    A.   I think that's when she started doing
10 some work for me. My, my previous receptionist
11 was having some personal issues and I was having
12 to miss work, so Staff filled in.
13    Q.   I asked you earlier today about, do you
14 recall appearing a sentencing in federal court,
15 correct?
16    A.   I'm, you mean related to January 6th?
17    Q.   Correct?
18    A.   Yes.
19    Q.   Obviously that was a big day, a court
20 day?
21    A.   Yes.
22    Q.   Did they take you away that same day
23 or, or did they let you self-surrender to the
24 court?
25    A.   They let me self-surrender.

193

1    Q.   I think the judge gave you what, three
2 months?
3    A.   Two months.
4    Q.   Two months. Do you remember at the
5 sentencing the issue of your YouTube account came
6 up?
7    A.   Maybe it did. I'm not, I'm not really
8 sure.
9    Q.   Would you agree you don't remember all
10 the details what happened at the sentencing?
11    A.   Yes, I would, I would, agree that I
12 don't remember all the details.
13    Q.   Would you agree similarly; you don't
14 remember all the details of what happened when
15 you were in the Capitol building on January 6th?
16    A.   I remember all the important ones.
17    Q.   Lastly, I did provide, sent to your
18 counsel, an amended notice of deposition with
19 certain documents. I don't know if I can direct
20 this to you or your counsel, but do you have
21 those documents with you today?
22    A.   The documents pertaining to the
23 forensic analysis?
24    Q.   No. There were financial documents. Mr.
25 Hunt are you there?







VETERAN REPORTERS

855.667.0077
VETERANREPORTERS.COM

194

1      MR. HUNT: Yes, I'm here.
2      MR. LINK: I don't think you
3  looked at my screen.
4      MR. HUNT: I'm here. Let me see.
5  To be honest with you, you can look at the notice
6  here. What were you looking for?
7      MR. LINK: There was a request for
8  financial documents. Well, here, here's what I
9  would like to do given that the lateness of the
10  hour.
11      MR. HUNT: Okay.
12      MR. LINK: If we could, we might
13  have to come back when we deal with this
14  anonymous letter thing.
15      MR. HUNT: Okay.
16      MR. LINK: If you could, if we
17  could hold the record open, if there's anything
18  in there, I would, be lengthy, but I would, if
19  there's something that...
20      MR. HUNT: Yes, you don't get to
21  read the closing right here.
22      MR. LINK: As it pertains to those
23  documents I would want to see that.
24      MR. HUNT: I have no, no
25  objection.

196

1  Yes.
2      DEPONENT: No, I'm fine with it.
3  I'm fine with it.
4      MR. HUNT: You waive his right to
5  read.
6      COURT REPORTER: Thank you. The
7  deposition...
8      MR. LINK: Thank you. Have a good
9  evening.
10      COURT REPORTER: The deposition is
11  concluded at 4:37 p.m.
12  (WHEREUPON, the Deposition of DAVID CHADWICK
13  WALLS-KAUFMAN, D.C. was concluded at 4:37 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

195

1      MR. LINK: You think you're going
2  to be doing this Smith at 10 o'clock on what? The
3  sixth?
4      MR. HUNT: Yes, I'll have the
5  notice tomorrow, as long as that still works.
6      MR. WABER: To confirm, is that
7  via Zoom or in person?
8      MR. HUNT: No, no Zoom. Who wants
9  to come to Greenville?
10      MR. LINK: Hold on that note.
11  We're completed for today.
12      MR. HUNT: Yes, sir.
13      MR. LINK: Don't make fun of
14  Prince George's County.
15      MR. HUNT: Now we are concluded
16  for today it's being held open. You have the
17  absolute right to read your deposition before
18  it's entered to check for, you know, error, you
19  know, check for spelling problems, you know,
20  can't change your testimony we did want to change
21  it you'd be subject to read deposition. You want
22  to read your deposition before it's entered or do
23  you want to waive that right?
24      DEPONENT: You mean me, Hughie?
25      MR. HUNT: Yes, you the witness.

197

1              CAPTION
2
3  The deposition of DAVID CHADWICK WALLS-KAUFMAN, D.C.,
4  taken in the matter, on the date, and at the time and
5  place set out on the title page hereof.
6
7  It was requested that the deposition be taken by the
8  reporter and that the same be reduced to typewritten
9  form.
10
11  It was agreed by and between counsel and the parties
12  that the deponent will read and sign the transcript
13  of said deposition.
14
15
16
17
18
19
20
21
22
23
24
25





855.667.0077
VETERANREPORTERS.COM

198

1    CERTIFICATE OF REPORTER AND SECURE
ENCRYPTED
2    SIGNATURE AND DELIVERY OF CERTIFIED TRANSCRIPT
3    I, TAMARA LAQETIA ADAMS, Notary Public, do
4  hereby certify that the forgoing matter was reported
5  by stenographic and/or mechanical means, that same
6  was reduced to written form, that the transcript
7  prepared by me or under my direction, is a true and
8  accurate record of same to the best of my knowledge
9  and ability; that there is no relation nor employment
10  by any attorney or counsel employed by the parties
11  hereto, nor financial or otherwise interest in the
12  action filed or its outcome.
13    This transcript and certificate have been
14  digitally signed and securely delivered through our
15  encryption server.
16    IN WITNESS HEREOF, I have here unto set my hand
17  this 9TH day of APRIL, 2025.
18
19
20
21
22
23  /s/ TAMARA LAQETIA ADAMS
24  COURT REPORTER / NOTARY
25  MY COMMISSION EXPIRES:  04/12/2027





**VETERAN
REPORTERS**

**855.667.0077**
VETERANREPORTERS.COM